UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Cause No. |
| Plaintiff, | ) | 1:18-mj-0776 |
| | ) | Indianapolis, Indiana |
| vs. | ) | **August 21, 2018** |
| | ) | 3:34 p.m. |
| NOLAN BREWER, | ) | |
| | ) | **VOLUME I** |
| Defendant. | ) | |


**Before the Honorable**
**MARK J. DINSMORE**

OFFICIAL REPORTER'S TRANSCRIPT OF
DETENTION HEARING


**For Plaintiff:**                Nicholas Linder, Esq.
                                 Assistant U.S. Attorney
                                 United States Attorney's Office
                                 Suite 2100
                                 10 West Market Street
                                 Indianapolis, IN  46204


**For Defendant:**               Harold Samuel Ansell, Esq.
                                 Suite 900
                                 156 East Market Street
                                 Indianapolis, IN  46204




Court Reporter:                  David W. Moxley, RMR, CRR, CMRS
                                 United States District Court
                                 46 East Ohio Street, Room 340
                                 Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY AUDIO RECORDING
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

# **I N D E X**

**GOVERNMENT'S WITNESS:**                                    **PAGE**

BRADLEY A. BOOKWALTER

Direct Examination by Mr. Linder ................9
Cross-examination by Mr. Ansell ...............53
Redirect examination by Mr. Linder ............71
Recross-examination by Mr. Ansell .............74


**DEFENDANT'S WITNESSES:**                                  **PAGE**

JEFFREY L. BREWER

Direct Examination by Mr. Ansell ..............76
Cross-examination by Mr. Linder ...............87
Redirect Examination by Mr. Ansell ............92
Redirect Examination by Mr. Ansell ............94

JEAN K. HOLLAND

Direct Examination by Mr. Ansell ..............95
Cross-examination by Mr. Linder ...............97

DAVID McCAULEY

Direct Examination by Mr. Ansell ..............100
Cross-examination by Mr. Linder ...............103

# I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:**                                    **PAGE**

1 ............................................9
2 ............................................9
3 ............................................9
4 ............................................9
5 ............................................9
6 ............................................9
7 ............................................9
8 ............................................9
9 ............................................9
10 ...........................................9

11 ...........................................9
12 ...........................................9
13 ...........................................9
14 ...........................................9
15 ...........................................9
16 ...........................................9
17 ...........................................9
18 ...........................................9
19 ...........................................9
20 ...........................................9
21 ...........................................9

22 ...........................................9
23 ...........................................9
24 ...........................................9
25 ...........................................9
26 ...........................................9
27 ...........................................9
28 ...........................................9

Vol. 1-4

1                        (In open court.)

2          THE COURT:  It is 3:34 p.m., Tuesday, August 21,

3   2018.  We're here on the matter of United States versus Nolan

4   Brewer, 1:18-mj-776.  For the United States, Nick Linder; for

5   the defendant, Sam Ansell; for the United States Probation

6   Office, Ryan Harrold.  We are here -- this is United States

7   Magistrate Judge Mark J. Dinsmore.  The record is electronic.

8   We're here for probable cause hearing and a detention hearing

9   in this matter.

10          Mr. Brewer, at the outset, I'll remind you, you have

11  the right to remain silent.  Anything you say can and may be

12  used against you.  If you've made a statement in the past, you

13  have the right to make no further statements.  If you begin to

14  make a statement, you may stop at any time.  Your right to

15  remain silent applies to any statement of any kind, including

16  out-of-court statements to the United States Marshals, the

17  United States Attorneys, or anyone else.  If you do decide to

18  make a statement, you have the right to have your counsel

19  present when that statement is made.

20          You have the right to counsel.  That right applies

21  at every critical step of these proceedings against you.  You

22  always have the right to hire counsel at your own expense.  If

23  you cannot afford to hire counsel, counsel will be appointed

24  for you.  In this case, the Court has appointed Mr. Ansell to

25  represent you in this matter.

Vol. 1-5

1        Now I'd just like to ask you a few questions to make

2  sure you have the ability to understand the proceeding today.

3        Mr. Ansell, if you could hit that red button and

4  push that a little closer to him.

5        Mr. Brewer, how old are you?

6        THE DEFENDANT:  I'm 20.

7        THE COURT:  And how many years of schooling have you

8  completed?

9        THE DEFENDANT:  I've completed high school and a

10  general studies diploma at Ivy Tech.

11        THE COURT:  All right.  Are you able to read and

12  write the English language?

13        THE DEFENDANT:  Yes.

14        THE COURT:  Are you currently under the influence of

15  any medication or other substance that could affect your

16  ability to understand what we're doing here today?

17        THE DEFENDANT:  No.

18        THE COURT:  All right.  Mr. Ansell, this matter was

19  scheduled for a preliminary hearing.  Is it still your

20  client's desire to proceed with a preliminary hearing in this

21  matter?

22        MR. ANSELL:  No, Your Honor.  We'll waive probable

23  cause.

24        THE COURT:  All right.  Very well.  And this matter

25  was also set on the United States' motion seeking to have

Vol. 1-6

1   Mr. Brewer detained pending trial in this matter.  Mr. Linder,

2   could you briefly state for the record the bases upon which

3   detention is being sought and the standard that the United

4   States believes applies to the Court's determination of the

5   detention issue?

6             MR. LINDER:  Your Honor, the United States is

7   seeking detention under the Bail Reform Act and must show, by

8   clear and convincing evidence, that the defendant poses a

9   danger to the community and that there are no conditions or

10  combinations of conditions that can reasonably assure the

11  community's safety.

12            During the prior hearing in front of Judge Baker, we

13  reserved the right to present evidence as to risk of flight.

14  At this time, we will not be proceeding on that basis.  Our

15  testimony and evidence today will focus on danger to the

16  community.

17            THE COURT:  Very well.

18            MR. LINDER:  Thank you.

19            THE COURT:  Mr. Ansell, do you agree that the

20  appropriate standard for danger to the community is clear and

21  convincing evidence?

22            MR. ANSELL:  Yes, Your Honor.

23            THE COURT:  All right.  I have before me a Pretrial

24  Services report, a PS3, dated August 16, 2018.  Do the parties

25  have any premarked exhibits?

Vol. 1-7

1          MR. LINDER:  Yes, Your Honor.

2          THE COURT:  Did you use numbers or letters?

3          MR. LINDER:  Numbers, Your Honor.

4          THE COURT:  I would propose to mark the PS3 as

5  Exhibit -- do you have any, Mr. Ansell?

6          MR. ANSELL:  I do not, Judge.

7          THE COURT:  Okay.  I propose to mark the PS3 as

8  Exhibit A to this hearing.  Is there any objection from the

9  United States?

10          MR. LINDER:  No, Your Honor.

11          THE COURT:  Does the United States have any proposed

12  corrections or changes to Exhibit A?

13          MR. LINDER:  No, Your Honor.

14          THE COURT:  Mr. Ansell, any objection to marking the

15  PS3 as Exhibit A?

16          MR. ANSELL:  No, Your Honor.

17          THE COURT:  Do you have any proposed corrections or

18  changes to Exhibit A?

19          MR. ANSELL:  I do not.

20          THE COURT:  Very well.

21          Mr. Linder, the United States bears the burden.  You

22  may proceed.

23          MR. LINDER:  Thank you, Your Honor.  At this time,

24  the United States would call FBI Special Agent Bradley

25  Bookwalter.

Vol. 1-8

1          THE COURT:  Raise your right hand.

2          (The witness is sworn.)

3          THE COURT:  Mr. Linder.

4          MR. LINDER:  Thank you, Your Honor.  Your Honor,

5   before I examine the witness, just a logistical -- brief

6   logistical matter.  I've furnished the Court, defense counsel,

7   and actually the witness has, as well, a copy of the exhibits

8   we intend to introduce in this proceeding.  They're premarked

9   Exhibits -- Government's Exhibits 1 to 28, and I'll refer to

10  them as we move along here.  And so everyone has a copy.

11         THE COURT:  Thank you very much.

12         MR. LINDER:  And, in fact, before I begin, just a

13  moment, Your Honor.  I'll try to expedite things.

14         (Off the record.)

15         MR. LINDER:  Your Honor, again, before we begin, a

16  logistical point to try to speed things along.  At this time,

17  it's the government's understanding that defense counsel would

18  not object to the introduction of all the exhibits into

19  evidence at this -- for the purposes of this proceeding.  So

20  at this time, the United States would move into evidence

21  Government's Exhibits 1 to 28.

22         THE COURT:  Mr. Ansell, any objection?

23         MR. ANSELL:  No objection, Your Honor.

24         THE COURT:  All right.  Exhibits 1 through 28 are

25  admitted for purposes of this hearing.

*BOOKWALTER - DIRECT/LINDER*          Vol. 1-9

 1          *(Government's Exhibits 1 - 28 were*

 2               *received in evidence.)*

 3          MR. LINDER:  Very well.  Thank you, Your Honor, may

 4   it please the Court.

 5       **BRADLEY A. BOOKWALTER, GOVERNMENT'S WITNESS, SWORN**

 6                    **DIRECT EXAMINATION**

 7   BY MR. LINDER:

 8   Q.  Sir, could you please tell the Court your name and spell

 9   it for the record.

10   A.  My name is Bradley A. Bookwalter, B-O-O-K-W-A-L-T-E-R.

11   Q.  Mr. Bookwalter, how are you employed?

12   A.  I'm a special agent with the Federal Bureau of

13   Investigation.

14   Q.  And how long have you been an FBI special agent?

15   A.  Over 21 years.

16   Q.  And 21 years ago, did you begin your academy training at

17   the FBI Academy in -- begin your career training at the FBI

18   Academy in Quantico, Virginia?

19   A.  I did, approximately 23 years ago, yes.

20   Q.  And have you received additional training along your way

21   throughout your career?

22   A.  Yes, I have.

23   Q.  And what is your area of responsibility presently?

24   A.  I'm assigned to our public corruption squad, public

25   corruption civil rights squad.  I investigate violations along

1  those lines of public -- public corruption and/or civil rights

2  matters.

3  Q.  And that's a squad that focuses on criminal matters; is

4  that right?

5  A.  Yes.

6  Q.  And do you have experience conducting criminal

7  investigations throughout your career?

8  A.  I do.

9  Q.  Very roughly, how many investigations do you think you've

10  been a part of?

11  A.  A lot.  I don't know that I could estimate the number.

12  It's hundreds.

13  Q.  It's been a long career?

14  A.  Yes.

15  Q.  Do you have experience conducting investigations involving

16  criminal violations of the civil rights laws?

17  A.  I do.

18  Q.  Do you have experience executing search warrants?

19  A.  I do.

20  Q.  And do you have experience interviewing subjects or

21  targets of investigations?

22  A.  Yes, I do.

23  Q.  Would you say, with respect to all of those things, your

24  experience is extensive?

25  A.  I would not say that charge -- or civil rights violations

1  or charging civil rights violations are as extensive, but I

2  would say overseeing those and my broad range of experience,

3  yes, it is extensive.

4  Q.  With respect to investigations?

5  A.  Yes.

6  Q.  All right.  Now, what I want to talk to you about today

7  are several related subjects, starting with the weight of the

8  evidence against this defendant and turning to the nature and

9  circumstances of the offense charged, and then the nature and

10 dangerousness or seriousness of the danger posed by this

11 defendant.  So let's just start out with the evidence

12 against -- with respect to this charge.  Do you recognize this

13 defendant here?

14 A.  Yes, I do.

15 Q.  And how do you recognize him?

16 A.  I interviewed him and I arrested him.

17 Q.  And what crime is he charged with?

18 A.  Conspiracy against the right to hold property free from

19 racial discrimination.

20 Q.  And it's commonly known as a criminal civil rights

21 violation?

22 A.  Yes.  It's in Title 18 United States Code, Section 241(a).

23 Q.  And was there a criminal complaint filed against the

24 defendant?

25 A.  Yes.

1  Q.  And were you the affiant of that complaint?

2  A.  Yes, I was.

3  Q.  If you'd turn to tab 1 in your binder there, is that a

4  copy of the criminal complaint?

5  A.  Yes, it is.

6  Q.  And do you stand by those allegations today?

7  A.  I do.

8  Q.  They would be your testimony if I asked you to redo the

9  whole thing?

10  A.  Yes, they would.

11  Q.  For expediency, I won't do that, but I do want to talk a

12  little bit about some of the allegations, particularly those

13  at paragraph 24 and its subparagraphs.  If you could turn to

14  that, please.  It's on page 7.

15          And, actually, turn to page 8.  It contains the

16  substance of the subparagraphs.

17          Did you talk with the defendant on the day he was

18  arrested?

19  A.  Yes, I did.

20  Q.  And for about how long?

21  A.  Approximately two hours.

22  Q.  And he voluntarily offered to talk with you?

23  A.  Yes.

24  Q.  And did he talk with you about the offense as charged?

25  A.  He did.

1  Q.  And taking a look at these paragraphs on page 8, starting

2  with A and then go down to page 9, to G, does this summarize

3  the substance of what he told you in a very general sense?

4  A.  Yes, it does.

5  Q.  So, for example, paragraph A says he -- the defendant

6  admitted that he conspired with another person, another

7  individual, who is known to you, to paint Nazi graffiti on the

8  premises of a synagogue in Carmel; is that correct?

9  A.  Yes, that's correct.

10  Q.  And he admitted that he and his co-conspirator purchased

11  materials to do that in advance; is that right?

12  A.  Yes.

13  Q.  And he also admitted that he and his co-conspirator made

14  what he referred to as homemade napalm; is that correct?

15  A.  Yes.

16  Q.  And that he lit a fire with that homemade napalm during

17  the incident; is that right?

18  A.  Yes, that he put it on the ground and his co-conspirator

19  lit it on fire.

20  Q.  And at some period of time during the interview, did you

21  happen to show him a picture of the scene as law enforcement

22  had taken it, of the crime scene?

23  A.  Yes.

24  Q.  And if -- if we would turn to Exhibit Number 2, is this

25  the photograph, or one of the photographs, that you showed

1  him?

2  A.  Yes, it is.

3  Q.  And is there anything that you asked him about this?

4  A.  I asked him several questions regarding it, yes.

5  Q.  Did he -- did he -- did you ask him why he did this?

6  A.  Yes.  I asked him -- I'm sorry.  I asked him the message

7  that was being sent by this.

8  Q.  And what did he say?

9  A.  He said that the message -- the message was to get out.

10  Q.  And did he say what the purpose of doing this was?

11  A.  Yes.  The purpose was to -- to -- I apologize.  The

12  purpose was to send a message to the ethnic Jews at this

13  synagogue.

14  Q.  And did he intend the ethnic Jews, so to speak, as he

15  refers to them, or whoever the audience of this message was,

16  did he intend them to experience some kind of emotion by

17  seeing this?

18  A.  Yes.

19  Q.  What was that?

20       Let me rephrase.  Did he intend to scare them?

21  A.  Yes.

22  Q.  Did he say that?

23  A.  Scare the hell out of them.

24  Q.  Now --

25  A.  That's what -- he said that -- I asked him what message

1  this sent, and he -- and he said it would scare the hell out

2  of them.

3  Q.  And by "them," you understood that to be the members of

4  the synagogue?

5  A.  Yes.

6  Q.  What was his demeanor during that portion of the

7  conversation?  Was it questioning or was it matter of fact?

8  A.  It was matter of fact.

9  Q.  Did he -- did he reference -- did he reference anybody

10  else, other than his co-conspirator, that he communicated with

11  about the offense, about the conduct seen here?

12  A.  He did reference someone else that he and his

13  co-conspirator communicated with about this --

14  Q.  Who's that, or what is that?

15  A.  It was an on-line person who was using the on-line user

16  name Asbestos Peter.

17  Q.  And is the on-line person -- did he reference if it's a

18  physical person or was it just an on-line presence or user?

19  A.  He believed it to be a real person.

20  Q.  Had he ever met this person?

21  A.  No, not in person, no.

22  Q.  Did he ever talk to a live person or was it all over

23  social media?

24  A.  It was all over applications, yes.

25  Q.  And what were the nature of those communications?

1  A.  He said the nature of those communications were related

2  to -- were related to this incident.

