UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:18-cr-00286-TWP-DLP |
| | ) | |
| NOLAN BREWER, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by counsel, Josh J. Minkler, United States Attorney for the Southern District of Indiana, and Nicholas J. Linder, Assistant United States Attorney, hereby submits the following Sentencing Memorandum in the above-captioned case.

## INTRODUCTION

Members of Congregation Shaarey Tefilla, a Jewish synagogue in Carmel, Indiana, awoke in horror on the morning of July 29, 2018 to perhaps the starkest symbol of hate and violence that could be directed at those of the Jewish faith. Two massive red and black Nazi flags, flanked by two Iron Crosses, had been painted on the walls of the Congregation's property. And below them, the ground had been scorched by fire, yet another reminder of the genocide the Jewish people suffered during the Holocaust. The Congregation knew that over the past several years, hate crimes against people of the Jewish faith were on the rise. Some of them deadly. Fear shook the Congregation.

Fear is what Nolan Brewer and his co-conspirator wife intended. Brewer had come to believe in Nazism. He admired Adolf Hitler, wore Nazi paraphernalia, and spoke of white supremacy. He and his wife wanted to send a message. So they went out and bought supplies.

Not only spray paint, but also ingredients they used to build overpressure explosive devices and concoct homemade "napalm."  In the middle of the night, they drove over 50 miles to the Synagogue.  They parked a mile away to avoid detection and carried their supplies in a backpack, planning to break into the Synagogue and set it on fire.  In the end, the Synagogue's security deterred them from breaking in, so they sent their message on the walls of a nearby enclosure.

The next day, while the Congregation, and indeed the entire community, took notice in shock and disgust, Brewer bragged about what he had done.  He was not remorseful.  Witnesses will testify that he was unusually happy and excited.  He showed them photos and gloated about the national news coverage.  And, more than two weeks later, when arrested by the FBI, he still had the spray paint, explosive devices, and other tools in the trunk of his car.

Brewer's hateful conduct demands a meaningful sentence of imprisonment.  Not only to reflect the seriousness of the crime, but perhaps even more critically, to promote deterrence.

Brewer is pleading guilty.  There is no plea agreement, nor a stipulated factual basis, however.  At sentencing, the government will present witnesses and exhibits to support its view of the facts, which Probation has credited and included in the Presentence Report's summary of the offense conduct.  Furthermore, relevant to the Sentencing Guidelines, the evidence is likely to show, by a preponderance, that the base offense level is 24, instead of 12.

Most critically, though, the evidence will show that a reasonable sentence under section 3553(a) requires a meaningful sentence of imprisonment.  Brewer's crime involved more than spray-painting a swastika on a synagogue.  It involved planning, overpressure bombs and homemade napalm, and a sense of excitement and pride in Brewer.  Even if the Court does not conclude that Brewer's base offense level is 24, the substantially lower base offense level of 12

hardly captures the full scope of Brewer's beliefs and conduct before, during, and after committing the offense.

Nor would a minimal prison sentence adequately afford deterrence, which is perhaps one of the most important sentencing considerations in case of this kind at this moment in time. Religious-bias hate crimes, particularly against those of the Jewish faith, have become more prevalent of late. The tragic incidents at synagogues in Pittsburgh, Pennsylvania and Poway, California in just the last few months underscore the danger of the recent escalation. This Court's sentence should send a message that society cannot, and will not, tolerate deliberate criminal acts of hate targeted at a community's faith. The government recommends a sentence within or reasonably close to the guidelines range at an offense level 24.

## BACKGROUND

### I.   Factual Background

The Presentence Report's summary of the offense conduct accurately depicts the nature and circumstances of the crime. *See* PSR, Dkt. No. 52, at ¶¶ 7–24. The government will not restate that summary here. Instead, this section summarizes the evidence the government expects to introduce at sentencing to support the PSR's factual summary and the PSR's guidelines calculation using a base offense level of 24 (PSR ¶ 29). In general, the government's evidence at sentencing, which will include witness testimony and the exhibits attached to this sentencing memorandum, falls into four categories.

### A.   Brewer's Attack on the Synagogue was Planned

First, the evidence will show that the attack on the Synagogue was not a spontaneous, late-night childhood prank but was planned out and calculated to cause fear. *See* Exhs. 1–3 (photographs of defaced Synagogue). In fact, he said as much to a co-worker a few days after the

3

attack when she asked if it was a spur-of-the-moment decision: "No.  We planned it… Okay.  We planned it out the entire day before."  Exh. 57 at 4 (excerpts from transcript of covert consensually recorded conversation[1]).