3  Q.  Have you personally seen those communications yet?

4  A.  I have not.

5  Q.  Were a number of devices used as part of this offense?

6  A.  Yes, they were.

7  Q.  And are they still being reviewed by the FBI?

8  A.  They are.

9  Q.  Did he talk with you about his plans that -- for what he

10  and his co-conspirator planned to do that night?

11  A.  Yes, he did.

12  Q.  And did they include other potential conduct other than

13  what's depicted in this picture?

14  A.  Yes, they did.

15  Q.  What did -- what did he plan to do?

16  A.  Well, he said that this Asbestos Peter wanted them to get

17  inside, to break in.

18          MR. ANSELL:  The answer is nonresponsive.  He's

19  speaking to what someone else had told him to do, not what he

20  said that he planned to do.  He asked him what else he planned

21  to do but apparently didn't carry out.

22          THE COURT:  I'll overrule that objection.  Go ahead.

23  A.  That this Asbestos Peter wanted him to get inside

24  ultimately, he believed, to set off a -- what's called a Drano

25  bomb, put some napalm on that when he did it.

1  BY MR. LINDER:

2  Q.  And did he carry that out?

3  A.  He did not.

4  Q.  Did he tell you why he did not carry that out?

5  A.  Yes.

6  Q.  What did he say?

7  A.  He said two things, that he and his co-conspirator got

8  nervous when they got to the -- the synagogue because of the

9  lights and the cameras on the building.  He also said the fire

10  that was lit outside was burning bright and made them nervous.

11  Q.  Did you talk with other witnesses in your investigation of

12  this case concerning the defendant's own statements to those

13  witnesses about what his plans were?

14  A.  Yes.

15  Q.  Was what he told you consistent or inconsistent with what

16  those witnesses said?  For instance, did those witnesses tell

17  you that he had told them they were afraid and did not carry

18  out the rest of their plan, or did they tell you some other

19  reason about why he did not carry out the rest of the plan?

20  A.  They did not say that he said that he was afraid.

21  Q.  They said something else?

22  A.  No, I don't -- I guess I'm not recalling what they said,

23  as far as what he actually -- what he actually did.

24  Q.  Okay.  We'll get back to that.

25          Was there other evidence, in addition to his own

1  statement with respect to this offense, that led you to

2  conclude that there was probable cause to arrest this

3  individual?

4  A.  Yes.

5  Q.  Including surveillance video from where the supplies to do

6  this event, incident, were purchased?

7  A.  That's correct.

8  Q.  Where were they purchased?

9  A.  At Walmart in Greencastle, Indiana.

10  Q.  And did you obtain surveillance video from there?

11  A.  Yes.

12  Q.  And if you'd turn to tab 3, please.  And there are three

13  photos behind tab 3.  Can you just briefly describe what these

14  three photos show, what they are?

15  A.  The three photos are Walmart's surveillance video showing

16  Nolan Brewer and his co-conspirator -- co-conspirator checking

17  out and standing.  Some red and black spray paint.  And then

18  the third photograph shows Nolan Brewer and his co-conspirator

19  walking out of the Walmart with the groceries that they

20  purchased -- or the -- I'm sorry, the items that they

21  purchased.

22  Q.  And the individual on the left there, is that the

23  defendant?

24  A.  Yes, it is.

25  Q.  Was there a receipt that you were able to recover from

1  this transaction?

2  A.  Yes.

3  Q.  Turn to Exhibit 4.  Did agents go back and verify what the

4  items were reflected on this receipt?

5  A.  Yes, they did.

6  Q.  And is this the receipt from that transaction that was

7  shown with the defendant and his co-conspirator on the

8  surveillance video?

9  A.  Yes, it is.

10  Q.  That was confirmed with Walmart?

11  A.  Yes.

12  Q.  And did the agents ultimately purchase or know that red

13  and black spray paint was purchased?

14  A.  Yes.  An agent actually went back and purchased these

15  actual -- the actual SKU numbers associated with these items,

16  and we collected them as evidence.

17  Q.  And how about bandanas?  Were those purchased?

18  A.  Yes.

19  Q.  Were other items purchased, as well?

20  A.  Yes.

21  Q.  We'll get to those in a moment.

22          Did the surveillance video show how the defendant

23  traveled to and from Walmart?

24  A.  It did.

25  Q.  If you'd turn to tab 5, please.  Is this a still

1  photograph from Walmart?

2  A.  Yes, it is.

3  Q.  And were you able to analyze the license plate, which has

4  been redacted here for privacy reasons, to trace it back to

5  where the defendant's car was registered?

6  A.  Yes.

7  Q.  It was ultimately registered to his parents' house; is

8  that right?

9  A.  It's registered to his and his -- or his parents' house

10  that -- where he lives, and it was to his mother.

11  Q.  Did you ultimately apply for a search warrant for this

12  car, that residence, as well as his person and the person of

13  his co-conspirator?

14  A.  Yes, I did.

15  Q.  And when did you execute that?

16  A.  On August 15.

17  Q.  Did you have authorization to search containers, including

18  the trunk -- locked containers, including the trunk of his

19  car, as well as cell phones and electronic devices?

20  A.  We did.

21  Q.  If you'd turn to tab 6, please.  Is this the vehicle that

22  was searched?

23  A.  Yes, it was.

24  Q.  If you'd turn to the next page there, what are the --

25  what's the first -- and, in fact, as we kind of flip through

1  here, the first several pages -- or the pages behind that

2  first page of tab 6 there, what is that showing?

3  A.  The three pages behind the photo, the photograph of the

4  vehicle, are the trunk of that vehicle and the items which

5  were seized from that trunk during the execution of that

6  search warrant.

7  Q.  And what are -- what is this sort of -- is that a

8  backpack?

9  A.  Yes.  It's a backpack with spray paint, red and black

10  spray paint bottles inside it.

11  Q.  If you turn to the last page behind Exhibit 6, you see two

12  black spray paint canisters as well as two red ones; right?

13  A.  Correct.

14  Q.  Is that consistent with what was purchased at Walmart on

15  that receipt?

16  A.  Yes, it is.

17  Q.  If you'd turn to tab 7, please.  What's tab 7 showing?

18  A.  It's a blue and white -- or dark colored with white design

19  bandana.

20  Q.  And is it -- where was this found?

21  A.  It was found inside the backseat of his vehicle.

22  Q.  Again, is this consistent with what was purchased from

23  Walmart?

24  A.  Yes, it is.

25  Q.  Were his phone -- you mentioned you had authority to

1  search his cell phone and his co-conspirator's -- well, I

2  should ask.  You had authority to search their persons -- I'm

3  sorry.  I did ask you already whether you had authority to

4  search phones, and you did.

5           Did you, in fact, search his phone, or at least the

6  phone he was in possession of, as well as that of his

7  co-conspirator?

8  A.  We did.

9  Q.  Did -- on those phones, did you find additional evidence

10 of the crime charged?

11 A.  Yes, we did.

12 Q.  If you'd turn to Exhibit 8, please.  Do you know which

13 phone this was found on?

14 A.  That was found on Nolan Brewer's cell phone.

15 Q.  And what is this?

16 A.  It's a map -- or overhead map of the area near

17 Congregation Shaarey Teffilla with what's a handwritten or a

18 hand-drawn line with a circle around the area of the

19 synagogue, with the start of the line around The Church of the

20 Latter-day Saints on, I believe it's Shelbourne Road in

21 Carmel, Indiana.

22 Q.  Is this sort of a screen shot which was used, sort of an

23 edit or paint function, it looks like?  Is that what that is?

24 A.  Yes.

25 Q.  If you'd take a look at page 9, tab 9, please.  And where

1   was this item found?

2   A.   It was found on his co-conspirator's cell phone.

3   Q.   And what are we looking at here?

4   A.   It's a bigger overhead map, or overhead view of the same,

5   generally the same area, with the hand-drawn route on there,

6   or hand-drawn area being a little bit different with the

7   marked-in area, what I call the colored-in area, being the

8   synagogue, the Congregation Shaarey Teffilla.  Below that is a

9   picture of Durbin Drive in Carmel with the writing or the

10  typed-out parking place.

11  Q.   Now, did the defendant, during his conversation with you,

12  tell you where they actually parked to commit the offense?

13  A.   Yes.

14  Q.   Was it in this spot or was it in a spot shown more clearly

15  by his item, his depiction on number 8?

16  A.   He said it was near where he -- more -- I guess more

17  consistent with Government Exhibit 8, that they parked down by

18  The Church of the Latter-day Saints.

19  Q.   Turning to tab 10, what's this?

20  A.   That's a photograph that was found on his co-conspirator's

21  phone, with Nolan Brewer and his co-conspirator.  The

22  co-conspirator is wearing one of the scarves consistent with

23  what was purchased at Walmart, and some sunglasses.

24  Q.   Were there text messages recovered, or other

25  communications recovered, from the phones between the

1   co-conspirators?

2   A.  There were.

3   Q.  Were there also text messages between the defendant and a

4   third party?

5   A.  Yes, there were.

6   Q.  If you'd turn to tab 11, please.  Turning it on its side

7   here, what is this, Government's Exhibit 11, depicting?

8   A.  It's text messages that are from Nolan Brewer's phone --

9   I'm sorry.  It's a list of text messages that came from Nolan

10  Brewer's phone, both incoming and outgoing.  These are text

11  messages with the screen name Chan Kona.  A telephone number

12  related with that name is next to it.

13  Q.  And were these taken from his cell phone using some sort

14  of extraction procedure?

15  A.  They were.

16  Q.  At the scene?

17  A.  Yes.

18  Q.  By FBI personnel?

19  A.  Yes.

20  Q.  On these particular items here, the first one, number

21  408, says, "Sent."  And, again, you said "Chan! Kona," or Kona

22  Chan sent.  What does "Sent" mean?

23  A.  That means it's an outgoing from Nolan Brewer's cell

24  phone.

25  Q.  Outgoing, there you go, a few items over.

1           And the far right column there, what does that

2  depict?

3  A.  That's the content of the text message.

4  Q.  And he says, "We gotta run to Camby really quick.  You

5  know how long that'll take, man."  Chan Kona replies, "I'm 5

6  minutes out."  And, again, the defendant, or at least his

7  phone, sends back, "Ok.  We'll be grabbing the can to fill it

8  up, run to Camby, and come back."  Do you have a sense of what

9  he's talking about there?  The defendant that is.

10 A.  Yes.

11 Q.  What?

12 A.  A gas can.

13 Q.  And what is the date of these text messages?

14 A.  These text messages are July 27, 2018.

15 Q.  At what time?

16 A.  Between 2129 and 2223.

17 Q.  And when was the incident at the synagogue discovered?

18 A.  It was discovered on July 28th.

19 Q.  So the night before?

20 A.  Yes.  And --

21 Q.  Turning to the next exhibit, 12, again, over near the

22 right-hand side, there's a column that says, "Wife! The."  Do

23 you know whose phone this is associated with?

24 A.  The text messages were taken -- or this text message list

25 was taken from Nolan Brewer's.

1  Q.  I'm sorry.  And do you know who the wife, or "Wife! The,"

2  is referring to?

3  A.  Yes.

4  Q.  Is it his wife?

5  A.  Yes.

6  Q.  Is his wife the co-conspirator?

7  A.  Yes.

8  Q.  Now, throughout these text messages -- again, what's the

9  date of this?

10  A.  The date of these is July -- they're all dated July 30,

11  2018.

12  Q.  And so after the incident occurred; is that right?

13  A.  Yes.

14  Q.  And it says, "From the wife," incoming, "Holy" S.  We made

15  CNN, Fox, IndyStar, WTHR...Mike Pence even tweeted about us."

16  And it goes on to describe comments, I suppose, from social

17  media; is that right?

18  A.  Yes.

19  Q.  What do you understand them to be referring to based on

20  the context?

21  A.  Facebook comments about the incident.  And, once again, at

22  the top, it says the news stations that were covering it, as

23  well as the vice president, "even tweeted about us."

24  Q.  So a lot of publicity about what had occurred?

25  A.  Yes.

1   Q.  And, again, the second one down says, "We made CNN," et

2   cetera; correct?

3   A.  Correct.

4   Q.  And the fifth one up from the bottom, which is item 431,

5   it's outgoing.  That means Nolan Brewer sent it; right?

6   A.  Yes.

7   Q.  And what's he say?

8   A.  "Yay!"

9   Q.  13, Exhibit Number 13.  Again, another set of text

10  messages.  Are these from the defendant's phone?

11  A.  Yes.

12  Q.  With the Chan Kona, Kona Chan?

13  A.  Yes.

14  Q.  And what -- the date of these is July 30th?

15  A.  Yes, they're all dated July 30th.

16  Q.  And he says, at the beginning, "Buddy!  Look!  Holy" S.

17  In reference -- and then it says, "It made Fox59."  Again, do

18  you know what he's referring to?

19  A.  Yes.  He's referring to the incident at Congregation

20  Shaarey Teffilla.

21  Q.  And at the bottom, item 442, again, outgoing from the

22  defendant to Kona Chan, he says, "Google it!  The word

23  synagogue is trending in Indiana and soon to go regional."  Is

24  that what he said?

25  A.  That's correct.

*BOOKWALTER - DIRECT/LINDER*               Vol. 1-28

1    Q.  Did he also send Kona Chan some snapshots or photos?

2          Let's take a look at Exhibit 14.

3    A.  I'm sorry.  He sent him MMS messages, which included

4    screen shots, I believe.

5    Q.  Very well.  Let's take a look at 14.  And are those the

6    screen shots that he sent via MMS message?

7    A.  Yes, they are.

8    Q.  And the first one is a news article with Vice President

9    Mike Pence's response to the -- to the incident --

10   A.  Yes.

11   Q.  -- is that right?

12         And the next page is yet another news story from

13   FoxNews.com?

14   A.  Yes.

15   Q.  And tab 15, if you'd turn to that, are those the MMS

16   messages, or at least documentation that these files were sent

17   over MMS messages?

18   A.  Yes, they are.

19   Q.  And are those two files that are in purple there -- have

20   you verified that those are, in fact, the items we just looked

21   at under 14?

22   A.  Yes, I have.

23   Q.  All right.  Now, we've talked quite a bit right now about

24   the fact that the event occurred and the defendant did it.  I

25   want to now spend a little time talking about some of the

1  details of the incident itself.  So turning back to Exhibit

2  Number 2, that photograph of the incident itself, what is on

3  the ground in front of the structure which has the spray

4  painted Nazi flag and iron crosses on it?

5  A.  It's a hardened, burned sod area.

6  Q.  And what is -- there appears to be a black substance on

7  the wall itself, in fact, covering the, to some extent, the

8  Nazi flag that's spray painted.  What is that?

9  A.  It's just a smoke residue.

10 Q.  From a fire?

11 A.  Yes.

12 Q.  And do you know, was there, in fact, a fire that burned on

13 the ground there?

14 A.  Yes, there was.

15 Q.  And who started that fire?

16 A.  Nolan Brewer and his co-conspirator.

17 Q.  And did he tell you that when you talked to him?

18 A.  Yes.

19 Q.  And what did he say he started that fire with?

20 A.  The homemade napalm.

21 Q.  Was that his term, "homemade napalm"?

22 A.  Yes.  Well, he said "napalm."  I'm calling it "homemade

23 napalm" because it's actually gas and styrofoam.  And he

24 described it as "gas and styrofoam."

25 Q.  Very well.  If we would, were there -- on the cellular

1   phones, we saw some text messages and that sort of thing after

2   the fact.  Were there also evidence or photographs taken at

3   the time of the incident by the defendant or his

4   co-conspirator of that fire burning?

5   A.  Yes.

6   Q.  Can we turn to page 16 -- or tab 16, please.  Is that what

7   this depicts?

8   A.  Yes, it is.

9   Q.  And where was this -- and if we'd turn to the next two

10  photographs, are they also showing the image at night?

11  A.  Yes.  Those are all photographs that were on Mr. Brewer's

12  phone, taken the night that he and his co-conspirator did

13  that.

14  Q.  Now, these, in fact, these photographs, these particular

15  ones we're looking at right here, were printed off files from

16  his co-conspirator's phone; is that right?

17  A.  Yes, they were.

18  Q.  And the -- but you know, however, that these were also

19  present on his phone; correct?

20  A.  I do.

21  Q.  How do you know that?

22  A.  Because he showed one of the special agents that was with

23  me that day those files were password protected.  He showed

24  those photos to the other special agent, who told me these

25  were the photos.