Brewer and his co-conspirator purchased supplies specifically for the attack.  Walmart surveillance video and a receipt from the day before the attack show Brewer, in his German military jacket, and his co-conspirator purchasing red and black spray paint, rubber gloves, a roll of aluminum foil, a package of Styrofoam plates, eight bottles of Gatorade, two containers of Drano, and two bandanas.  *See* Exhs. 6–9 (Walmart surveillance still images and receipt).  These were the only items they purchased.

When arrested, Brewer gave a statement to the FBI, which was recorded.  *See* Exh. 10 (transcript of recorded statement).[2]  At first, he lied and denied ever going to the Synagogue.  *Id.* at 19–20.  This was not the only time Brewer lied to the FBI, though.  For instance, Brewer told the FBI that an online persona called "Asbestos Peter," whom Brewer claimed inspired their attack on the Synagogue, had "told us how to make napalm."  *See* Exh. 10 at 26.  That is false.  Brewer's old phone contained a text message he sent dated April 29, 2018, three months before the Synagogue attack, which stated "Right now we're just getting stuff for napalm."  *See* Exh. 54 at 6 (SMS Messages #2).

Eventually, Brewer admitted to the FBI his involvement in the Synagogue attack and explained the use of the items they bought:  the spray paint was for the Nazi flags and iron crosses, which measured several feet across, *id.* at 35; the Gatorade bottles, aluminum foil, and Drano were

---

[1]     The full audio is available and can be made available for the Court's review.

[2]     The full audio is available and can be made available for the Court's review.

for making overpressure explosive devices, referred to as "Drano bombs,"[3] *id.* at 26, 36–37, 88, 91–92; and the Styrofoam plates were for mixing with gasoline to make a sticky flammable substance, referred to as homemade "napalm," *id.* at 23, 37, 46, 91–93.  (Additional evidence regarding the "napalm" includes a text message the day before the Synagogue attack from Brewer to his friend Alex Hitchcock (referred to as "Kona Chan") about filling up a gas can, *see* Exh. 11, and a digital photo of the completed "napalm" mixture, *see*  Exh. 12.)

Furthermore, they chose their target specifically and planned how to get there.  The Synagogue in Carmel, Indiana, was located over 50 miles from Brewer's residence.  Both Brewer and his co-conspirator sketched out a parking area and routes on maps on their cell phones.  *See* Exhs. 4 (from Brewer's phone) and 5 (from his co-conspirator's phone).  And they followed their plan.  Brewer later admitted to the FBI that they parked at a Mormon Church – as shown on the map from Brewer's phone (Exh. 4) – and walked over a mile from the parking place to the Synagogue, hauling all of their supplies, including the "napalm," with them.  *See* Exh. 10 at 32 (transcript of Brewer statement to FBI).

Finally, when confronted, Brewer admitted he understood the gravity of his actions.  When asked what impact the attack had on the members of the Synagogue, he responded, "Scare the hell

---

[3]     Drano cleaner and aluminum foil, when combined, can react to create a gas.  Inside a sealed container, such as a Gatorade bottle, the mixture can potentially create an overpressure situation which causes the sealed container to explode.  *See, e.g.*,

https://www.google.com/amp/s/abc7ny.com/amp/news/exclusive-girl-burned-by-drano-bomb-on-playground-speaks-out/2108485/

https://www.theindychannel.com/news/local-news/drano-bombs-explode-at-two-pendleton-homes

http://www.nbcnews.com/id/51822636/ns/technology_and_science-tech_and_gadgets/t/how-kiera-wilmots-school-bomb-could-have-killed-her/

According to Brewer, however, the type of Drano he purchased, which was a gel and not a liquid, did not cause that reaction.

out of them." *See* Exh. 10 at 78.  When asked what the purpose of the attack was, Brewer responded, "sending a message of like, get out I guess.  Sending a message you know." *Id.* at 95.