1   Q.  Now, I want to focus on something you just mentioned.

2   Those files are password protected.  Can you elaborate on

3   that?

4   A.  Just that they couldn't be seen without putting in a

5   password of some sort.

6   Q.  On his phone?

7   A.  On his phone, yes.

8   Q.  So not --

9   A.  They were in a file that was password protected.

10  Q.  Not only do you need a password to get into the phone, but

11  you also needed a password on his phone to access these

12  pictures specifically; is that right?

13  A.  Yes.

14  Q.  Let's turn to page 17.  We'll talk a little bit more about

15  this homemade napalm.  Is this image here on 17 found on the

16  defendant's phone?

17  A.  This one was found on his co-conspirator's phone.

18  Q.  On his co-conspirator's phone?  And what does this appear

19  to you to be?

20  A.  That appears to be the styrofoam and gas substance on

21  the -- also known as the homemade napalm.

22  Q.  And do you recognize the pot, for example, or anything

23  else similar to what you've seen elsewhere in this

24  investigation?

25  A.  Yes, I do.

1  Q.  And what is -- where did you see this?

2  A.  I saw the pot and a smaller portion of this substance when

3  agents from the FBI went and talked to Kona Chan and seized

4  that pot and homemade napalm from his residence.

5  Q.  And were photographs taken at that time of the pot of

6  napalm at Kona Chan's house?

7  A.  They were.

8  Q.  Let me turn to 18, please.  And are these those

9  photographs?

10  A.  Yes, these are photographs taken, I think, when the item

11  was actually brought back to our office and photographed by

12  our evidence personnel.

13  Q.  And does this appear to be the same pot that was in the

14  prior photograph?

15  A.  Yes, it does.

16  Q.  And is the quantity less in this later photograph than it

17  was in the earlier one we just saw?

18  A.  Yes, it is.

19  Q.  Did you talk with -- you mentioned you talked with the

20  defendant about how this napalm was made?

21  A.  Yes.

22  Q.  And what's it made with?

23  A.  Strips of styrofoam, or ripped up styrofoam plates, and

24  gasoline.

25  Q.  And was there anything purchased at Walmart that's

 1  consistent with that?

 2  A.  Yes.

 3  Q.  What?

 4  A.  200 styrofoam plates, a package of 200 styrofoam plates.

 5  Q.  And we already saw text messages earlier referring to

 6  picking up the gasoline?

 7  A.  Yes.

 8  Q.  The can, that is?

 9  A.  Yes.

10  Q.  Did agents talk with Mr. Kona Chan about the -- how the

11  homemade napalm was made?

12  A.  Yes, they did.

13  Q.  And what did he say?

14  A.  That the styrofoam plates were torn up into strips, and it

15  was placed in a bucket, the gasoline was poured over it, it

16  was mixed together, and then it was poured in the pot or the

17  pan where it was found.

18  Q.  And did --

19  A.  And, I'm sorry.  The top was put on it and was taped.

20  Q.  Did Kona Chan -- to be clear, is Kona Chan this person's

21  real name?

22  A.  No.

23  Q.  It's just what the defendant may refer to him as in his

24  phone, or something like that?

25  A.  It's a nickname.

1   Q.  He has a real name?

2   A.  Yes.

3   Q.  Okay.  And he's a real person; it's not some on-line

4   identity?

5   A.  No, he's a real person.

6   Q.  All right.  Did he say who made it?  Kona Chan, did he say

7   who made the napalm?

8   A.  Yes.

9   Q.  Who?

10  A.  The three of them, Kona Chan, Nolan Brewer, and the

11  co-conspirator.

12  Q.  Kona Chan said he knew what they were going to do with the

13  napalm?

14  A.  No.  He did say that he didn't know what they were going

15  to do at that time.

16  Q.  On this cell phone, did you recover videos of the -- of a

17  fire outside of this event that we're talking about here?

18  A.  Yes.

19  Q.  And did it appear that -- well, can you just briefly

20  describe what those videos looked like?

21  A.  It was videos of Nolan Brewer, the co-conspirator, and

22  Kona Chan lighting what appeared to be the homemade napalm

23  substance on fire on a coconut, and also putting it on a sword

24  and Nolan Brewer swinging the sword around.

25  Q.  Sort of a flaming sword, so to speak?

1  A.  Yes.

2  Q.  Did those videos occur on a different day?

3  A.  Yes, they did.

4  Q.  All right.  Again, I kind of want to turn -- we talked a

5  lot about what occurred, including the fire.  I want to turn

6  to what didn't necessarily occur, but may have.  On the

7  Walmart receipt, were there other items purchased than what we

8  have discussed so far?  So we've discussed, just to be clear,

9  spray paint, bandanas, and foam plates.

10  A.  Yes.

11  Q.  Were there other items purchased from Walmart?

12  A.  Yes, there were.

13  Q.  What was purchased?

14  A.  An eight-pack of Gatorade and two 82-ounce bottles of gel

15  Drano.

16  Q.  Anything else?

17  A.  And a package of aluminum foil.

18  Q.  Anything other than that?  Were there any gloves

19  purchased?

20  A.  Oh, yes, there were.  There were some nitrile, or what do

21  they call them?  What I would call rubber gloves, purchased.

22  Q.  Were those items significant to you as an investigator?

23  A.  Yes.

24  Q.  And your fellow law enforcement?

25  A.  Yes.

1  Q.  And how so?

2  A.  In speaking with our -- or, actually, speaking with

3  several people, including our bomb technician, they recognized

4  that a mixture of liquid Drano, a certain type of liquid

5  Drano, and aluminum foil in a closed container can cause

6  overpressure and cause that container to rupture or explode.

7  And that was what was purchased here, except that the Drano

8  was actually gel Drano.

9  Q.  And -- well, let's turn to tab 19.  And did you find those

10  items during your searches on August 15?

11  A.  Yes, we did.

12  Q.  And on tab 19, there are several photographs.  We'll just

13  sort of page through them.  The first one, is this the

14  trunk?

15  A.  Yes, that's the trunk of Nolan Brewer's 2004 Chevy Impala.

16  Q.  And sort of towards the left there, we see two red

17  containers.  What are those?

18  A.  Those are the two -- I believe the 82-ounce bottles of gel

19  Drano.

20  Q.  And is that what we see on the next page that I've sort of

21  zoomed in on those items that are seized?

22  A.  Yes.  80-ounce.  I'm sorry.

23  Q.  All right.  Turn to the next page, please.  We see a -- it

24  looks like a plastic bag there with an item that says "glove."

25  What is that?

1  A.  That's the nitrile, or rubber, gloves that were -- that

2  were purchased at Walmart.

3  Q.  And the next page, is it just a zoomed in of that; is that

4  right?

5  A.  Yes.

6  Q.  The next page after that, behind the two red Drano

7  containers, look like two Gatorade bottles.  Is that what they

8  are?

9  A.  Yes.

10  Q.  The page after that shows -- is that those two Drano --

11  or, sorry, Gatorade bottles?

12  A.  Yes, it is.

13  Q.  And what is inside?  It's hard to see the one on the right

14  because there's a wrapper, but the one on the left, is there

15  something inside the bottle?

16  A.  There's something inside both of them.  It's aluminum

17  foil.

18  Q.  It's already in there?

19  A.  Yes.

20  Q.  With the top screwed on?

21  A.  Yes.

22  Q.  The next page, please.  This backpack here we've seen

23  before.  Is that the same backpack that contained the spray

24  paint?

25  A.  Yes, it is.

1  Q.  And is this -- does it contain multiple, I don't know,

2  folds or pockets?

3  A.  Yes, it does.

4  Q.  And in one of the pockets, were there some more Gatorade

5  containers?

6  A.  I believe two of the pockets, there were six more Gatorade

7  bottles in the backpack itself.

8  Q.  And is that what we see as we sort of page through here?

9  The next one shows yet another pocket open with more Gatorade

10 bottles?

11 A.  Yes.

12 Q.  And, again, next page, showing sort of a close-up of

13 those; is that right?

14 A.  Yes.

15 Q.  With the -- is that the spray paint canisters there in the

16 back?

17 A.  Yes, it is.

18 Q.  Again, the next page, is that the items that are seized,

19 on the ground, taken out of the backpack?

20 A.  Correct, with the aluminum foil inside of them.

21 Q.  And, again, next page, yet again, more Gatorade bottles

22 with aluminum foil inside?

23 A.  That's correct.

24 Q.  All of that being consistent with the development of these

25 overpressured devices that you have conferred with your bomb

1  technicians about?

2  A.  Yes.

3  Q.  And these are present in the defendant's car, in his

4  backpack, still 18 days after the incident; is that right?

5  A.  Yes.

6  Q.  Still in his possession when you arrested him?

7  A.  They were.

8  Q.  Okay.  What did he -- did you talk with him -- well, we

9  spoke about this before.  You did talk with him when you

10 interviewed him about why or what motivated him to commit this

11 incident; is that right?

12 A.  Yeah.  I asked him several times the purpose of doing

13 this.

14 Q.  And what was that?

15 A.  What was his answer?

16 Q.  Yeah.

17 A.  His answer was -- well, he had several answers, but

18 ultimately it was to -- it was to send a message, get -- or

19 get a point across to, also, I guess, stir up discussion and

20 stir up people or groups to understand that there were people

21 who would do this stuff.

22 Q.  Was there anything that the defendant said that was

23 sympathetic to a viewpoint that is known to be antisemitic?

24 A.  Yes.

25 Q.  What was that?

1  A.  Well, I mean, he -- he said that this was done to send a

2  message to the ethnic Jews, the congregation.  It was not the

3  religious Jews, it was the ethnic Jews and the fact that

4  they -- and he referenced Hitler and that Hitler said that --

5  or Hitler's belief was that Jews had too much representation

6  for their percentage of population.

7  Q.  That was in the context of talking about why he did this?

8  A.  Yes.

9  Q.  Did you find evidence of his and/or his co-conspirator's

10 belief in Nazism or Adolf Hitler during the search warrant?

11 A.  Yes.

12 Q.  Did you find it on their phones?

13 A.  Yes.

14 Q.  If we would, turn to tab 20, please.  There are two pages

15 here.  What are these -- where did these come from?

16 A.  These two came from either Nolan Brewer's phone or his

17 co-conspirator's phone.

18 Q.  And in the first picture, is that Nolan Brewer?

19 A.  That is Nolan Brewer.

20 Q.  Is that a swastika around his neck on a chain?

21 A.  That's -- yeah, that's a pendant that forms a swastika.

22 Q.  And there's a swastika sort of as a watermark in the

23 background of this photo, too; right?

24 A.  Yes.

25 Q.  And on the second page, the identity of this person is

1  obscured, but do you know this person to be his

2  co-conspirator?

3  A.  Yes.

4  Q.  And is this person also wearing a swastika around his or

5  her neck?

6  A.  Yes.  It's the same type pendant that forms a swastika.

7  Q.  If we'd turn to tab 21.  Was this also found on his phone?

8  A.  It was.

9  Q.  And it appears to be some -- well, what is this?

10  A.  It's a meme of some sort, depicting, I guess, Adolf

11  Hitler.  It says, "You tie my heart in little knotsies."  And

12  at the bottom it says, "Be mein" m-e-i-n.

13  Q.  One of a very crude Valentine's Day reference?

14  A.  Yes.

15  Q.  Tab 22, please.  Again, images found on his phone;

16  correct?

17  A.  Yes.

18  Q.  The first one is a Nazi iron cross with a swastika in

19  the middle of it; is that right?

20  A.  That's correct.

21  Q.  And then yet another swastika with some radiating light in

22  the background; is that right?

23  A.  Yes.

24  Q.  Another iron cross with another swastika; right?

25  A.  Yes, with the year "1939."

1  Q.  Another iron cross; correct?

2  A.  That's correct.

3  Q.  Yet another swastika with light radiating; is that right?

4  A.  That's correct.

5  Q.  The last page in this item here, what -- again, this was

6  an item or image found on his -- the defendant's phone; is

7  that correct?

8  A.  Yes, it was.

9  Q.  And what is this depicting?  That's described?

10 A.  Just a list of -- an X and Y axis with "Authoritarian" on

11 one end of the Y axis, "Libertarian" on the other end.  "Left"

12 on the one end of the X axis and "Right" on the far right of

13 the X axis.

14 Q.  And under "Authoritarian," does it say, very faintly,

15 "Fascism"?

16 A.  Yes, it does.

17 Q.  And next to that, there's a red dot and it says "Hitler."

18 A.  Yes.

19 Q.  And just below that is another red dot; is that right?

20 A.  That's correct.

21 Q.  And there's an arrow pointing to it?

22 A.  Yes.

23 Q.  That appears to be drawn sort of by a paint function?

24 A.  Yes.

25 Q.  And what is -- who is that?

1   A.  It says "me."

2   Q.  Okay.

3   A.  And that is off of Nolan Brewer's phone.

4   Q.  Tab 23, please.  These are images from his

5   co-conspirator's phone; is that right?

6   A.  Yes.

7   Q.  And they're consistent with what we just saw, more Nazi

8   Hitler images; is that right?

9   A.  Yes, they are.

10  Q.  Now, did he mention anything to you, as he was talking

11  with you, about whether he believed in -- well, what aspects

12  of Nazism he believed in, or was he fully bought into it, or

13  did he talk to you about his beliefs?

14  A.  He did.  We talked first about his -- the -- the jacket he

15  was wearing and where he had gotten that.  And he said he had

16  gotten it from his grandfather, and his grandfather had been

17  in the German army in the 1950s and that he was kind of part

18  of the Hitler youth; and that his grandfather had also given

19  him a pendant, which would be consistent with the pendant

20  that's in the photos, that formed a swastika.  And we talked

21  about the German army of the '50s, and then we talked about

22  the German army from before that.

23          And he said that he didn't -- or that he didn't --

24  I'm sorry.  And we talked about his grandfather.  His

25  grandfather, he said, once again said, gave this to him, was

1   kind of Hitler youth; and that his grandfather also, at family

2   gatherings, would feign -- would feign dementia and say, "Heil

3   Hitler," and that he said he was raised with the Nazi notion

4   of hard work and be an example, but -- and he said he would --

5   he -- he believed in the economic side of national socialism

6   or Nazism.  He believed in the economic side and he believed

7   it was a good thing, but he was recovering from the social

8   side of that.

9   Q.  Did you see anything on his phone indicating evidence

10  concerning economics?

11  A.  No, I don't recall seeing anything like that.

12  Q.  Did you see anything, on the other hand, relating to

13  Nazism and hatred toward various races?

14  A.  I did.

15  Q.  If you'd turn to tab 24, please.  Was this contained on

16  his phone?

17  A.  Yes.

18  Q.  What does it say?

19  A.  It said, "What is a Jew doing poking around in the

20  ashtray?"  It says, "Studying his family history."

21  Q.  The next image there, again, is this from his phone, the

22  defendant's phone?

23  A.  Yes.

24  Q.  And what does it say?

25  A.  It says, "That's offensive.  Why are you so antisemitic?"

1  And, "Me:" and it has a picture of some -- of a wrestler

2  holding a long list, a very long list.

3  Q.  Let's turn to tab 26.  Were -- I'm sorry, 25.  And I

4  should say, were Jews the only race which the defendant's

5  phone contained discriminatory or blatantly racist images of?

6  A.  No.

7  Q.  Again, 25.  All of these images are found on his phone; is

8  that right?

9  A.  Yes.

10          MR. LINDER:  And I think your Honor can review

11  these.

12  BY MR. LINDER:

13  Q.  The first one depicts a gallow, so to speak?

14  A.  Yes.

15  Q.  With the N word?

16  A.  Yes.  It says "Swing Set."

17  Q.  I have another -- the next page is an old man?

18  A.  Yes.

19  Q.  With some words, "Back in my day, we didn't have video

20  games.  We went outside and beat," N word, "with sticks"?

21  A.  That's correct.

22  Q.  The next one is a picture of several African-American

23  children with "2 + 2" written on the blackboard, and the

24  student's holding up the -- a number four with their fingers

25  and the student writing what appears to be a hand showing four

1   fingers?

2   A.   That's correct.

3   Q.   The next page shows a man and a woman, a black man, white

4   woman, sort of figurines, with crossed out in the middle, like

5   a no smoking sign.  It says, "Once you go black, we don't want

6   you back"; is that correct?