### B.      Brewer Originally Intended to Break Into to the Synagogue

Second, the government anticipates that the evidence will show that Brewer and his co-conspirator originally intended to enter and set fire to the Synagogue itself but were unable to do so and thus settled for defacing and burning the ground around an enclosure on Synagogue property.  A former co-worker of Brewer's is expected to testify that, on the day after the incident, Brewer seemed unusually happy at work.  When the co-worker asked why, Brewer said he had vandalized a Jewish synagogue with Nazi symbols and later showed her photos of the scene on his cell phone.  *See* Exhs. 13 and 14.  Brewer also told the co-worker that he and his wife originally planned to break into the Synagogue and wanted to find a way inside but, after arriving there, they got spooked and did not have enough time, so they targeted the external enclosure instead.

Brewer himself admitted to the FBI that he and his co-conspirator had originally planned to break into the Synagogue and set fire to it.  He told the FBI that the original plan was to "take the Drano bomb . . . and then toss the napalm on top of it, and then light it and run so that whenever the Drano bomb went off, it would set the napalm everywhere." *Id.* at 92.  He also admitted that they had brought with them ceramic pieces of spark plugs, which they believed contained chemical properties ("aluminum oxide") that would help them break windows and enter the Synagogue.  *Id.* at 89–91.

When asked why they did not enter the building, though, Brewer's statements evolved throughout the interview.  At first, Brewer stated that they originally intended to enter the Synagogue but, when they walked up to the Synagogue, they saw lights and security cameras and became nervous, so they diverted to the external enclosure to spray paint and set fire.  *See* Exh. 10

at 32–33, 81.   Later, however, instead of the security cameras and lights causing them to change

plans at the scene, Brewer stated that they decided not to set fire to the Synagogue "on the way up

. . . on 465 heading north."  *Id.* at 92.

### C.   Brewer Held Strong Beliefs in Nazism

Third, the evidence is expected to show that Brewer's hate crime was the product of fervent

beliefs in Nazism, anti-Semitism, and white nationalism.  Co-workers from two different jobs

where Brewer worked during 2018 will testify that Brewer wore a swastika or an iron cross on a

necklace, had a swastika on the background of his cell phone, routinely spoke about his admiration

for Adolf Hitler and/or Nazism, and attempted to recruit co-workers to his Nazi views.  Indeed, in

his room at home, agents found a book by Adolf Hitler, a German flag hung above the bed, and an

iron cross necklace prominently hung on the wall next to the door.  *See* Exhs. 15–17.

Additionally, Brewer's cell phones contained numerous digital images, text messages, and

other data that reinforce that he was a Nazi sympathizer who held racist and anti-Semitic beliefs,

such as:

| Exhibit No. | Description |
|---|---|
| 18–20 | Photos of himself wearing Nazi paraphernalia. |
| 21–22 | Photos of his wife (co-conspirator) wearing Nazi paraphernalia. |
| 23 | A photo of himself the German military jacket seen in the Walmart surveillance and his wife wearing a bandana. |
| 24–25 | Photos titled "Little Sisters" depicting young female standing next to Nazi flag. |
| 26–37 | Images of swastikas, iron crosses, and other Nazi paraphernalia, including the background wallpaper on Brewer's cell phone throughout July 2018. |
| 38–43 | Images identifying with Adolf Hitler and Nazism and Nazi ideology and text message to co-worker discussing Nazism. |
| 44–50 | Anti-African American images and memes. |
| 51–53 | Anti-Semitic images and memes. |
| 54 | Anti-Hispanic text messages dated March 10, 2018, from Brewer's old cell phone.  (Page 10, Timeline #s 8 and 9.) |

| Exhibit No. | Description |
|---|---|
| 54 | Google search history from Brewer's old cell phone containing references to Hitler, Nazism, and anti-Semitism, including "swastika images" on April 9, 2018, and "when jews found out it wasn't a shower meme" on April 12, 2018. (Pages 4–5, "Searched Items.") |

### D.      Brewer Bragged About his Attack on the Synagogue

Fourth, the evidence will show that, after the incident, Brewer was pleased and excited with what he had done at the Synagogue.  As noted above, Brewer's co-worker observed that he seemed unusually happy as he told her about what he had done and showed her the photos on his phone.  In addition, Brewer's text messages two days after the incident further substantiate his pride in defacing the Synagogue.  In one exchange, his wife (co-conspirator) tells him that the incident made the news and that Vice President Mike Pence had tweeted about it.  Brewer's responded, "Hole f***ing sh*t!!!!!  You're not kidding are you?"  She tells him she has taken "tons and tons of screenshots of comments" on the news stories, to which Brewer responded, "Yay!"  *See* Exh. 55.