7   A.   Yes.

8   Q.   The next one says, "The Original Boys N The Hood," and has

9   clan members with a burning cross in the background; is that

10  correct?

11  A.   Yes.

12  Q.   The next one has -- it's another meme that says, "Dreaming

13  of a White Christmas," with a Christmas tree with five

14  clansmen and an iron cross; is that correct?

15  A.   Yes.

16  Q.   Finally, did his phone contain evidence or indications

17  that he was sympathetic toward violence, or at least found it

18  funny; is that right?

19  A.   Yes.

20  Q.   Turning to tab 26, what does this mean?  What does this

21  say?

22  A.   It says, "Freshmen wear these on the first day and you

23  will have ladies lining up to meet you.  I cannot stress this

24  enough."

25  Q.   And what are the items shown?

1  A.  It shows a black trench coat, camouflaged pants, an uzi

2  submachine gun, sunglasses, and combat -- or black combat

3  boots.

4  Q.  Now, you mentioned his grandfather.  You also mentioned

5  earlier that you said he was raised in an -- with the Nazi

6  notion of hard work; is that right?

7  A.  The Nazi notion of not acting out, by work hard, along

8  those lines.

9  Q.  And that's how he phrased his upbringing, Nazi notion; is

10 that right?

11 A.  Yes.

12 Q.  During the search of the house, did you -- did the agents

13 find other evidence pertaining to Nazism and/or Adolf Hitler?

14 A.  Yes.

15 Q.  Turning to tab 27, what is this showing?

16 A.  Tab 27 is showing a necklace bearing a pendant with the

17 iron cross.

18 Q.  And where was this taken?

19 A.  Inside -- inside the house -- or his house.

20 Q.  Which is also his parents' residence?

21 A.  Yes.

22 Q.  And tab 28, what is this showing?

23 A.  It shows the book, Adolf Hitler book, <u>My Struggle</u> Parts 1

24 and 2.

25 Q.  Again, found in the house?

*BOOKWALTER - DIRECT/LINDER*          Vol. 1-48

1  A.  That was -- yes, that was found -- actually, both items
2  were found in Nolan Brewer's and his co-defendant's room at
3  the house.
4  Q.  And were his parents interviewed as part of the search
5  warrant at the house?
6  A.  They were.
7  Q.  Did they express surprise about what the defendant had
8  done?
9  A.  They did.
10 Q.  Did they consent to searches of their electronic devices?
11 A.  I'm not aware of that.
12 Q.  Did they -- were their electronic devices part of the
13 warrant, in any event?
14 A.  Yes.  They were --
15 Q.  Was there a discussion about what might be on one of the
16 electronic devices?
17 A.  Yes.
18 Q.  And what -- who was -- who had something to say about
19 that?
20 A.  Jeff Brewer, Nolan's father, said that there may be some
21 KKK images on -- a few KKK images on his phone, but that it
22 was purely historical.
23 Q.  Now, I want to come back to, earlier you mentioned you
24 talked to other witnesses as part of this investigation;
25 right?

*BOOKWALTER - DIRECT/LINDER*          Vol. 1-49

 1  A.  Yes.

 2  Q.  And Mr. Brewer -- did those witnesses indicate that they

 3  had talked to Mr. Brewer about both his belief in Nazism as

 4  well this particular offense?

 5  A.  Yes, they did.

 6  Q.  Did you, for example, talk to some of his coworkers --

 7  A.  Yes.

 8  Q.  -- at one of his various jobs --

 9  A.  Yes.

10  Q.  -- about this?

11         And can you summarize, briefly, what some of those

12  coworkers had to say?

13  A.  That -- both coworkers that I'm thinking of said that

14  he -- he espoused or was -- liked the Nazi ideology, that he

15  talked about it, that he was favorable toward what Hitler and

16  the Nazis did to the Jews, favorable and/or sympathetic to

17  what was done, and that he was actually a white nationalist.

18  And I think one witness said, straight up, "white

19  supremacist," and that he was actually trying to recruit

20  coworkers to his cause.

21  Q.  And did he try to, along those lines, justify the Nazis'

22  treatment of the Jews?

23  A.  Yes.

24  Q.  And did he, in terms of trying to recruit, do things like

25  talk about this particular incident or show them evidence of

*BOOKWALTER - DIRECT/LINDER*                  Vol. 1-50

1  this particular incident in an effort to try to recruit them?

2  A.  He showed -- he showed at least two of his workers a

3  picture of this incident following it and made references to

4  it, yes, and actually claimed or bragged about what they -- or

5  "we had done."

6  Q.  "We" referring to him and his co-conspirator?

7  A.  Yes.

8  Q.  With regard to talking about that, what did they -- what

9  did Mr. Brewer -- what did the witness relate to you that

10  Mr. Brewer said to him about this event -- or him or her about

11  this event in question?

12  A.  That there was good news and bad news.  The good news is

13  that "we" had vandalized a synagogue 70 miles from his house,

14  and the bad news was that they didn't -- weren't able to

15  finish because they couldn't -- they didn't get -- or they

16  weren't able to break in because they couldn't find a door to

17  access it.

18  Q.  Access the synagogue?

19  A.  Yes.

20  Q.  Did you --

21          THE COURT:  I'm going to just take a one-minute

22  break.

23          MR. LINDER:  Yes.

24          THE COURT:  Off the record.

25          (Off the record.)

 1          THE COURT:  My apologies, Mr. Linder.  Please

 2   continue.

 3          MR. LINDER:  Not a problem, Your Honor.  Thank you.

 4   BY MR. LINDER:

 5   Q.  Finally -- I'm almost finished with my examination -- did

 6   you talk to Mr. Kona Chan about -- or you or other agents --

 7   about what the defendant may have told him either before or

 8   after the event about the incident in question?

 9   A.  Yes.

10   Q.  In addition to the sort of making of the homemade napalm

11   we talked about earlier?

12   A.  Yes.

13   Q.  What did Mr. Kona Chan tell you that the defendant told

14   him?

15   A.  He didn't tell me, but he told my coworkers, the agents on

16   my team, that he didn't know what was -- or where they were

17   going with the homemade napalm on the evening of the incident,

18   but that he later learned what happened, a couple of days

19   later, from Nolan Brewer, that in -- that Nolan Brewer had

20   done it.  And he had also been told by Nolan Brewer that he

21   was -- he intended -- or he was wanting to take out the

22   rabbi's house with napalm, because he knew where the rabbi

23   lived, and it was a $500,000 house up in Carmel.

24   Q.  That's what Mr. Kona Chan reported to your agents that the

25   defendant had told him after the fact?

 1   A.  Yes.

 2   Q.  And did Mr. Kona Chan relay anything about why or why not

 3   Mr. Brewer did not do that?

 4   A.  Yeah.  He said -- he said he didn't do it because they

 5   stuck to the plan.

 6   Q.  The plan being?

 7   A.  The plan being what they had done.

 8   Q.  Did he, Mr. Kona Chan, relay anything else that the

 9   defendant said about future plans with regard to hate

10   incidents?

11   A.  Yes, he did.

12   Q.  What did he say?

13   A.  He said that there was -- or they were Googling mosques

14   outside of a 50-mile radius because that was what they were

15   going to -- that was what they were going to target next.

16   Q.  And this was after the event occurred?

17   A.  Yes.

18   Q.  And, lastly, did Mr. Kona Chan describe to you how the

19   defendant described to him these incidents -- or the incident

20   and his plans?  Was he somber or was he laughing about it?

21   A.  No, he was laughing about it.

22           MR. LINDER:  No further questions.

23           THE COURT:  Mr. Ansell?

24

25

1          **CROSS EXAMINATION**

2   BY MR. ANSELL:

3   Q.   I didn't hear that last part.  Who was laughing about it?

4   A.   Nolan Brewer.

5   Q.   According to?

6   A.   Kona Chan.

7   Q.   According to -- so he told -- he didn't tell that to you;

8   right?

9   A.   I'm sorry.  He -- yeah, he told it to other agents on my

10  squad.

11  Q.   Which agents?

12  A.   Special Agent Matt Stahl and Special Agent Casey Farrell.

13  Q.   So Kona Chan told Matt Stahl and who else?

14  A.   Casey Farrell.

15  Q.   Casey Farrell?

16  A.   Yes.

17  Q.   Please spell Farrell.

18  A.   F-a-r-r-e-l-l.

19  Q.   Casey with a C or a K?

20  A.   C.

21  Q.   And he related to those agents what Nolan Brewer's

22  emotional affect was when he told them about the plans?

23  A.   Yes.

24  Q.   And are you sure it wasn't the co-conspirator that told

25  these things to Mr. Kona Chan?

BOOKWALTER - CROSS/ANSELL          Vol. 1-54

1  A.  No.  As I sit here, I'm not sure that it wasn't the

2  co-conspirator.  I believe it was Nolan Brewer, but I'm not --

3  I'm not positive.

4  Q.  What do you base that belief on?

5  A.  My recollection of the report that I read.

6  Q.  But you're not sure?

7  A.  I'm not.

8  Q.  And that was an ROI?

9  A.  Yes.  It was an FE 302, yep, report of investigation, yes.

10  Yep.

11  Q.  Okay.  And it was authored by one of those two agents?

12  A.  Yes.  Both of them.

13  Q.  But it might have been the co-conspirator who talked about

14  the future plans; correct?

15  A.  No.  I believe it was Nolan Brewer that talked about the

16  future plans.

17  Q.  That's what you think?

18  A.  Yes.

19  Q.  Okay.  But, as you said, you're not sure?

20  A.  I'm not 100 percent sure, no.

21  Q.  With respect to the homemade napalm, are you familiar with

22  actual napalm?

23  A.  Just from -- I've never used it or seen it myself, no.

24  Q.  Do you have any knowledge of what it actually is?

25  A.  No.  What chemical makeup, no, I don't.

*BOOKWALTER - CROSS/ANSELL*        Vol. 1-55

1  Q.  Or do you have any knowledge of the distinction between

2  napalm and styrofoam soaked in gasoline?

3  A.  Well, yes.

4  Q.  And what's that distinction?

5  A.  Well, I take that back.  I don't know that there's a

6  distinction chemically.

7  Q.  So, as far as you know, it could be the exact same thing?

8  A.  Yes.

9  Q.  Do you believe that?

10  A.  That it is?

11  Q.  Do you believe that the napalm that's used in war is the

12  same as gasoline and styrofoam mixed together?

13  A.  No.

14  Q.  Okay.  So you think there's a distinction?

15  A.  I think there's additional substances, yeah.  Yes --

16  Q.  Okay.  So --

17  A.  -- chemicals that make up that -- those devices.

18  Q.  Differences in its lethality, maybe, or differences in how

19  it can be applied?

20        MR. LINDER:  Your Honor, objection.  The government

21  has never indicated that this is actual military grade napalm.

22  We readily concede that it is homemade napalm.

23        MR. ANSELL:  But is that even an accurate -- what

24  I'm trying to get at, is that even an accurate

25  characterization?

 1          THE COURT:  Based upon my prior experience, I have

 2   an understanding of what napalm is, I have an understanding of

 3   what gasoline soaked styrofoam is.

 4          MR. ANSELL:  Very well.

 5   BY MR. ANSELL:

 6   Q.  Now, these pressure bombs, you stated that they didn't

 7   have the right kind of Drano to actually cause a chemical

 8   reaction; is that correct?

 9   A.  Yes, correct.  Well, I was told that by Mr. Brewer, that

10   he tried it, they tried it when they got back to Kona Chan's

11   house, and that it didn't work, that the -- he tried using the

12   gel Drano, and it didn't work.

13          As I talked to my bomb technician, with his limited

14   experience with that actual substance, he explained to me

15   that, yes, that's probably true, but he couldn't absolutely,

16   for sure, say that it wouldn't cause the same reaction based

17   upon how he used it or, you know, whether it was -- whether it

18   was used correctly or not.

19   Q.  So your understanding from your bomb expert at the FBI is

20   that it's probably correct what Nolan told you, that the gel

21   Drano did not cause the chemical reaction with the explosion

22   that he had apparently hoped to?

23   A.  I agree with that summary, yes.

24   Q.  And when he was pulled over 18 days after this incident,

25   it was still the gel Drano in his car; right?  He had not, to

1  your knowledge, purchased any of the liquid Drano?

2  A.  No, I have no knowledge that he did.

3  Q.  Okay.  So there's no evidence, that you know of, that he

4  or his co-conspirator went out and obtained the correct Drano?

5  A.  None that I'm aware of.

6  Q.  Not in their house, not in their -- not in the car?

7  A.  Not that I'm aware of, no, sir.

8  Q.  No electronic communication referencing that?

9  A.  No, none that I'm aware of.

10  Q.  Now, you did find electronic communication referencing the

11  event in terms of the -- as it was happening, and plans;

12  correct?

13  A.  Can you restate that?

14  Q.  You did find electronic communication about the event,

15  about the action that he apparently undertook in terms of the

16  planning and the execution of it; right?

17  A.  Yes.

18  Q.  Okay.  And it's true, is it not, that you did not find any

19  communication about future plans?

20  A.  Well, I don't -- thinking about just the two devices that

21  I've seen the logical extractions for, which are Nolan

22  Brewer's and his co-defendant -- or co-conspirator, no, I

23  can't say that I've seen anything that indicates future

24  planning.  But I have not seen Google history or anything like

25  that for those phones.

1  Q.  So the evidence of future plans was merely that coworkers

2  claimed to other agents that Nolan Brewer, with possibly his

3  co-conspirator, spoke about plans to hit a mosque in the

4  future?

5  A.  That was not the only evidence.  The other evidence was

6  Mr. Brewer told me that Asbestos Peter wanted them to hit a

7  mosque next.

8  Q.  But he didn't say that he planned to do it, did he?

9  A.  No.  In fact, he said he was -- he was doing something at

10 work.

11 Q.  Now, he -- what do you mean, "doing something at work"?

12 What are you --

13 A.  That he was doing some OSHA training or something that, I

14 guess, would prevent him -- or he would ignore it, ignore the

15 direction or the instruction by Asbestos Peter.

16 Q.  Now, had they terminated their communication with Asbestos

17 Pete?

18 A.  I don't -- I can't say that absolutely.  I know -- as of

19 today, sir?  I'm not sure of --

20 Q.  No.  As of their -- at the time of their arrest, didn't

21 they tell you that they were no longer communicating with

22 Asbestos Pete?

23 A.  Mr. Brewer told me that they originally -- or his

24 co-conspirator communicated on Discord, the application

25 Discord, with Asbestos Pete, and that he had been -- that

1  Asbestos Peter had been banned from Discord.

2  Q.  Okay.  But --

3  A.  But he also said they -- that she communicated on the

4  application Telegram, also, and I don't know that we ever

5  talked about whether she was -- or, I'm sorry, whether the

6  co-conspirator was talking with him on Telegram.

7  Q.  Did you determine when these chats were taking place on

8  Discord, times of day or the length of the conversations?

9  A.  Either -- my recollection is Mr. Brewer or the

10 co-conspirator said that -- or I think Nolan Brewer said that

11 his co-conspirator was communicating for six hours at a time

12 with Asbestos Peter.

13 Q.  So it was mostly the co-conspirator that communicated with

14 Asbestos Peter; is that correct?

15 A.  He said it was mostly the co-conspirator, and that he

16 would go sit by the co-conspirator at times.

17 Q.  But he was also working a lot; correct?

18 A.  He said he was, yes.  And I have reason to believe that --

19 Q.  You don't doubt that he was working full time; correct?

20 A.  No, I don't.

21 Q.  In fact, he worked Monday through Friday, and he also had

22 a job on Saturdays that was eight hours, eight hours on

23 Saturday; is that correct?

24 A.  I -- I did not get the times that he was working during

25 the week.  I know he was seen at home at 1:00 on a day that he

1  went in early, so he may have been working that much.  I don't

2  know for sure.

3  Q.  So you don't have any reason to doubt that he was working

4  about 50 hours a week during the course of the runup to this

5  incident?

6  A.  I really don't have anything to indicate specifically that

7  he was, but I don't have anything to indicate specifically he

8  wasn't.  I know he was working.

9  Q.  Well, you talked to his coworkers; right?

10 A.  Yes.

11 Q.  You didn't find out when -- the hours that he put in when

12 you went to his job?