A few hours later, Brewer texted his friend, Alex Hitchcock (a/k/a "Kona Chan"), and sent screenshots of news stories about the incident.  Brewer said, "Buddy!  Look!  Holy sh*t! . . .  It made FOX59 . . .  Google it!  The word synagogue is trending in Indiana and soon to go regional." *See* Exh. 56.

The government anticipates that Hitchcock will testify that Brewer admitted to him that he (Brewer) and his wife had attacked the Synagogue.  Hitchcock is also expected to testify that Brewer and his wife said that they knew where the rabbi of the Synagogue lived, that it was a $500,000 house, and that they wanted to burn it down.  Hitchcock is further expected to testify that

Brewer's wife stated that if it had been up to her, they would have burned it down already, but Brewer had made up an excuse to leave after they had spray painted the Nazi symbols and set fire to the ground around them.

Furthermore, a week later, Brewer talked again with a co-worker about the incident, his planning of it, and the nationwide response to it.  He was giddy and proud of what he had done. At one point, he stated, while chuckling:

> Yeah if you actually drive down 70, you can see a billboard where it says Love and then it has the Jewish star of David in it, because like there's, there's like fourteen of those signs around Indiana now because they're just trying to show some support for the people.

*See* Exh. 57 at 3 (excerpts from transcript of covert consensually recorded conversation).  His excitement was apparent, saying at one point, "You've got me smiling over here," *see id.* at 5, and he talked about how there was a "2.5K bounty out for information on us, cause they have nothing," and that "Mike Pence tweeted about us," *see id.* at 3.

Finally, more than two weeks after the incident, when arrested in his car on August 15, 2018, Brewer still had his supplies with him, including the spray paint, bandanas, Drano, and emptied Gatorade bottles still filled with rolled up pieces of aluminum foil.  *See* Exhs. 58–67.  The spray paint and the Gatorade bottles were still contained in a backpack and plastic grocery bag that Brewer admitted using to carry the supplies to the Synagogue.  *See* Exh. 10 at 34–35.

## II.    <u>Procedural Background and Issues at Sentencing</u>

Brewer was charged by Criminal Complaint following his arrest on August 15, 2018.  *See* Dkt. No. 2.  Brewer was ordered released pending trial over the government's objection and appeal to the district court.  *See* Dkt. Nos. 13, 22, 25, 26, and 27.  On September 12, 2018, the grand jury indicted Brewer on one count of Conspiracy to Violate Rights, in violation of 18 U.S.C. 241(a).

*See* Dkt. No. 28.  On January 24, 2019, Brewer filed a Petition to Enter Plea of Guilty, without a plea agreement.  *See* Dkt. No. 47.  To date, there is no stipulated factual basis.

Following disclosure of the initial PSR, Brewer submitted objections to various paragraphs of the offense conduct.  *See* Final PSR Addendum, Dkt. No. 52 at 16.  Brewer also lodged an objection to the Probation Office's finding that the base offense level was 24.  *Id.* at 17.  The Probation Office responded that it stood by its guidelines calculation because Brewer's conduct involved actual or attempted destruction of a building, land, or other location accessible or open to members of the public.  *Id.*

At sentencing, in addition to the ultimate sentencing determination under 18 U.S.C. § 3553(a), the parties will address the appropriate base offense level under U.S.S.G. § 2H1.1(a).

## ARGUMENT

### I.    Base Offense Level Under U.S.S.G. § 2H1.1

Under the relevant hate crime guideline, U.S.S.G. 2H1.1(a), the base offense level equals the greater of the offense level applicable to any underlying offense, or level 12.  Here, as the PSR points out, the relevant underlying offense is arson, which is governed by U.S.S.G. § 2K1.4.  Under that guideline, the base offense level is 24 if the offense involved the actual or attempted destruction of "a place of public use." U.S.S.G. § 2K1.4(a)(1).  Congregation Shaarey Tefilla is "a place of public use."  *See* 18 U.S.C. § 2332f(e)(6) (defining "place of public use" as "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally, and encompasses any commercial, business, cultural, historical, educational, religious, governmental, entertainment, recreational, or similar place that is so accessible or open to the public").  Therefore, the key guidelines issue in

this case is whether, by a preponderance, the evidence shows that Brewer attempted to destroy the Synagogue.