13 A.  I did not talk to all the coworkers.  I talked to a couple

14 of the coworkers, and I did find out the hours he was working

15 at times, yes, but I don't -- I didn't find out the -- his

16 full work schedule.

17 Q.  So you do have reason to believe that he was working

18 full-time hours; is that correct?

19 A.  I believe so, yes.

20 Q.  You testified earlier that you didn't find anything that

21 suggested an interest in the economic aspect of what

22 Mr. Brewer apparently understood to be Nazism or national

23 socialism; is that correct?

24 A.  I don't -- yeah, I don't recall.  The only thing I do

25 recall at this point is seeing a -- something homemade that

1  was drawn on his phone that said -- it looked like "NC."  And

2  something he had talked about was a concept that he had come

3  up with that was national corporatism.

4  Q.  What about the fifth page of -- or the sixth page of

5  Exhibit 22?

6  A.  I think I'm looking at the graph, the "Authoritarian" --

7  Q.  The graph?  The X and Y axes?

8  A.  Yes.

9  Q.  On the right, it says, in very light letters,

10  "Neo-liberalism," and below that it has a dot that says

11  "Friedman."  Do you know who that would be in reference to?

12  A.  Yes.

13  Q.  Who?

14  A.  Milton Friedman.

15  Q.  And so the range is from "Neo-liberalism," which I presume

16  is pure laissez-faire economics, all the way to the far left,

17  which is "Communism," which is a command economy, forced

18  collectivism, forced equality, economic equality?

19  A.  Yes.

20  Q.  So, I mean, this does evidence him at least having an

21  academic interest in the economic aspect of the philosophies

22  that he was trying to learn about; is that true?

23  A.  Yeah, I would say -- I would -- yes.

24  Q.  Okay.  And I bring that up because your testimony

25  previously suggested that he's -- that he was not being honest

1   when he said that he was more interested in the economic

2   aspect of it because he's got all these distasteful memes and

3   offensive joke memes on his phone.  Is that -- do you think

4   that's a fair characterization, or that he wasn't being

5   honest, or do you think maybe he was?

6   A.   I think it's fair -- a fairer characterization that he

7   wasn't being honest because of the totality of the evidence,

8   especially some of the interviews.  And he wasn't talking --

9   didn't appear to be talking to people, at least the people

10  that we talked to, about the corporate side of Nazism, but he

11  did espouse a belief that -- in Hitler, and was pro Hitler and

12  pro the Nazis' treatment of the Jews.

13  Q.   Someone told you or other case agents that he said that he

14  agreed with the Nazi treatment of the Jews?  Is that -- was it

15  you or someone else?

16  A.   No, it was me.

17  Q.   Okay.  And did you -- did you get any kind of

18  clarification on what he allegedly said, according to this

19  person?

20  A.   That he joked about The Holocaust, one person said he

21  joked about The Holocaust.  The other person said that he was

22  sympathetic, his talk was sympathetic to what the Nazis did to

23  the Jews.

24  Q.   And that was a characterization by this person?

25  A.   Yes.

1  Q.  But you don't know if he maybe didn't believe what

2  happened to the Jews or didn't believe what we know happened

3  in The Holocaust, or that he thought it was a good thing that

4  people were murdered?

5  A.  Well, during our interview, I mentioned that the Nazis had

6  killed 6 million Jews, and he corrected -- he immediately

7  corrected me and said, "Oh, I thought it was only 4 million."

8  Q.  He expressed remorse, did he not?

9  A.  He made statements saying that they were -- that they were

10 rethinking what they had done.  And he also described it -- or

11 said that his co-conspirator was more the -- and I can't

12 remember the term he used, but I would -- I would characterize

13 it as more for a violent action and that he just thought it

14 was ick.  That's the word he used.

15 Q.  That he's not prone to violence, in other words?

16 A.  That he -- that he had thought about what they had done,

17 and they were rethinking.

18 Q.  So you did ask him, did you not?  Did you not ask him,

19 "Are you remorseful now?"

20 A.  I believe I did.

21 Q.  And did he say, "It's been weighing on my conscience" --

22 excuse me.  "It's been weighing on my conscience, so I've been

23 trying to pick up more hours at work to stay busy and away

24 from home."  Do you remember him saying that?

25 A.  He did.  I do remember him saying that he's been trying to

 1  pick up more hours at work.

 2  Q.  Do you remember him saying it's been weighing --

 3  A.  He made --

 4  Q.  -- on his conscience?

 5  A.  I don't remember those specific words, but I remember him

 6  expressing that, that he was trying to spend more time at

 7  work, away from home.

 8  Q.  Why?

 9  A.  I believe when he expressed it, it was for that reason --

10  Q.  Because --

11  A.  -- because of what they had done, yes.

12  Q.  Because it was weighing on his conscience?

13  A.  Generally, yes.  Yes.  I don't know that those were his

14  specific words, but, yes.

15  Q.  You don't remember the specific words, but that was the

16  gist of it; is that correct?

17  A.  I believe so, yes.

18  Q.  Did you get an impression as to how influenced he is or

19  was by his co-conspirator, who's also his wife?

20  A.  Yes, absolutely.

21  Q.  Describe that.

22  A.  The way he made it seem is that she had a great deal of

23  influence over him and that he would pretty much do what she

24  said, which is what he said happened in this instance, was

25  Asbestos Peter told her what to do.  She grabbed him, and he

 1  went along.
 2  Q.  Now, was there a difference in the beginning of the
 3  interview and later in the interview with how he described his
 4  wife's involvement?  Did he try to downplay her involvement in
 5  the beginning of the interview?
 6  A.  I don't recall that.
 7  Q.  So in the beginning of the interview, do you remember him
 8  saying words to the effect that he was trying to influence her
 9  to his way of thinking?
10  A.  I remember him saying that during the interview, yes.
11  Q.  Do you remember him saying, later in the interview,
12  describing more that it was actually her that was influencing
13  him, and was pushing him?
14  A.  That sounds accurate, but I don't --
15  Q.  Now, in the beginning of the interview is when he told you
16  that he'd been raised as a Nazi; correct?
17  A.  Yeah, he had been raised with the Nazi notion, yes.
18  Q.  And that was at the same time of the interview when he was
19  downplaying his wife's involvement; correct?
20  A.  I don't -- I don't recall him downplaying her involvement.
21  Q.  Okay.  Now, he also said that his grandfather grew up in
22  Germany and lived in Germany and was a member of the German
23  army after the war?
24  A.  He just said he was a member of the German army in the
25  early to mid-'50s.

1  Q.  Did you believe him?

2  A.  I just -- I -- I didn't know.

3  Q.  And he told you, in the beginning of the interview, that

4  he had -- that his grandfather had given him his German

5  military jacket; is that correct?

6  A.  Yes.

7  Q.  And he told you, at the beginning of the interview, also,

8  that his grandfather would sometimes feign dementia and say,

9  "Heil Hitler," and words to that effect?

10  A.  Yes.

11  Q.  And it was his grandfather who he described as having that

12  influence over him; correct?

13  A.  That's -- that's who we were talking about, yes.

14  Q.  Is that your impression, that it was his grandfather that

15  raised him in that way?

16  A.  Once again, I don't know who he -- or I know he was

17  talking about his grandfather, but I don't know that he was

18  talking -- he didn't say specifically that his grandfather

19  raised him.

20  Q.  When he talked about not going into the synagogue, did he

21  tell you why he didn't go into the synagogue?

22  A.  Yes.

23  Q.  What did he say?

24  A.  He said the -- well, at first he said the lights -- they

25  saw the lights in the bulbs where they thought the cameras

1  might be, and that made them nervous.  He also said the --

2  when the -- when they lit the homemade -- or the -- I guess

3  we'll call it the styrofoam and the gas substance, that it

4  was -- it was very -- it burned very bright, so that made them

5  nervous, also.  And later he said they didn't want to burn the

6  place down.

7  Q.  So are you sure that was the order?

8  A.  I don't know that that was the order, but --

9  Q.  Well, you said "first."  First he said this, and then

10 later he said that.

11 A.  Yeah, I believe, yes.

12 Q.  Are you certain of that?

13 A.  Yeah, I'm fairly certain.

14 Q.  Are you sure the first thing he didn't say was, "No, I

15 didn't want to go in at all because that is breaking and

16 entering, and that is a completely different thing.

17 Destroying the inside is different than something they could

18 just paint, you know, could plant new grass, you could

19 pressure wash the wall, easier to recover"?

20 A.  He did say that.  Yes, I do.

21 Q.  Isn't that the first thing he said when you asked him

22 about why he didn't go in?

23 A.  It may have been.

24 Q.  Okay.  Did he later say that Peter Asbestos (sic) wanted

25 them to do internal damage, but that, "We didn't have the

1  balls to do that"?

2  A.  Yes, he did.  Asbestos Peter, yes.

3  Q.  Did he say that his wife was the one who talked to

4  Asbestos Peter for six hours at a time?

5  A.  Yes, and that he would sit next to her at times and see

6  the conversations.

7  Q.  Did he also say that he doesn't -- doesn't agree with this

8  sort of behavior, or even if he -- even if he buys into some

9  form of Nazism, that he doesn't believe in this kind of thing

10  that he did?

11  A.  I don't know.  We talked about it for two hours, sir.  I

12  don't know if he said he didn't believe in this kind of thing

13  he did.

14  Q.  Did he say something to the words, though, that he would

15  not be for this sort of behavior?

16  A.  I don't recall those words.

17  Q.  Did he say that his co-conspirator is more of the -- more

18  inclined to this sort of -- in terms of their philosophies,

19  that she's more inclined to violent action and that he's less

20  inclined to that sort of thing?

21  A.  That's -- that's what I took from what he was saying, yes.

22  Q.  Did you -- in response to that, did you ask him, "Well,

23  why do this?"

24  A.  I believe I did.

25  Q.  And did he say, "My wife was involved, so I felt like I

1  needed to be involved, a really corrupt version of Romeo and

2  Juliette, I guess"?

3  A.  Yes, I remember that.  Not specifically those words, but I

4  remember the, "corrupt version of Romeo and Juliette."

5  Q.  So no evidence that he ever obtained the right kind of

6  Drano to carry out any further acts of vandalism or to carry

7  out anything more serious, no evidence of any active plans to

8  do anything else, and he expressed remorse; correct?

9  A.  No, I disagree with that, sir.

10  Q.  Which part do you disagree with?

11  A.  The plans to carry out further.  I mean, we have his

12  friend, or Kona Chan, saying that they wanted to go to a

13  mosque, do a mosque next.  And then he also told me that

14  Asbestos Peter had told him to hit a mosque.

15  Q.  Did he say that he planned to hit a mosque?

16  A.  No, he didn't.

17  Q.  Did Kona Chan say that he planned to hit a mosque or just

18  that that had been spoken of?

19  A.  He knew that they were Googling it.

20  Q.  Did he know when they had Googled it?

21  A.  No.  I don't know.

22  Q.  Okay.  And with respect to his father, did you -- the

23  father spoke to you about his phone?

24  A.  No.

25  Q.  To another agent?

 1  A.  Yes.

 2  Q.  And the other agent communicated to you that he mentioned

 3  that there are some photos of KKK imagery?

 4  A.  That's correct.

 5  Q.  Now, did he put that into any kind of context, the other

 6  agent?

 7  A.  He put that in the context of the phone being seized.

 8  Q.  But he didn't speak about what -- where those images were

 9  on the phone?

10  A.  He did not relay that to me, no.

11  Q.  He didn't tell you that they were amongst 800 or so images

12  of photographs from historical books?

13  A.  No, he did not.  He said they were -- he was told that and

14  that they were historical in nature.

15  Q.  But there was no further explanation of that?

16  A.  Not to me, no, sir.

17  Q.  Your implication presented in court today is that Dad

18  might be a Nazi, too; right?

19  A.  I -- I didn't testify to that.  I testified that what --

20  what was relayed to me and what he had said about his phone.

21  Q.  So you can't say anything about what Dad's beliefs are;

22  right?

23  A.  No, I cannot.

24  Q.  So the fact that there were a couple of images about the

25  KKK on his phone could mean that he's a history buff, and that

*BOOKWALTER – REDIRECT/LINDER*          Vol. 1-71

1  is one of hundreds and hundreds of images that depict history;

2  is that correct?

3  A.  I don't know, sir.

4  Q.  Could be is what I'm asking you.

5  A.  Once again, I have not reviewed his phone, so I probably

6  wouldn't comment on it.

7  Q.  But what I'm saying is that you don't have enough

8  information about that statement that he made to put it into

9  any kind of a meaningful context; is that correct?

10  A.  I don't have a reason to, beyond that, to believe that he

11  has any beliefs about Nazism.

12  Q.  So you can't draw any inferences from that fact that was

13  presented in court; correct?

14          MR. LINDER:  Objection, Your Honor.  It's your job

15  to draw inferences, not this witness'.

16          THE COURT:  I'll allow the answer.

17  A.  The only inferences I would draw is that when his phone

18  was being seized, he volunteered this to the agent.

19          MR. ANSELL:  Okay.  No more questions, Judge.  Thank

20  you.

21          THE COURT:  Mr. Linder?

22          MR. LINDER:  Very briefly, Your Honor.

23                      **REDIRECT EXAMINATION**

24  BY MR. LINDER:

25  Q.  Just to clarify a couple of things, sir.  First of all,

*BOOKWALTER – REDIRECT/LINDER*          Vol. 1-72

1  has the FBI finished going through the cell phones and

2  electronic devices that have been seized?

3  A.  No.

4  Q.  There were numerous devices that have been seized; is that

5  right?

6  A.  Yes.

7  Q.  So there may be other devices that contain indications of

8  future plans, you don't know yet; is that right?

9  A.  I don't know.

10  Q.  In fact, however, you do have an indication that there

11  were text messages deleted that relate to this offense,

12  deleted from this defendant's phone; is that right?

13  A.  Yes.

14  Q.  What is the basis to believe that there were text messages

15  deleted from this defendant's phone?

16  A.  We received text messages from Kona Chan that were not

17  present in the logical abstract of Mr. Brewer's phone.

18  Q.  So there were text messages between Mr. Kona Chan and

19  Mr. Brewer that were found on Mr. Kona Chan's phone that were

20  not, however, found during the extraction of Mr. Brewer's

21  phone; is that right?

22  A.  Yes.

23  Q.  And had they been deleted, that would lead to that result;

24  correct?

25  A.  Correct.

*BOOKWALTER – REDIRECT/LINDER*          Vol. 1-73

1   Q.  Now, you would be able to tell if they were deleted if you

2   had done -- or in the process of doing, if you have time to do

3   it, a larger, more complete extraction of the phone; is that

4   right?

5   A.  Yes.

6   Q.  But as you sit here today, that's all you can conclude

7   about it?

8   A.  Yes.

9   Q.  So you don't know definitively whether the defendant has

10  deleted them, but it's certainly possible based on the

11  evidence you've seen?

12  A.  I know that there were text messages that Mr. Kona Chan

13  gave to us that we didn't find in the logical extract of Nolan

14  Brewer's phone.

15  Q.  All right.  Next topic.  You did not -- on direct

16  examination, your testimony regarding whether there were

17  evidence of economic relation of Nazism or national socialism

18  was in the context of what was found on his phone; correct?

19  A.  Yes, correct.

20  Q.  There was, for example, a written document found in his

21  vehicle that described how some of the tenants of national --

22          MR. ANSELL:  Object.  Leading, Your Honor.

23  BY MR. LINDER:

24  Q.  What was found in his document -- what was found in his

25  vehicle relating to national socialism as an economic policy?

1  A.  I don't recall.  I don't recall seeing anything.

2  Q.  All right.  The German military style jacket that he

3  received, that he testified he received from his

4  grandfather --

5  A.  Yes.

6  Q.  -- did you see that jacket at any other point in this

7  investigation?

8  A.  I saw it on the Walmart video.  He was wearing it on the

9  Walmart video.  He was wearing it when he was arrested -- or

10  when he was interviewed and arrested.

11  Q.  And, lastly, with regard to what was told to Mr. Kona

12  Chan, your testimony is that the agents that interviewed him,

13  they told him that he had said -- "he," Mr. Brewer, had told

14  Mr. Kona Chan -- that he had planned to hit or firebomb a

15  rabbi's house and also was looking for a mosque; is that your

16  testimony?