"Attempt" involves both the intent to commit an act and a "substantial step" toward committing the act. *See United States v. Rovetuso*, 768 F.2d 809, 821–22 (7th Cir. 1985). A "substantial step" must be "conduct strongly corroborative of the firmness of the defendant's criminal intent." *Id.* The Seventh Circuit has characterized a "substantial step" this way:

> A substantial step is some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime. It requires something more than mere preparation, but less than the last act necessary before actual commission of the substantive crime. This line between mere preparation and a substantial step is inherently fact specific; conduct that would appear to be mere preparation in one case might qualify as a substantial step in another. Generally, a defendant takes a substantial step when his actions make it reasonably clear that had the defendant not been interrupted or made a mistake he would have completed the crime.

*United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013) (internal quotations omitted). In evaluating whether conduct constitutes a substantial step, "the focus is on the actions already taken to complete the underlying crime, *not* on the acts that remain uncompleted at the time of the arrest." *United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010).

Here, Brewer admitted to the FBI that their plan was to break into the Synagogue, using the ceramic pieces, and then "take the Drano bomb . . . and then toss the napalm on top of it, and then light it and run so that whenever the Drano bomb went off, it would set the napalm everywhere." *See* Exh. 10 at 92. Such evidence strongly indicates that Brewer had the intent to set fire to the Synagogue.

Thus, the question is whether he carried through on his plan to the point of taking a "substantial step." The anticipated testimony and other evidence, if found credible by the Court, supports such a finding by a preponderance of the evidence:

11

- Brewer told the FBI that he only decided not to enter the Synagogue after seeing the Synagogue's lights and security cameras.

- Brewer told a co-worker that he intended to break into the Synagogue and wanted to find a way inside, but when he got there, he got spooked and diverted to the external enclosure.

- Brewer brought along pieces of spark plug ceramic casing because he believed he could use them to break the Synagogue's glass windows.

- Brewer made "Drano bombs" and carried them by foot in a backpack over one mile to the Synagogue, but then never deployed them.

- Brewer made homemade napalm by combining gasoline and Styrofoam in a saucepan and carried it by foot over one mile to the Synagogue.

- Brewer and his co-conspirator later told his friend, Alex Hitchcock, that they planned to burn down the rabbi's house and knew where the rabbi lived.

- Brewer was found over two weeks later still with the Drano bombs, spray paint, and ceramic spark plug pieces in the trunk of his car.

The notion that Brewer's original plan was only to target the external outbuilding structure with spray paint and fire, and not the Synagogue itself, is nonsensical.  This is what he claims in his PSR Objection No. 2, and what his story evolved to during his statement to the FBI ("on 465 heading north").  This position is not supported by the evidence.  Brewer did not carry spark plug casings, napalm, and eight Drano bombs – which were never used – when he only intended to spray paint an external structure housing a garbage dumpster.  It is unlikely Brewer even knew the external structure, located in the back of the Synagogue's property, even existed before arriving at the Synagogue in the middle of the night.

What is more likely – and is proven by a preponderance of the evidence – is what he told his co-worker and what he told the FBI (before he minimized):  He intended to break into the Synagogue and set fire to it up to the point when they reached the Synagogue itself.  They did not find an easy way inside, and in the process, they noticed the security lights and cameras around the Synagogue's exterior, so they diverted to the external structure to send their hateful message.  In other words, but for the Synagogue's security measures, Brewer was likely to have completed the destruction of the Synagogue, which he had originally set out to do.

This sequence of events – which is more credible and corroborated than the notion that Brewer's only intent was to graffiti an outbuilding – constitutes an attempt, which results in a base offense level of 24.[4]

## II.  A Meaningful Prison Sentence is Required by Section 3553(a)

A sentence of imprisonment within the advisory guidelines range assuming a base offense level of 24 (a range of 51–63 months), or reasonably close to the low-end of that range, is sufficient but not greater than necessary.  Thus, if the Court concludes that the base offense level is 12 and not 24, the Court should vary upwards.  A base offense level of 12 does not adequately capture the nature and circumstances of the offense and Brewer's history and characteristics, nor promote meaningful deterrence given today's hate crime landscape.  *See United States v. White*, 883 F.3d 983, 987 (7th Cir. 2018) ("When a judge explains that a disputed guideline issue ultimately did not matter for the exercise of sentencing discretion under § 3553(a), we will treat an arguable error in the guideline calculation as harmless.").