17  A.  That he had wanted to take out the rabbi's house with

18  napalm.

19          MR. LINDER:  Thank you.

20          THE COURT:  Mr. Ansell, any further questions?

21                   **RECROSS-EXAMINATION**

22  BY MR. ANSELL:

23  Q.  This was according to the codefendants -- or, I'm sorry,

24  the coworkers of Mr. Brewer, that he had said that he wanted

25  to take out the rabbi's house with napalm?

*BOOKWALTER - RECROSS/ANSELL*          Vol. 1-75

1  A.  That's according to Kona Chan.

2  Q.  Kona Chan said that he said that?

3  A.  Yes.

4  Q.  Okay.  And, however, Nolan Brewer did say that he didn't

5  have the guts to do anything more than what he had done that

6  night at the synagogue; is that correct?

7  A.  He did say that during our interview.

8          MR. ANSELL:  All right.  No more questions, Judge.

9          MR. LINDER:  Nothing further, Your Honor.

10          THE COURT:  Thank you very much.

11          (Witness excused.)

12          THE COURT:  Mr. Linder, do you have any further

13  evidence?

14          MR. LINDER:  No, Your Honor.

15          THE COURT:  I have one question of the government

16  before I give it to Mr. Ansell.  What is the -- and I don't

17  want an address -- the location of the co-conspirator at this

18  point?  Is the co-conspirator in custody?

19          MR. LINDER:  Yes, Your Honor.

20          THE COURT:  Okay.  Mr. Ansell?

21          MR. ANSELL:  The defense calls Jeffrey Brewer.

22          THE COURT:  Would you raise your right hand.

23          (The witness is sworn.)

24          THE COURT:  Please sit down.

25          Mr. Ansell?

1          MR. ANSELL:  Thank you.

2     **JEFFREY L. BREWER, DEFENDANT'S WITNESS, SWORN**

3                **DIRECT EXAMINATION**

4  BY MR. ANSELL:

5  Q.  Sir, would you please state your name and spell your name

6  for the record.

7  A.  Jeffrey L. Brewer, Jeffrey Lane Brewer.  J-E-F-F-R-E-Y,

8  B-R-E-W-E-R.

9  Q.  And you are Nolan Brewer's father?

10 A.  Yes, I am.

11 Q.  Okay.  So first, tell me where you work.

12 A.  I work at the Eminence Corporate School Corporation as a

13 custodian.

14 Q.  And how long have you worked there?

15 A.  About 12 years.

16 Q.  How long has Nolan lived with you?

17 A.  All of his life.

18 Q.  Up until the point of his arrest; correct?

19 A.  Yes.

20 Q.  Never lived anywhere else?

21 A.  No.

22 Q.  To put into context what you told the FBI agents, are you

23 interested in history?

24 A.  Very much so, especially the photographic part of it.

25 Q.  And where do you have access to historical images or

*BREWER - DIRECT/ANSELL*                  Vol. 1-77

1  historical photographs?

2  A.  At the school.  There's all kinds of history types --

3  books and stuff.

4  Q.  So as a custodian at the school, you have access to

5  history books, textbooks, and so on?

6  A.  Yeah.

7  Q.  And you spent time looking at those books; correct?

8  A.  Yes, sir.

9  Q.  So --

10  A.  At times, I do.

11  Q.  Historical images on your phone, where would those have

12  come from?

13  A.  The textbooks.

14  Q.  Would they have only come from textbooks?

15  A.  No.  I do have some that came from taking snapshots on the

16  computer, as well.

17  Q.  Okay.  So you'll take, like a --

18  A.  Yeah, because I didn't --

19  Q.  -- take a physical picture of an item?

20  A.  -- have any idea how to access them --

21  Q.  How to downloaded --

22  A.  -- from the computers.  I'd take my phone and take

23  photographs of them.

24  Q.  Approximately how many photographs of historical images do

25  you have on your phone?

1   A.  I don't know.  I think I got pretty close to 900

2   photographs on my phone, but probably half of those, at least,

3   are historical based, yes.

4   Q.  So maybe 450 photographs of historical images?  Does that

5   sound right?

6   A.  Yes.

7   Q.  And of those images, apparently a couple of those depicted

8   KKK --

9   A.  Yes.

10   Q.  -- images?

11   A.  Yeah.

12   Q.  Now, what's the context of that?  How did those pictures

13   end up on your phone?

14   A.  I would just put them on there because of the history of

15   those events.  I just wanted to, you know, have that reminder

16   on my phone of what has happened in the past, because that's

17   history.

18   Q.  So you don't have a specific interest in the Ku Klux Klan;

19   correct?

20   A.  I have no interest in the Ku Klux Klan.

21   Q.  But you have an interest in history?

22   A.  Yes.

23   Q.  And so a very small percentage of those photographs happen

24   to depict the Ku Klux Klan; is that correct?

25   A.  Yes, sir.  I believe that there were two or three, maybe

1  four.

2  Q.  And you mentioned that to the agents before you gave them

3  consent --

4  A.  Yes, sir --

5  Q.  -- to search the phone?

6  A.  -- I did, because I knew -- I had an idea what they were

7  looking for, and I just wanted them to know that they were on

8  there.

9  Q.  What are some of the other types of images that you have,

10 that are historical?

11 A.  I have a bunch of vehicles, like service vehicles, and

12 just old cars.  I have actresses and actors, and I have

13 presidents.  And I have -- without looking, I can't tell you

14 all of them, but it's a wide variety, a wide variety of items.

15 Q.  Have you ever adopted or believed in any kind of a Nazi or

16 racist ideology?

17 A.  No, I do not.

18 Q.  That's completely foreign to you?

19 A.  Yes.

20 Q.  And was Nolan raised to believe in Nazism?

21 A.  No, he was not.  He was raised the opposite of that.

22 Q.  And what -- tell me about your family.  Is your family

23 multiracial?

24 A.  Yes, it is.  I have two granddaughters that are part

25 black, and I have nieces and nephews that are Asian and

1  Central America relation.  I have nieces and nephews that

2  are -- their parent is Japanese.  We have a multiracial

3  family.

4  Q.  And your family gets together for reunions, does it not?

5  A.  Yes.

6  Q.  And everyone gets together and there's no -- there's no

7  racial tension?

8  A.  No.  No.  We --

9  Q.  Now, your grandchildren that are biracial, those would be

10  Nolan's nieces; correct?

11  A.  Correct.

12  Q.  Does he have a relationship with them?

13  A.  Yes.  He's had a very good, close relationship with my

14  oldest granddaughter that is -- she's a quarter black, because

15  her father was half African-American, half Italian, we were

16  told, so -- but he also has a very good relationship with her

17  younger daughter, who is -- her father was black.

18  Q.  Now, does -- have you ever heard Nolan talk about

19  exploring radical ideas or ideology?

20  A.  He's never discussed that with me at all.

21  Q.  What kind of a kid was he growing up?

22  A.  He was a very caring, loving child, and he was up to the

23  point -- well, I don't know if you want me to expound on that,

24  but he -- until recent times.  We had seen changes in his

25  behavior.  But he's been involved at church, church mission

1  groups, community service things, both with the school and

2  with the church, and after-school activities with the school.

3  Q.  And one of your church's pastors is here on his behalf;

4  correct?

5  A.  Correct --

6  Q.  He's in the gallery?

7  A.  -- and I am -- I am, if I may, also an associate pastor at

8  our church.

9  Q.  And do you do any kind of missionary work?

10  A.  Yes.  For the last -- the church itself has gone out to

11  Oklahoma for the last like 20 years to help the Comanche

12  Indian church out there, to teach vacation Bible school.  And

13  Nolan has gone with us for, I believe 11 of those years.

14  Q.  Is your father still alive?

15  A.  Yes.

16  Q.  Where was he born?

17  A.  He was born and raised in Morgan County.

18  Q.  Not Germany?

19  A.  No.

20  Q.  What about your father-in-law?

21  A.  He was born and raised in Morgan County, as well.

22  Q.  So the stories about your father or your father-in-law,

23  either grandparent, being a Nazi, is there any truth to that?

24  A.  None whatsoever.

25  Q.  Do you know why Nolan would have made that up at the

1  beginning of his interview with the FBI?

2  A.  I can only theorize as to what the idea might have been,

3  but I would -- and I don't know if I'm allowed to do that or

4  not.

5  Q.  With -- with respect to Nolan's wife, how long ago did she

6  come into the picture?

7  A.  Oh, approximately three years ago.  They had a

8  long-distance relationship for quite a while because she lived

9  in Columbus.  And before that, she lived down by Brown County,

10 so he would go back and forth whenever he, you know, had the

11 opportunity to go down to see her when they were dating.  But

12 actually being in our home, not -- just since May.

13 Q.  So they got married in May?

14 A.  Yes.

15 Q.  And she moved into Nolan's room?

16 A.  Yes, in the last part of May.  I can't remember for sure

17 what the date was, but it was the last part of the month.

18 Q.  Who gave Nolan the German military jacket?

19 A.  We were told that she did.

20 Q.  That his wife --

21 A.  His wife, yes.  His wife did.

22 Q.  Did you know anything about any, like a Nazi pendant or

23 anything like that, or a swastika in his possession?

24 A.  No, but we did see him wearing the iron cross pendant.

25 Q.  You did see him wearing an iron cross pendant.  Did you

 1  know what that meant or what he meant to say with that?

 2  A.  No.

 3  Q.  Did you know where he got it?

 4  A.  I can't say for sure where he got it, but --

 5  Q.  Do you have any reason to believe --

 6  A.  I know that she has one just like it.  That's --

 7  Q.  That his wife did?

 8  A.  Yes.

 9  Q.  Now, if Nolan were to come home while this case is

10  pending, could he live at your house?

11  A.  Most assuredly.

12  Q.  And could he be at your house on electronic monitoring?

13  A.  Yes, indeed.

14  Q.  And is anyone going to -- would he ever be in the house

15  alone?

16  A.  He never, ever would.

17  Q.  Why is that?

18  A.  Because we will not allow it.  My wife -- my wife does not

19  work, so she'll be there 24 hours, so --

20  Q.  So if she leaves, it will be after you come home?

21  A.  Yes.

22  Q.  And would you and your wife have enough respect for the

23  court to contact the court or Pretrial Services if Nolan

24  exhibited any kind of inclination to cut off his electronic

25  monitoring bracelet?

*BREWER - DIRECT/ANSELL*                    Vol. 1-84

1  A.  By all means, I would.

2  Q.  So if he left the house without permission, you would

3  contact Pretrial Services?

4  A.  As quickly as I possibly could.

5  Q.  Do you believe that Nolan would respect the Court's orders

6  and stay home if he was placed on electronic monitoring?

7  A.  I certainly do.

8  Q.  Do you believe that if he were permitted to work, that he

9  would go to work and nowhere else?

10 A.  Yes.  I would even drive him back and forth and bring him

11 back if I had to, or she would.

12 Q.  So one of the two of you could take him to and from work?

13 A.  Yes, indeed.

14 Q.  And he would not drive?

15 A.  No, if that was the stipulation.

16 Q.  Do you believe -- well, no.  There's no issue of flight

17 risk.

18           When Nolan expressed remorse about what he has

19 allegedly done, do you believe that's genuine?

20 A.  Yes, I do.

21 Q.  Was this activity contrary to the Nolan that you know?

22 A.  Yes, very much so.

23 Q.  Have you ever known him to engage in any kind of

24 vandalism?

25 A.  I have never known him to be in any kind of a violent

*BREWER - DIRECT/ANSELL*                    Vol. 1-85

1  situation ever.

2  Q.  Has he ever had a girlfriend before his wife?

3  A.  Yes.

4  Q.  How long ago?

5  A.  It was -- I don't know how long ago it was between her

6  (sic) and Kiomi, but it was probably a little bit over three

7  years ago, maybe three and a half years ago.

8  Q.  So when he was a teenager or a kid?

9  A.  Yes.

10 Q.  Is this his first serious relationship?

11 A.  Yes.

12 Q.  Do you think it's been a -- that she's had a positive

13 influence or --

14 A.  No, I do not.

15 Q.  Now, if he comes home -- it's your home -- is his wife

16 welcome at the house?

17 A.  Most certainly not.

18 Q.  You would not let her live there?

19 A.  No.  We have packed all of her things and put in her

20 vehicle to be taken away.

21 Q.  You've already done that?

22 A.  Yes.

23 Q.  There's no firearms in the home?

24 A.  No, never has been.

25 Q.  And there was mention of a sword collection in the PS3.

1  Do you know about that?

2  A.  Yes.

3  Q.  Have you removed that from the house?

4  A.  Yes, I have.

5  Q.  And Nolan doesn't have a passport; correct?

6  A.  A what?

7  Q.  A passport.

8  A.  A passport?

9  Q.  Correct, a passport.

10  A.  No.

11  Q.  Does he have his own vehicle or does he borrow yours?

12  A.  He uses the one we've allowed him to use, which is hers,

13  in his mother's name.

14  Q.  And that's only with your permission; correct?

15  A.  Right.

16  Q.  In light of the trouble that he's gotten himself into, are

17  you going to be stricter about letting him use the vehicle?

18  A.  Yes.  If --

19  Q.  You're worried about him, aren't you?

20  A.  -- if he's allowed to go to work, that would be whatever

21  the stipulations would be, is the only time that he would be

22  able to do so, yes.

23  Q.  Has he always been kind of a bookworm?

24  A.  Yes.

25  Q.  And he's pretty smart, isn't he?

1   A.  He's smarter than me.

2   Q.  Do you believe that with further study and some guidance,

3   that he will find his way out of this belief system that he's

4   worked his way into?

5   A.  I do.  I truly do believe that.

6   Q.  Do you believe that this is a -- sort of an intellectual

7   belief system that he's adopted based on misinformation?

8   A.  It would be my opinion that, yes, he's been --

9   Q.  So you don't believe that it's based on any kind of an

10  emotional hatred that he harbors or that he's had for any

11  period of time?

12  A.  No.  He hasn't had any kind of hatred that -- in my

13  opinion.

14  Q.  Do --

15  A.  I think he --

16  Q.  Do you think this is something that he's sort of

17  intellectually gone down a wrong path?

18  A.  I am very sure of that, yes.

19           MR. ANSELL:  I have no more questions, Judge.

20           THE COURT:  Mr. Linder?

21           MR. LINDER:  Yes, Your Honor.

22                    **CROSS-EXAMINATION**

23  BY MR. LINDER:

24  Q.  Mr. Brewer, I'm sure this is tremendously difficult for

25  you.

 1  A.  Yes, sir, it is.

 2  Q.  I'm sure it's tremendously difficult for your family.  Is

 3  it?

 4  A.  Yes.

 5  Q.  I've got to ask you some things, though.  This -- the

 6  events described in the complaint, are you familiar with

 7  those?

 8  A.  Only from what I've heard here today.

 9  Q.  You've been present all day today and you've heard the

10  evidence that's been presented?

11  A.  Yes.

12  Q.  And your testimony is you had no idea your son was doing

13  or into any of that?

14  A.  No.

15  Q.  Yet his entire life, he has lived in your house?

16  A.  Yeah.

17  Q.  Now, you said you recalled that iron cross that he wears,

18  which was hanging on that pendant, or there was an exhibit of

19  that.  Do you remember me referring to that earlier?

20  A.  Yes.

21  Q.  And you've seen him with that?

22  A.  Yes, I have.

23  Q.  And you're a history buff; right?

24  A.  I'm a history -- interest.

25  Q.  But you're not -- but you testified you didn't know what

 1  that meant, though; right?

 2  A.  No.  I thought the iron cross was a German medal.

 3  Q.  And it was a German medal --

 4  A.  Yeah.

 5  Q.  -- back in 1939; right?

 6  A.  That I don't know.

 7  Q.  And you're also aware that your son had a large German

 8  flag above his bed; right?

 9  A.  Yes.

10  Q.  But none of his family is German; right?

11  A.  No.  That's not true.

12  Q.  You have German history, German heritage?  How about all

13  the -- let me -- you heard me talk about, on direct

14  examination with this agent here, about the images that were

15  on your son's phone; right?