---

[4]     One other note regarding the Guidelines calculation in this case:  To receive any reduction for acceptance of responsibility, Brewer must not "falsely deny" or "frivolously contest" relevant conduct.  *See* U.S.S.G. § 3E1.1 app. n. 1(A).  In his objections to the PSR, Brewer stated that he "never intended . . . to set fire to the synagogue itself" and that Brewer "withdrew from any further conspiracy to violate rights after he and K.B. vandalized the synagogue."  PSR at 17.  As noted herein, the evidence at sentencing is expected to show otherwise as to both points.

A.    <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of Brewer's hate crime are best summarized by the victim impact statement in this case: "Short of injury or death . . . nothing instills more intense emotion in the Jewish community than images and language from the Nazi era when six million Jews were murdered." *See* Dkt. No. 60.  Two massive Nazi flags, and flanked by Iron Crosses and a patch of scorched earth, struck fear into the Congregation Shaarey Tefilla and members of the Jewish community throughout central Indiana.  Brewer knew this.  Indeed, as with many hate crime offenses, instilling fear was his purpose for committing this brazen act.

But Brewer's is not a mine-run hate crime case.  Several facts exacerbate his culpability. For example, Brewer targeted a house of worship, not a private residence or community organization.  Such a target, which was over 50 miles from Brewer's residence, reflects not only a level of planning but also an attempt to maximize the impact of his conduct.  Furthermore, along these lines, Brewer did not target an individual or small group, but rather a congregation of people. It was planned and designed to instill fear among an entire community – to "scare the hell out of them," as Brewer told the FBI.  And, in the days that followed, Brewer relished his sense of accomplishment as he read and shared national news stories and chuckled about the outpouring of support on billboards throughout Indiana.

Additionally, as discussed at length above, Brewer's conduct involved much more than spray paint.  He and his wife planned it out in advance.  They targeted a place of worship 50 miles from their home.  They purchased supplies for and made "Drano bombs" and homemade "napalm," which they carried for over a mile from their parking spot – along with their ceramic spark plug pieces that they believed could help break windows – with the intent to break into the

14

Synagogue and set it on fire.  None of those circumstances of the offense are captured in a base offense level of 12.

Rather, a base offense level of 12 would apply if all Brewer had done was spray paint a swastika.  But that ignores the worst of his conduct.  It ignores the true "seriousness of the offense." Therefore, even if the Court does not conclude that Brewer's conduct legally constituted a "substantial step" to trigger a base offense level of 24, the Court should vary upwards to hold Brewer accountable for the full scope of his malicious intent, level of planning, the danger he posed, and the closeness to which he came in making that danger a reality.

**B.    History and Characteristics of the Defendant**

Just as Brewer's hate crime was not a spontaneous event, neither was Brewer's affinity for the hateful ideology that motivated it.  The evidence will show that, for months at least, Brewer had been obsessed with Nazism and white nationalism.  He talked about it with co-workers whenever they would listen.  And, to corroborate the co-workers' testimony, his cell phones were replete with Nazi paraphernalia and blatantly racist and anti-Semitic symbols and memes.

That Brewer may have been introduced to the Nazi ideology by others does not mitigate his culpability.  At sentencing, the government anticipates that Brewer will point to his co-conspirator wife as the driver behind his Nazi beliefs and one of the instigators in the attack on the Synagogue, since she had previously participated in vandalizing two churches in southern Indiana. The other instigator Brewer has pointed to is an online persona referred to as "Asbestos Peter," with whom his wife appears to have communicated via social media.  During his interview with the FBI, Brewer routinely blamed the "Asbestos Peter" user as the source for the ideas of attacking the Synagogue, making Drano bombs, and concocting homemade napalm.  *See* Exh. 10 at 23–29.

15

Such claims should have little bearing on Brewer's sentence for at least three reasons.  First, Brewer was not a reluctant participant.  The attack on the Synagogue was planned and prepared for, and Brewer participated fully in it.   Second, along these lines, the Guidelines already adequately account for his role in the offense.  Although Brewer is being convicted of a conspiracy, there is no U.S.S.G. § 3B1.1 enhancement for "organizer, leader, manager, supervisor."  At the same time, no reduction for a "mitigating role" is appropriate.  The evidence shows that Brewer was at least equally culpable as his co-conspirator wife.

Third, the fact that Brewer may have been radicalized into Nazi ideology by his wife, through social media, or from any other source, is irrelevant.  People become radicalized by others – that is the nature of any radicalization.  What *is* relevant is Brewer's receptiveness to the Nazi ideology, the thinking of Adolf Hitler, and the racism and anti-Semitism that accompanies it.  And the evidence shows that Brewer was, for months, not only receptive but trying to spread the ideology to others.