16  A.  Yes.

17  Q.  Numerous racist, KKK, Nazi images; right?

18  A.  I heard him talk about that, yes.

19  Q.  But you've never seen any of that, have you?

20  A.  No, I have not.

21  Q.  You never had any inclination that your son was involved

22  with racist beliefs?

23  A.  No, because it was never brought before us.

24  Q.  I'm sorry.  I didn't hear you, sir.

25  A.  No.

 1  Q.  And no inclination that your son was sympathetic to Nazi

 2  beliefs; right?

 3  A.  No.

 4  Q.  No indication that your son made Drano bombs; is that

 5  right?

 6  A.  No, because that was not done at my house.

 7  Q.  No indication that your son made "napalm," a mixture of

 8  gasoline and styrofoam; right?

 9  A.  Again, that was not done in my house.

10  Q.  Again, no indication that he harbored a hatred toward

11  ethnic Jews; right?

12          MR. ANSELL:  Objection, asked and answered.

13          MR. LINDER:  No, I did not ask that question, Your

14  Honor.

15          THE COURT:  You can answer.

16  A.  No, he has never had any inclination to harbor any of

17  those feelings against ethnic Jews.

18  BY MR. LINDER:

19  Q.  And no inclination, certainly, that he intended to or did

20  vandalize and burn a synagogue -- or the property of a

21  synagogue in Carmel, Indiana; right?

22  A.  No.

23  Q.  The first you heard about that was the moment that the

24  agents showed up to your house; right?

25  A.  That is true.

BREWER - CROSS/LINDER                    Vol. 1-91

1  Q.  With regard to your phones, is there going to be anything

2  on them that shows any sort of racism or Nazism other than

3  those items that we discussed earlier?  You claimed there --

4  A.  On our phones?

5  Q.  On --

6         MR. ANSELL:  Objection to the question.  It assumes

7  a fact that's not in evidence.

8         THE COURT:  It doesn't assume -- no.  Overruled.  He

9  asked him, "Is there."

10         MR. ANSELL:  But he said, "other than" those images.

11         MR. LINDER:  That you testified that he --

12         MR. ANSELL:  I guess --

13         MR. LINDER:  I didn't finish the question.

14  BY MR. LINDER:

15  Q.  Sir, I'll ask it again.  On direct examination with

16  Mr. Ansell, you testified that there are some KKK images on

17  your phone, which are historical in nature; right?

18  A.  That's absolutely true.

19  Q.  And you would agree that the KKK is a racist organization;

20  is that right?

21  A.  Yes.

22  Q.  Are there any other images or communications or anything

23  on your cell phone that is either related to the KKK, Nazis,

24  or otherwise espouses racist or antisemitic messages?

25  A.  No, there is not.

*BREWER– REDIRECT/ANSELL*          Vol. 1-92

1   Q.  And you do understand we have your phone and will search

2   it and you are under oath?

3   A.  I do understand that.

4           MR. LINDER:  Very well.  Thank you.

5           Just a moment, Your Honor.

6           Nothing further.  Thank you.

7           THE COURT:  Mr. Ansell.

8           MR. ANSELL:  Thank you.

9                    **REDIRECT EXAMINATION**

10  BY MR. ANSELL:

11  Q.  Mr. Brewer, what -- do you have any sympathies towards the

12  KKK?

13  A.  No, I do not.

14  Q.  What is your opinion of the philosophy of racism that they

15  espouse?

16  A.  My opinion is that they were people that mistreated people

17  that shouldn't have been mistreated.  The people did the

18  atrocities that should not have been -- occurred.  I don't

19  follow any of their beliefs.  I think that they were wrong,

20  because the Bible teaches us that all of us are the children

21  of God, and none of us should be treated in the manner that

22  that organization or the Nazis treated people.

23  Q.  Is that how you tried to raise your son?

24  A.  That is how I tried to raise my son, yes.

25          MR. ANSELL:  No more questions.

1            MR. LINDER:  Nothing further, Your Honor.

2            THE COURT:  I have a question.

3            THE WITNESS:  Yes, sir.

4            THE COURT:  One moment.

5            Mr. Brewer, you testified that your son has a German

6    flag hanging in his room?

7            THE WITNESS:  Yes.  That was brought to our house by

8    his wife.

9            THE COURT:  Is it a current German flag?

10           THE WITNESS:  Yes.

11           THE COURT:  So it's black, yellow, and red?

12           THE WITNESS:  Yes.

13           THE COURT:  So it's not a Nazi flag?

14           THE WITNESS:  No.

15           THE COURT:  All right.  And so it's been there since

16   his wife moved in?

17           THE WITNESS:  Yes.  And the flag on his German

18   camouflage jacket is also a modern day flag.

19           THE COURT:  All right.  That's all the questions I

20   have.

21           Do you have any questions based on those questions,

22   Mr. Ansell?

23           MR. ANSELL:  I just have one, briefly.

24

25

1          **REDIRECT EXAMINATION**

2   BY MR. ANSELL:

3   Q.  Did you know that -- you knew that the iron cross was a

4   German medal; correct?

5   A.  Yes.

6   Q.  And that predates Nazism; correct?

7   A.  Yes.

8   Q.  Did you know that neofascists have adopted the iron cross

9   as one of their symbols?

10  A.  No, I did not.

11          MR. ANSELL:  No more questions.

12          MR. LINDER:  No, Your Honor.

13          THE COURT:  All right.  Thank you very much, sir.

14          (Witness excused.)

15          MR. ANSELL:  Judge, may I check with a witness?

16          THE COURT:  Yes.

17          MR. ANSELL:  Thank you.

18          (Off the record.)

19          MR. ANSELL:  The defense calls Jean Holland.

20          THE COURT:  Please raise your right hand.

21          (The witness is sworn.)

22          THE COURT:  Please be seated.

23          Mr. Ansell.

24          MR. ANSELL:  Thank you.

25

1    **JEAN K. HOLLAND, DEFENDANT'S WITNESS, SWORN**

2    <u>**DIRECT EXAMINATION**</u>

3    BY MR. ANSELL:

4    Q.  Ma'am, would you please state your name for the record.

5    A.  My name is Jean K. Holland, H-o-l-l-a-n-d.

6    Q.  And how do you spell Jean?

7    A.  J-E-A-N.

8    Q.  And how do you know Nolan?

9    A.  I was his Sunday school teacher.

10   Q.  From what age to what age?

11   A.  From about the time that he was about eight until he was

12   14.

13   Q.  And do you know his family, as well?

14   A.  Yes, I do.

15   Q.  They're members of your church?

16   A.  Yes.

17   Q.  Can you describe how Nolan was as a child?

18   A.  He was my poster child.  He was very good, kind, loving,

19   giving, considerate, caring.  He was everything you would

20   want.

21   Q.  Do you think those were genuine attributes that he had?

22   A.  Absolutely.

23   Q.  And do you believe that his -- do you have any knowledge

24   of -- in your interactions with his family and with his

25   parents, do you have any knowledge of the sorts of beliefs

1  that he was raised to have?

2  A.  He was raised in a good Christian home.

3  Q.  Do you believe that the home he was raised in was a home

4  that was free of any racist belief?

5  A.  Absolutely.

6  Q.  And in all the years that you taught him at Sunday school,

7  did he ever exhibit any kind of racist belief?

8  A.  No, never.

9  Q.  And did you see him interact with kids of different races?

10  A.  Yes, I have.

11  Q.  And did he treat everyone the same?

12  A.  Always.

13  Q.  Have you had any occasions to spend any time with him

14  since he was 14?

15  A.  Yes.

16  Q.  Can you describe when and how?

17  A.  At church, church events.  His father and I took a group

18  of youth to a concert, a Christian concert with ten Christian

19  bands.  Those type of events.

20  Q.  Up until about how -- about what age was Nolan when the

21  most recent of your significant interactions with him?

22  A.  I would say about 18.

23  Q.  So as recently as two years ago.  And did you ever see any

24  change in his character or did he remain that kind and caring

25  child that you knew as he grew up?

1   A.  He was a little quieter recently, but he was always very

2   courteous and kind to everyone whenever we were together.

3   Q.  Respectful?

4   A.  Very.

5   Q.  Is he the kind of person that you would expect to obey the

6   court's orders as far as where he can go and what he can do?

7   A.  Yes.

8   Q.  Even if it were true that -- even if it's true that he

9   committed this crime?

10  A.  Yes.

11  Q.  So you think that having been caught and being before the

12  Court, you believe he's going to revert back to his deeper

13  character?

14  A.  Yes, I do.

15  Q.  So do you believe that he presently presents any kind of a

16  real danger to the public?

17  A.  No.

18          MR. ANSELL:  No more questions, Judge.  Thank you.

19          THE COURT:  Thank you.

20          Mr. Linder?

21                      **CROSS-EXAMINATION**

22  BY MR. LINDER:

23  Q.  Ms. Holland, I recognize that this, too, for you is also

24  very difficult; right?

25  A.  Yes.

*HOLLAND - CROSS/LINDER*          Vol. 1-98

1   Q.  You said you've known Nolan for a long time?

2   A.  Yes.  Since 2006.

3   Q.  You were his Sunday school teacher until age 14, so he was

4   14?

5   A.  Until he was about 14 when I stepped down, because I had

6   other duties that didn't give me enough time.

7   Q.  He's 20 years old now; right?

8   A.  Yes.

9   Q.  And how -- to what extent have you been in touch with him

10  or his family --

11  A.  Weekly.

12  Q.  -- at his current age?

13  A.  Weekly.

14  Q.  So you feel like you know him right now?

15  A.  Know him, yes.  We talk at church, at church events,

16  before, after church.  He's -- I've kept up with what he's

17  been going -- what he's been doing.  I didn't -- I might have

18  stepped down from teaching him, but I didn't stop caring about

19  him or believing in him.

20  Q.  So you feel like you know Nolan Brewer today; right?

21  A.  I -- the Nolan that I know, I just can't believe what he's

22  done.  And I know the evidence shows that he did do what he

23  did, but the Nolan I know, I feel, as I see sitting here right

24  now, okay, I see remorse in him.  And I know that he would

25  obey.  And I know his family, I know his parents, and I know

1  that they would make him obey.

2  Q.  Do you know that the Nolan you spoke about with -- on

3  direct was the Nolan you knew from Sunday school; right?

4  A.  It's the Nolan I've known since 2006.

5  Q.  And the Nolan you're talking about, the one who would

6  obey, is that Nolan; right?

7  A.  Yes.

8  Q.  But the Nolan you know is not a Nolan who would threaten

9  to burn down a rabbi's house; right?

10 A.  No.

11 Q.  It's not a Nolan that would go and look for other targets,

12 other mosques to deface, to get his message out; right?

13 A.  No.

14 Q.  It's not a Nolan that would have swastikas and Hitler all

15 over his cell phone, is it?

16 A.  It depends on the context of that.  Nolan is an artist.

17 And if it was in an art context, he might --

18 Q.  Have you ever known --

19 A.  -- but not in a vicious manner.

20 Q.  Have you ever known Nolan to make art with swastikas?

21 A.  I've known Nolan to make art with many different things.

22 Q.  Have you known him to make art with swastikas?

23 A.  Not that I recall.

24 Q.  All right.  Again, your opinion of Nolan is not the Nolan

25 who says that he defaced and drew Nazi flags and iron crosses

*McCAULEY - DIRECT/ANSELL*          Vol. 1-100

1  on a synagogue and burnt the ground of the synagogue to tell

2  ethnic Jews to get out; right?

3  A.  Correct.

4  Q.  Not the same Nolan who made Drano bombs; right?

5  A.  Correct.

6  Q.  Not the same Nolan who made napalm; right?

7  A.  Correct.

8  Q.  The Nolan you know is not the Nolan that did all of these

9  things recently, which is the whole reason we're here today;

10 right?

11 A.  Correct.

12          MR. LINDER:  Nothing further, Your Honor.

13          THE COURT:  Mr. Ansell?

14          MR. ANSELL:  Nothing, Judge.

15          THE COURT:  All right.  Thank you, ma'am.

16          (Witness excused.)

17          MR. ANSELL:  I have one more witness.  David

18 McCauley.

19          THE COURT:  Raise your right hand, please.

20          (The witness is sworn.)

21          THE COURT:  Please be seated.

22          **DAVID McCAULEY, DEFENDANT'S WITNESS, SWORN**

23                    **<u>DIRECT EXAMINATION</u>**

24 BY MR. ANSELL:

25 Q.  Good afternoon, sir.  Would you please state your name.

1  A.  Reverend David McCauley, D-A-V-I-D, M-C-C-A-U-L-E-Y.

2  Q.  And what's your relationship to the Brewer family?

3  A.  I was the pastor at Corinth Baptist Church from 2001 to

4  2005.  I was ordained at the Corinth church.  I've known Nolan

5  from that time.  And even up to today, I've known the family,

6  I've been to very many of their events.  I've had -- there's

7  been some trauma in the family, and I have been a part of

8  helping through that.  So I'm very, very much aware of the

9  family and all of the siblings and aunts and uncles.

10  Q.  How involved has the family been in the church?

11  A.  The family has been very involved.  Jeff has taught -- he

12  has a message during the worship service.  He has completed

13  some art projects for the church that are displayed.

14          They are very much a part of the mission field.  And

15  when they go to -- out west to the reservation and teach Bible

16  school, they are very involved in the community.  Even if

17  there's a church event, if we have a silent auction, if

18  there's something going on in the community, at the firehouse

19  or at Eminence School, they are always a part and

20  participated.

21  Q.  How many years have you known them to be involved in the

22  church?

23  A.  I came in about 2001, and they -- I've known them the

24  entire time up until today.

25  Q.  And do you have any reason to doubt Jeff Brewer's or Darla

1  Brewer's belief and the faith that they espouse at the church?

2  A.  No.  They hold to the Christian tenants, the principles of

3  scripture.  His messages to the young people during the

4  worship service, they are very historically based on the Bible

5  and various events.  No, not to my knowledge.

6  Q.  Have you ever seen any indication that Jeff Brewer harbors

7  any kind of racist feelings?

8  A.  No.  Jeff Brewer and Darla, they're very laid back

9  individuals.  They do give their -- they have given their

10 children leeway.  You know, they -- they're there for them,

11 but they do let them seek their own way.  They have -- Nolan's

12 siblings are great, great individuals, they've done well.

13 They're very kind.  I've never seen anything out of them that

14 has shown violence, racism.  It's just never -- I just -- I

15 just can't believe that.

16 Q.  Have you seen evidence of the contrary, evidence that they

17 are not racist, or evidence that they are not violent?

18 A.  Well, they are a very giving and open family.  I know when

19 we were there, Amy and I, they were very open for folks to

20 come into the church, very welcoming.  They are a

21 multicultural family, so they love each other.  They've always

22 interacted well with one another.  They're really -- I

23 can't -- racism has never been something that has been

24 displayed either through social media, on Facebook, or in

25 person, that we've seen.

*McCAULEY - CROSS/LINDER*                Vol. 1-103

1  Q.  Do you believe that the -- any influence to Nolan in a

2  racist or antisemitic or violence direction could have

3  possibly come from his family?

4  A.  No.  Nolan -- the first time I ever saw Nolan, he was four

5  or five years old, and he used to do somersaults down the

6  middle aisle of the church, which was rather funny.  But Nolan

7  is a very -- he's a very gentle young man.  He always has

8  been.

9         He's very inquisitive, so it would be nothing for

10  him to maybe look at various situations in the context just to

11  gain more of a knowledge.  My wife knows many of his teachers

12  that have had him in high school, and they have high praise

13  for Nolan, that he was more of a sponge for knowledge.

14        We have kept up with Nolan throughout his life

15  through those teachers, social media, so we have always -- we

16  may have left the church and gone on, but we were very much

17  aware, a part of the family, and we knew more about Nolan.  So

18  when this came up and it showed up in the paper, on WTHR, I

19  was appalled and shocked that he would be implicated in this

20  crime.

21              MR. ANSELL:  I have no more questions.  Thank you.

22              THE COURT:  Mr. Linder.

23                    **CROSS-EXAMINATION**

24  BY MR. LINDER:

25  Q.  Pastor McCauley, just very briefly, you testified you know

1   the family very, very well; is that right?

2   A.  Yes.

3   Q.  And you mentioned you have counseled them through

4   difficult issues --

5   A.  That's correct --

6   Q.  -- and trauma to the family; is that correct?

7   A.  Yes.

8   Q.  Has the family ever come to you and expressed to you

9   problems with Nolan regarding beliefs in Nazism?