Lastly, Brewer's rehabilitative efforts since his arrest should have little bearing on the Court's ultimate sentencing determination.  The government anticipates that Brewer will highlight those efforts at sentencing.  But a person's true character is not exhibited after they are caught – rather, it is on display when they believe no one is looking.

For Brewer, his true character can be measured not only by his Nazi ideology leading up to the Synagogue attack, but perhaps even more telling, by the excitement, pleasure, and pride he openly displayed in the weeks following it.  At no point did he express remorse or regret for what he had done.  Just the opposite.  He showed off photos of the Nazi flags and fire burning, he bragged about the reward offered for information about the crime, and he was proud of the attention his hateful act garnered, including attention from the Vice President.  Moreover, when

16

arrested, he still had the spray paint, Drano bombs, and other supplies in his trunk. Keeping the tools of one's criminal tradecraft in their possession is not consistent with remorse and regret – nor is it consistent with a withdrawal from a conspiracy, as Brewer suggested in his PSR Objections. Instead, it is consistent with someone who felt exhilarated by what he had done and desired to do it again in the future.

### C.   **Promoting Respect for the Law and Affording Adequate Deterrence**

Brewer's attack on the Congregation Shaarey Tefilla was part of a troubling national trend. In recent years, anti-Jewish hate crimes have become more prevalent in the United States. This is not only anecdotally true – although mass tragedies such as the shooting at the Tree of Life synagogue in Pittsburgh, Pennsylvania in October 2018,[5] and the shooting at the synagogue in Poway, California just three weeks ago, on April 27, 2019,[6] call attention to the problem. The FBI's Uniform Crime Reporting data show that hate crimes motivated by religious bias have increased 52% over just the past six years.[7] In fact, between just 2016 and 2017 (the last year data is available), the incidence of such crimes increased by 21%. In raw numbers, in 2016, there were approximately 1,291 religious-bias motivated hate crime incidents in the United States. In 2017, there were approximately 1,563, nearly 300 more in just one year.

Anti-Jewish hate crimes have consistently represented the majority of all religious-bias motivated hate crime incidents. In 2017, anti-Jewish hate crimes represented 58.1% of such hate

---

[5]     A copy of the federal charges are available at https://www.justice.gov/opa/press-release/file/1125336/download

[6]     A summary of the federal charges are available at https://www.justice.gov/usao-sdca/pr/alleged-synagogue-shooter-charged-federal-hate-crimes

[7]     Uniform Crime Reporting data on hate crimes is available for each year between 1995 through 2017 from FBI Criminal Justice Information Services Division's Hate Crime Statistics, *available at* https://ucr.fbi.gov/hate-crime. The data discussed herein is available by clicking the "Access Tables" link under the "Incidents and Offenses" heading on each year's hate crime statistics page.

crimes, up from 54.2% the year before, and 51.3% the year before that.  The next most prevalent

hate crime target, those of the Muslim faith, comprised between 18%–22% over the same three-

year period.

Section 3553(a) instructs that a sentence should afford adequate deterrence.  That includes

not only deterring Brewer, but most relevant here, deterring others who might think to commit

similar offenses.  *See United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018).  The hate crime

data, and the recent violence at Jewish synagogues, reinforce the need for general deterrence for

crimes such as Brewer's.  This Court's sentence should send a message that there is a high cost for

committing hate crimes, especially those that target houses of worship.  That cost is federal prison.

And, in this case, that is a meaningful term of imprisonment within or is reasonably close to the

guidelines range at offense level 24.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the

Defendant, Nolan Brewer, to a term of imprisonment within or reasonably close to the guidelines

range at offense level 24, a term of supervised release of 3 years, and restitution as set forth in the

Presentence Report.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

Date:   May 15, 2019          By:   /s/ Nicholas J. Linder
                                    Nicholas J. Linder
                                    Assistant United States Attorney

18

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2019 a copy of the foregoing, and the attached exhibits, were filed via CM/ECF, which will electronically notify counsel of record for all parties.  All parties may access this filing through that CM/ECF.


By:    /s/ Nicholas J. Linder
          Nicholas J. Linder
          Assistant United States Attorney
          United States Attorney's Office
          10 West Market Street, Suite 2100
          Indianapolis, IN 46204-3048
          Telephone: 317-226-6333
          Email: nick.linder@usdoj.gov