10  A.  No.

11  Q.  Has the family ever come to you and addressed issues or

12  sought your counsel regarding Nolan's penchant for racism?

13  A.  No.

14  Q.  Or Nolan's interest in making bombs?

15  A.  Oh, no.

16  Q.  Nolan's interest in playing with fire, or napalm, as he

17  calls it?

18  A.  No.

19  Q.  Nolan's hatred towards ethnic Jews, as he stated to the

20  officer?

21  A.  No.

22  Q.  And is it safe to say that prior to reading it on WTHR,

23  you had no indication from the family that they were aware

24  that Nolan had done this to this synagogue?

25  A.  No.

*McCAULEY - CROSS/LINDER*                    Vol. 1-105

1   Q.  So is it safe to say that his family had absolutely no

2   idea that he was in any of the evidence that we've presented

3   today?

4   A.  I don't believe so.

5           MR. LINDER:  No further questions.

6   A.  But the one thing -- if I may say one thing --

7           MR. LINDER:  Your Honor, on redirect.

8           THE COURT:  Go ahead.

9   A.  The one thing I can say about Nolan, he was -- so he's at

10  the synagogue and he decides to do this.  The part that I know

11  of Nolan, that I want to make clear, is there's a part of

12  Nolan, when he had the opportunity to bust through that door

13  and to firebomb that synagogue, the Nolan I know said no.  And

14  that's what is, to me, is the -- in my heart, and I know it's

15  in his, so I know the Nolan I know is there, because anybody

16  hellbent, excuse me, for destruction would never have just

17  allowed a light or a camera -- they would have done it.  And

18  Nolan, I think through the teachings that we have at Corinth,

19  said no.

20          And if I can say anything, I'm proud of him.  I'm

21  proud of him for not doing that.  I'm disappointed in what

22  he's done, but I'm proud that he did not take that extra step.

23  And I can say that.  That is what the church has taught Nolan

24  throughout his life, and I'm thankful for that.

25          MR. LINDER:  Nothing further, Your Honor.

*McCAULEY - CROSS/LINDER*          Vol. 1-106

1        THE COURT:  Mr. Ansell?

2        MR. ANSELL:  Nothing further, Your Honor.

3        THE COURT:  Thank you, sir.

4        (Witness excused.)

5        MR. ANSELL:  The defense rests.

6        THE COURT:  I have a question for you, then,

7   Mr. Ansell, as to the job.  He was working at Tradesmen

8   International.  Do you have any information, one way or the

9   other, as to whether that job is still there?

10        MR. ANSELL:  He believes that the job --

11        THE COURT:  You need to turn on your mic.

12        MR. ANSELL:  My apologies.  He believes that that

13   job is still available to him.

14        THE COURT:  And now you need to tell me you rest

15   with your mic on.

16        MR. ANSELL:  The defense rests.

17        THE COURT:  Any further evidence for the United

18   States?

19        MR. LINDER:  No, Your Honor.

20        THE COURT:  Argument.  United States?

21        MR. LINDER:  Yes, Your Honor.

22        Your Honor, this -- just to walk through the factors

23   here, this is an inordinately serious offense.  It is an

24   offense involving a threat to the Jewish people, involving

25   Nazism.  There is no symbol that carries a greater threat than

1   a Nazi flag to the Jewish people.

2          Moreover, there's not only a Jewish flag.  This

3   defendant, the evidence shows very strongly, was involved, was

4   guilty of this offense.  He confessed to it.  But, certainly,

5   the presence of fire, as the defendant well knows from

6   anything else, the memes on his phone, about what fire means

7   to the Jewish people, that vile image on his phone about Jews

8   and ashtrays.

9          The evidence shows an individual -- sure, he is a

10  young individual, but the evidence shows a depraved individual

11  at present.  He may have been a wonderful child, but presently

12  he is enthralled by Nazism and racism.  His phone is full of

13  it.  His discussions with his coworkers, that's what he talks

14  about.  He tries to recruit them to white, in their words,

15  white nationalism and white supremacy.

16          He brags about what he did.  He did not -- sure,

17  when he talked to the special agent, he expressed some

18  remorse.  Now, he also was forthright in why he did it, and he

19  did attempt to deflect blame in a way, whether it was his

20  on-line personality or his wife, but when he talked to his

21  coworkers or Mr. Kona Chan, his friend, he did not deflect

22  blame.  He bragged about this.  He was proud of this.  And his

23  text messages with his wife show he was proud of this.  He did

24  this to get attention, to make a point to the Jewish people

25  that they're to get out.  And, sure enough, it was covered on

1  CNN, and even the vice president talked about it.  He was

2  proud of that.

3        Now -- and the evidence regarding his perpetration

4  of the offense shows foresight and planning.  This is not

5  something he just did spur of the moment.  There are maps,

6  multiple maps, two different options about where he should be.

7  He told the agent he chose one of them.  He went to Walmart in

8  advance and bought supplies.  He talked to his pal, Kona Chan,

9  about getting the gas can and getting things ready.  He

10  planned this.  This is not something where he simply showed

11  up, spray painted something, and ran away feeling guilty.  He

12  spent at least the entire day planning it.  That's what the

13  evidence says.

14        And as the special agent testified, there's still

15  plenty of evidence to go through.  And the evidence involves

16  not only these threats with spray paint; it involves fire, it

17  involves a substance that the defendant has called napalm.

18  Now, we know it's not, but it's certainly a dangerous

19  substance.  And it involves explosive devices.  It involves

20  these overpressured devices that he still had on him 18 days

21  later.

22        Now, Mr. Ansell points out, well, he only had the

23  bad -- the type of Drano that doesn't work.  Okay, but he also

24  still had the spray paint and these devices.  If you're truly

25  remorseful, you're, like, "Oh, my God, I have bombs in my

1  trunk.  Let me get rid of these things."  No, he didn't do

2  that.  For two and a half weeks, he carried them around until

3  the very moment he was arrested.

4          And all he had to do was go back to Walmart and buy

5  some liquid Drano or some other substance that would make

6  these things activate.  And they're not just disparate items

7  either, but the foil was inside, the cap was on, they were

8  ready to go.  That is consistent with what the witnesses told

9  the agents when they talked about him, about this defendant

10  having future plans.

11          Now, the defense has tried to downplay that in a

12  variety of ways, but what you have is a defendant who was

13  proud of himself and very proud of what he did, and knew that

14  he got the shock value out of it, and went around bragging

15  about it and went around talking about the things that he

16  wanted to do or wished he could do, wished he could have

17  gotten into that building.

18          And, frankly, to some extent, even what he told the

19  agent, "Yeah, we were going to go in there, but we saw the

20  security cameras," that's not a remorseful person.  That's a

21  person worried about getting caught.  It still shows that, in

22  his head, he intended to do something terrible with these

23  explosive devices and this inordinately flammable substance.

24          So he brags about the offense to people, he uses it

25  as a recruiting tool, he tells law enforcement that he's, you

1  know, scared of the building, but then he tells his coworkers

2  that he couldn't get access into the building.

3          He never mentions to law enforcement that he

4  intended to burn the rabbi's house down, but, of course,

5  that's what he brags about to his friend and that's what he

6  tells his friend he plans to do.  And then he never tells law

7  enforcement that they were looking for other sites, but, of

8  course, again, he tells his friend that's what they -- that's

9  what he was planning to do with his co-conspirator.  That's

10  all consistent with the way that he has viewed this offense,

11  the way he carried it out, what he got from it, and what he

12  planned to do in the future, and the items in his trunk.

13          Now, as it apparently is suggested, the defense

14  would like to proffer that the defendant's parents' home is an

15  appropriate place for him.  And, Your Honor, the evidence is

16  that this defendant has harbored these extraordinary, extreme

17  Nazi, antisemitic, racist views under his parents' nose

18  without their -- them having any inkling about it whatsoever.

19  The defendant planned and perpetrated this offense with his

20  wife, who also lives there -- granted, she's in custody now,

21  but she lived there at the time.  And, again, with no inkling

22  from his parents.  This offense was a serious offense.  It is

23  not someone who just got up one day and went to go commit a

24  crime.  And here he is living with his parents, right next to

25  them, and they have no idea.

1          Thus, Your Honor, it is clear that a condition of

2     him being able to go home, even on electronic monitoring, just

3     is not sufficient.  They had the opportunity to find this out,

4     and they didn't.  They had no idea.  The presence of an ankle

5     bracelet is not going to change much.  This -- the clear and

6     convincing evidence in this record is that this defendant

7     poses a danger to the community, and there are no conditions

8     that would reasonably assure the community of its safety.  He

9     should be detained.  Thank you.

10          THE COURT:  Thank you, Mr. Linder.

11          Mr. Ansell?

12          MR. ANSELL:  Well, I do disagree with the

13     government's characterization.  I don't think that the parents

14     could be blamed for not seeing something that the defendant

15     would obviously have been hiding from them.  And he would hide

16     it from them because it's not something that they would

17     approve of or agree with.  And now they know that he's gotten

18     himself into this crazy belief system, and they're alarmed.

19     And they're the type of people who are going to look after him

20     and are going to try to protect him, and they're going to try

21     to keep him out of further trouble.

22          So I don't doubt that if he's at home on an ankle

23     bracelet -- and the dad testified that Mom doesn't work, that

24     she will be there, that one of the two of them will be there

25     24 hours a day, and that either one of them would immediately

1   call Pretrial Services if he showed the slightest inkling to

2   get up and go somewhere or do something that he shouldn't do

3   or, in any way, disobey the Court's orders.

4          Now, I am in complete agreement that the nature of

5   the offense is horrible, that the message that is -- was

6   attempted to be sent, and that was sent, by this vandalism is

7   just horrible.  However, I don't believe that the evidence

8   shows that Mr. Brewer was raised with some kind of a hatred

9   towards other groups of people.  I think this is something

10  that he was seduced into by his reading on-line, chatting

11  on-line, obviously the influence of his then girlfriend, now

12  wife.  And he has gone down a terrible path in terms of his

13  intellectual pursuit and the belief systems that he's bought

14  into, and also in the actions that he's taken.

15         I agree, the evidence is strong.  He confessed.  He

16  immediately confessed.  He told the case agent what he had

17  done, who he had spoken with.  I think in the beginning, he

18  was trying to deflect blame from his wife and tried to protect

19  her, but that sort of fell apart.  He didn't want to tell them

20  that she's the one that gave him the German jacket, that she's

21  the one that gave him the iron cross.  He made up this story

22  about his grandfather, which is nonsense.  His grandparents

23  were both born and raised in Morgan County, Indiana.

24         So he's got some problems, he needs some counseling.

25  He needs to continue his education and learn how to think

1  critically in order to be able to challenge these beliefs that

2  are false.  He needs a broader, deeper understanding of the

3  world to find his way out of these racist beliefs.  He wasn't

4  raised to be racist.  This is not something that's inherent in

5  him.  This is something that he has gotten into, and it's a

6  mistake.  And I think he understands it's a mistake.

7          And he's not so arrogant to believe that he's got

8  everything figured out.  He's still inquisitive.  He still has

9  questions.  He was still exploring different ways.  He was --

10 different belief systems.  He was still -- it was still

11 racist.  The Identitarian group that he was telling the agent

12 that he was interested in, that they're more of the nonviolent

13 separatists, that they're not the genocidal separatists, but,

14 I mean, it's -- it's -- he's still searching, he's still

15 trying to understand the world, he's still exploring the

16 world.  The path he went down is completely wrong.

17         It's not necessary to hold him in prison right now.

18 If he is sentenced to a term of imprisonment, that -- when the

19 time comes, the Court will make that decision, and the Court,

20 I'm confident, will make the right decision and take into

21 account the guidelines, the sentencing guidelines, take into

22 account the 3553(a) factors, take into account his history and

23 characteristics, and sentence him appropriately, but right now

24 he's not a danger to the public.  He is a scared child.  And

25 there is definitive scientific proof that the male juvenile

 1  brain is not even fully developed until about the age of 25.

 2  He's 20 years old.  He's essentially still an adolescent in

 3  his brain.

 4          Of course this is a terrible crime.  Of course he

 5  has made a terrible mistake.  Was he planning to do something

 6  else?  I don't think so.  I think he barely had the stomach

 7  for what he did.  And, yeah, maybe he bragged about it when he

 8  was still high on the adrenaline of doing something crazy and

 9  stupid.  And he was certainly encouraged by his wife, who I

10  think has some more deeply rooted racist beliefs, but I

11  believe that he is remorseful and I believe that he had no

12  intent to do anything violent.

13          And, again, I believe he was trying to figure out a

14  way to talk his wife out of going down this path.  If he was

15  going to do something else, he would have gotten the

16  appropriate Drano, the liquid Drano rather than the gel Drano,

17  and he would have done more experimentation with these

18  pressure bombs that blow the cap off of a Gatorade bottle.

19  There would have been something else, but there's not.

20          There is the terrible crime.  There is him trying to

21  get more hours at work because his conscience was bothering

22  him about it, it was weighing on his conscience.  And there is

23  his long history of being just a peaceful, kind, caring, law

24  abiding child who went to Sunday school every week, who went

25  to all the church functions, who was always respectful to his

1   parents, who was always respectful to the other adults at the

2   church and at the school.  That is him.

3           He's also the kid who got seduced into this crazy

4   belief system and bought into it and was goaded into taking

5   some -- what he believed was some kind of a message that was

6   appropriate or correct.  He knows it's wrong.  He is learning

7   even now.  We've had discussions about some of the fallacies

8   that he based his belief on.  He is open to learn.  He will

9   continue to learn.  He is not a danger to the public, and it

10  certainly has not been proved by clear and convincing

11  evidence.

12          THE COURT:  Thank you, Mr. Ansell.

13          Mr. Linder, any further argument?

14          MR. LINDER:  Very briefly, Your Honor.  To the

15  extent the defendant is still learning, it should not come at

16  a risk to society.  The defense argument is that this is a

17  young impressionable person, his brain isn't fully formed,

18  he's still learning things.  That is instability.  That is not

19  someone, with the evidence that we have presented, that should

20  be allowed out.  That is someone who needs to be detained

21  given the defendant's history already of what he has been

22  willing to do while he is still figuring things out.  Thank

23  you.

24          THE COURT:  Mr. Ansell?

25          MR. ANSELL:  Judge, the heart of my argument is that

 1  he's not a danger to the public.  And to the extent that he

 2  is, if he has inclinations to do further vandalism, that there

 3  are conditions or a combination of conditions that will

 4  reasonably assure the safety of the public, electronic

 5  monitoring, a curfew.  And I think the Court can be confident

 6  that his parents will keep a very close eye on him considering

 7  what has happened.

 8          THE COURT:  Anything else?

 9          MR. LINDER:  Nothing further, Your Honor.

10          THE COURT:  I need to give this some thought.  I'm

11  going to take it under advisement.

12          Counsel, are you available at 12:45 tomorrow?

13          MR. LINDER:  Yes, Your Honor.

14          MR. ANSELL:  Yes, Judge, I can be here.

15          THE COURT:  All right.  Then I'm going to take this

16  motion under advisement and reconvene this hearing at

17  12:45 p.m. tomorrow, August 22, 2018.  I'm going to remand the

18  defendant to the custody of the United States Marshals pending

19  that hearing.

20          Okay.  Anything further for the United States at

21  this time?

22          MR. LINDER:  No, Your Honor.  Thank you.

23          THE COURT:  Anything further from the defendant?

24          MR. ANSELL:  No, Your Honor.  Thank you.

25          THE COURT:  All right.  Thank you very much.  We are

Vol. 1-117

1  adjourned.

2          THE COURTROOM DEPUTY:  All rise.

3          (Proceedings adjourned at 6:18 p.m.)

4

5

6              CERTIFICATE OF COURT REPORTER

7

8      I, David W. Moxley, hereby certify that the

9  foregoing is a true and correct transcript from

10  reported proceedings in the above-entitled matter.

11

12

13

14  /S/ David W. Moxley_____    August 27, 2018
    DAVID W. MOXLEY, RMR/CRR/CMRS
15  Official Court Reporter
    Southern District of Indiana
16  Indianapolis Division

17

18

19

20

21

22

23

24

25