UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         ) CAUSE NO.:
                                   ) 1:18-CR-00286-TWP-DLP
                                   ) Indianapolis, Indiana
        -v-                        ) **May 20th, 2019**
                                   ) 2:00 p.m.
NOLAN BREWER,                      )
                                   )
                Defendant.         )

**Before the Honorable
TANYA WALTON PRATT, JUDGE**


OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING


**For Government:**        Nicholas J. Linder, Esq.
                           Assistant U.S. Attorney
                           United States Attorney's Office
                           10 West Market Street
                           Suite 2100
                           Indianapolis, IN  46204


**For Defendant:**         Harold Samuel Ansell, Esq.
                           Attorney At Law
                           156 East Market Street
                           Suite 900
                           Indianapolis, IN  46204


**Court Reporter:**        Laura Howie-Walters, FCRR, CSR, RPR
                           Official Court Reporter
                           United States District Court
                           46 E. Ohio Street
                           Room 217
                           Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

```
 1                        (Open court.)

 2            THE COURT:  You may be seated.  Good afternoon.

 3            MR. LINDER:  Good afternoon, Your Honor.

 4            THE COURT:  We are on the record.  This is the United

 5    States of America versus Nolan Brewer.  Our case number is

 6    1:18-cr-286, and we are here for both a change of plea and

 7    sentencing hearing.  And, Counsel, we'll begin by having you

 8    state your names and introduce those at your table, beginning

 9    with the Government.

10            MR. LINDER:  Good afternoon, Your Honor.  This is

11    United States Attorney Nick Linder on behalf of the United

12    States, and with me at counsel table is FBI Special Agent

13    Matthew Stahl.

14            THE COURT:  Good afternoon.

15            And at our defendant's table?

16            MR. ANSELL:  Good afternoon, Your Honor.  Sam Ansell

17    on behalf of our client, Mr. Nolan Brewer.

18            THE COURT:  For the record, from the United States

19    Probation Office, Brittany Neat is present, and our court

20    reporter is Laura Howie-Walters.

21            It's my understanding, Mr. Ansell, that Mr. Brewer

22    wishes to enter a plea of guilty to Count 1 of the indictment.

23    That count is conspiracy to violate rights, and the parties are

24    also prepared to proceed with sentencing today.  Is that

25    correct?
```

1         MR. ANSELL:  That's correct, Your Honor.

2         THE COURT:  And your client is pleading guilty without

3    the benefit of a plea agreement; is that correct?

4         MR. ANSELL:  He is pleading guilty without a plea

5    agreement.

6         THE COURT:  All right.  Mr. Ansell, would you and

7    Mr. Brewer come up to the lectern, and while they are doing

8    that, Mr. Linder, are there identifiable victims of the

9    offense?  Do any wish to be heard?

10        MR. LINDER:  There are indeed, Your Honor.  Some are

11   here in the courtroom today.  They have submitted a victim

12   impact statement, and that is how they wish to be heard.

13        THE COURT:  All right.  Thank you, Counsel.

14        MR. LINDER:  Thank you.

15        THE COURT:  Mr. Brewer, sir, you previously filed a

16   petition to enter a plea of guilty.  Are you prepared to go

17   forward with your hearing?

18        THE DEFENDANT:  Yes.

19        THE COURT:  All right, sir.  I need you to raise your

20   right hand as best you're able and I'm going to place you under

21   oath.

22        (Defendant sworn.)

23        You may put your hand down.

24        Mr. Brewer, do you understand that you're now under

25   oath, and if you answer any of my questions falsely, those

1    answers could later be used against you in another prosecution

2    for either perjury or make making a false statement?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Sir, what is your full name?

5              THE DEFENDANT:  Nolan Ross Brewer.

6              THE COURT:  How old are you, Mr. Brewer?

7              THE DEFENDANT:  Twenty-one years old.

8              THE COURT:  How far did you go in school?

9              THE DEFENDANT:  An associate's degree.

10             THE COURT:  Sir, have you been treated recently for

11   any mental illness or addiction to narcotic drugs?  And I need

12   you to speak directly into the microphone.

13             THE DEFENDANT:  I'm sorry, could you repeat that?

14             THE COURT:  Have you been treated recently for any

15   mental illness or addiction to narcotic drugs?

16             THE DEFENDANT:  No.

17             THE COURT:  Are you currently under the influence of

18   any medication or other substance that might affect your

19   ability to understand today's proceedings?

20             THE DEFENDANT:  No.

21             THE COURT:  Mr. Brewer, have you received a copy of

22   the indictment?  That's the document with the written charges

23   that have been made against you in this case.

24             THE DEFENDANT:  Yes.

25             THE COURT:  And have you had an opportunity to fully

1  discuss the charges and the indictment with Mr. Ansell?

2        THE DEFENDANT:  Yes, I have.

3        THE COURT:  Sir, you've agreed to plead guilty to

4  Count 1, conspiracy to violate rights.  And this is a very

5  serious felony charge.  It is a Class C felony that under

6  statutory provisions carries up to ten years imprisonment and

7  up to a $250,000 fine.  Do you understand?

8        THE DEFENDANT:  Yes.

9        THE COURT:  Any prison sentence for this charge may be

10 followed by what's called supervised release.  It's similar to

11 what you're presently under.  You're under pretrial

12 supervision, but you would be subject to supervision by a

13 federal probation officer.  You have to comply with a number of

14 conditions such as no new arrests or convictions.  If it was

15 alleged that you had violated conditions of your release, you

16 would have a hearing, and if found in violation, you could end

17 up back in prison on this exact same charge; do you understand?

18       THE DEFENDANT:  Yes.

19       THE COURT:  For this offense, supervised release could

20 last for up to three years.  Do you understand?

21       THE DEFENDANT:  Yes.

22       THE COURT:  In addition to being fined up to $250,000,

23 you could be ordered to pay restitution to any known victims,

24 and you'll also have to pay a mandatory special assessment fee

25 of $100; do you understand?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Mr. Linder, are there any other penalties

3     that need to be mentioned on this charge?

4          MR. LINDER:  No, Your Honor.

5          THE COURT:  Sir, have you had sufficient time to talk

6     with your lawyer about the Government's evidence against you in

7     this case?

8          THE DEFENDANT:  Yes, I have.

9          THE COURT:  And have you talked with your lawyer about

10    ways in which you might defend yourself when you were making

11    the decision whether you would plead guilty or proceed to have

12    a jury hear this matter?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Are you fully satisfied with the counsel

15    representation and advice that Mr. Ansell's given you?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Mr. Brewer, you've agreed to plead guilty

18    without a plea agreement.  Has anyone threatened you or used

19    any force to get you to plead guilty?

20         THE DEFENDANT:  No.

21         THE COURT:  Has anyone made any promises or assurances

22    about what's going to happen to persuade you to plead guilty?

23         THE DEFENDANT:  No.

24         THE COURT:  Are you pleading guilty of your own free

25    will and because you are, in fact, guilty?

1       THE DEFENDANT:  Yes.

2       THE COURT:  Sir, do you understand that the offense

3   that you're pleading to is a felony?  If your plea is accepted,

4   you'll be adjudged guilty, and a federal felony adjudication

5   may deprive you of very valuable civil rights such as a right

6   to vote, a right to hold public office, a right to serve on a

7   jury, and a right to possess any kind of firearms.  Do you

8   understand that, Mr. Brewer?

9       THE DEFENDANT:  Yes.

10       THE COURT:  And knowing these factors, do you still

11   wish to enter this plea of guilty?

12       THE DEFENDANT:  Yes.

13       THE COURT:  Sir, you do have a right to plead not

14   guilty to any offense charged against you and to maintain your

15   innocence, but when you plead guilty, you're giving up that

16   right.  Do you understand?

17       THE DEFENDANT:  Yes.

18       THE COURT:  You have a right to a trial by jury, but

19   when you plead guilty, you give up that right.  Do you

20   understand you will not have a trial?

21       THE DEFENDANT:  Yes.

22       THE COURT:  If you had gone to trial, you would be

23   presumed innocent, and Mr. Linder, representing the Government,

24   he alone would have the burden of proof.  Mr. Linder would have

25   to prove your guilt beyond a reasonable doubt, but because

you're admitting your guilt, he no longer has to meet that

burden of proof.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  You have a right to the assistance of

counsel for your defense, and a right to have an attorney

furnished free of charge if you cannot afford to hire your own,

and you do maintain your right to counsel at all stages of a

criminal proceeding.  Do you understand, Mr. Brewer?

THE DEFENDANT:  Yes.

THE COURT:  You have a right to see and hear all of

the witnesses against you.  If you had gone to trial,

Mr. Linder would have called each of his witnesses up here to

the witness stand, and then Mr. Ansell would have an

opportunity to cross-examine those witnesses in your defense,

but because you're pleading guilty, you've given up that right.

Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  You, sir, have a right to testify on your

own behalf and you also have a right to decline to testify.

You could not be made or compelled to testify unless you

voluntarily elected to do so in your defense, but when you

plead guilty, you give up that right.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  You have a right to use the Court's power

of subpoena to compel or bring in witnesses on your behalf and

1    in your defense, but when you plead guilty, you give up that

2    right.  Do you understand?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Sir, if you had gone to trial, and you and

5    Mr. Ansell had made the decision that you would not testify at

6    your trial, or if Mr. Ansell decided not to present any

7    evidence at trial, I would have admonished the jury and

8    instructed them they cannot discuss that fact or hold it

9    against you in any way, but when you plead guilty, you give up

10   that right.  Do you understand?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Do you further understand that by entering

13   a plea of guilty, if the plea is accepted by the Court, there

14   will be no trial, and you will have waived or given up your

15   right to trial as well as all of the rights associated with

16   trial that I've just described?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Sir, you've agreed to plead guilty to

19   Count 1, and you do not have a plea agreement.  So we're going

20   to talk about the elements of this offense.  These elements are

21   what the Government says they can prove beyond a reasonable

22   doubt if we went to trial, and because you're pleading guilty,

23   you're alleging that you're able to -- you accept these

24   elements.  And is this what you have in docket 68, Government

25   Exhibit 68, Mr. Linder?

1      MR. LINDER:  That's correct, Your Honor.  That was not

2  filed beforehand.  It's being submitted now as the elements of

3  the offense to guide this part of the Court's colloquy.

4      THE COURT:  Okay.  Have you seen this one?

5      MR. ANSELL:  Yes, we have it right here.

6      THE COURT:  These are the elements, Mr. Brewer.

7      The first element of conspiracy to violate rights is

8  that there was a conspiracy to injure, oppress, threaten or

9  intimidate the members of Congregation -- can somebody

10  pronounce it for me?

11     MR. LINDER:  Shaarey Tefilla.

12     THE COURT:  Shaarey Tefilla is charged in Count 1, and

13  second, that you, the defendant, Mr. Brewer, knowingly became a

14  member of the conspiracy with an intent to further the

15  conspiracy; and three, you, the defendant, intended to deprive

16  the members of the Congregation of the free exercise or

17  enjoyment of rights secured by the Constitution and laws of the

18  United States, such as the right to hold property, such as a

19  synagogue, free of racial discrimination under Title 42, United

20  States Code, Section 1982, which applies to persons of the

21  Jewish faith.

22     The Government is not required to prove that you, the

23  defendant, knew the rights were secured by the Constitution and

24  laws of the United States; and the fourth element is that one

25  or more of the intended victims was present in the state of

1    Indiana, which is in the United States.

2              Do you understand the elements of this offense?

3              THE DEFENDANT:  Yes.

4              THE COURT:  By pleading guilty, you are admitting that

5    the Government could prove each of these elements against you

6    beyond a reasonable doubt.  Do you understand that, Mr. Brewer?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Because there is no plea agreement, I will

9    use my discretion to fashion a sentence within the statutory

10   range that we talked about earlier.  That's up to ten years

11   imprisonment.  And I will consider factors that are set forth

12   in Title 18, United States Code, Section 3553(a) in determining

13   the appropriate sentence within the statutory range.

14             The 3553(a) factors, Mr. Brewer, are things such as

15   the nature and circumstances of the offense, your

16   characteristics, any criminal history you might have, the need

17   to promote respect for the law, and provide adequate deterrence

18   to criminal conduct of this nature.  Those are some of the

19   3553(a) factors.

20             Do you recall discussing those factors with

21   Mr. Ansell?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Did you have that conversation,

24   Mr. Ansell?

25             MR. ANSELL:  Yes, Your Honor.

1          THE COURT:  And I'm also going to take into account

2     and consider the United States sentencing guidelines.  And I

3     know Mr. Ansell went through the guidelines.  Do you do

4     electronic version or do you use the book, Mr. Ansell?

5          MR. ANSELL:  I usually go online.

6          THE COURT:  Okay.  There's a chart on the back, and

7     Mr. Ansell's indicated that you have reviewed the guidelines

8     with your client?

9          MR. ANSELL:  Yes, Your Honor.

10          THE COURT:  All right.  So I'll take those guidelines

11     into consideration, Mr. Brewer, but you should understand that

12     the sentencing guidelines are not mandatory or binding on the

13     Court, rather they are advisory in nature; do you understand?

14          THE DEFENDANT:  Yes.

15          THE COURT:  If I impose a sentence either higher or

16     lower -- I need to get some water.  If you'll give me one

17     minute, okay?

18                    (Off-the-record discussion.)

19          THE COURT:  If I impose a sentence either higher or

20     lower than any recommendation that you and your lawyer make, or

21     higher or lower than any recommendation that the Government's

22     attorney makes, or if I decide to sentence you outside of the

23     applicable guideline range, or if I determine a criminal

24     history category different than what's suggested by your lawyer

25     or the probation officer, you will not be able to withdraw from

1    your plea of guilty for those reasons.  Do you understand?

2             THE DEFENDANT:  Yes.

3             THE COURT:  If you were not a United States citizen

4    pleading guilty of this type of crime, this is considered a

5    removable offense, and if you were not a United States citizen,

6    you would likely be deported once you completed any executed

7    portion of the sentence.  Do you understand?

8             THE DEFENDANT:  Yes.

9             THE COURT:  I could also order forfeiture of any

10   right, title and interest in any contraband or proceeds or

11   items that were seized incident to your arrest or used in

12   assisting you in this criminal offense.  Do you understand?

13            THE DEFENDANT:  Yes.

14            THE COURT:  By pleading guilty, I can still impose the

15   same sentence as if you had maintained your innocence, gone to

16   trial and been found guilty by a jury.  Do you understand?

17            THE DEFENDANT:  Yes.

18            THE COURT:  Sir, you also have both a statutory and a

19   Constitutional right to appeal today's conviction and the

20   sentence that I will impose, and the manner in which your

21   sentence will be determined.  You also have a right to have an

22   attorney appointed to represent you in an appeal if you are

23   unable to afford to hire counsel or to pay the filing fee, and

24   any Notice of Appeal must be filed within 14 days after entry

25   of the judgment, which would be about 14 days after you've been

1    sentenced.  Do you understand?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  All right.  At this time, we need to

4    establish a factual basis, and Government, are you going to

5    establish that factual basis?

6                    MR. LINDER:  Yes, Your Honor.  To do so, I would call

7    the agent to the stand to give a summary of what the Government

8    would prove at trial.

9                    THE COURT:  All right.  So gentlemen, if you would

10   have a seat, and, Mr. Linder, you may call your witness.

11                   MR. LINDER:  Thank you, Your Honor.  The United States

12   would call FBI Agent Matthew Stahl.

13                   THE COURT:  Agent Stahl, if you'd come up to the

14   witness stand.  And, sir, if you would remain standing and

15   raise your right hand.

16        **MATTHEW STAHL, PLAINTIFF'S WITNESS, SWORN**

17                        **DIRECT EXAMINATION**

18                   THE COURT:  You may have a seat.  Once he's seated,

19   Counsel, you may examine your witness.

20                   MR. LINDER:  Thank you, Your Honor.

21                   In advance of sentencing today, the Government has

22   provided the Court and defense counsel with its factual basis,

23   which is marked as Government's Exhibit 69.  At this time, I'm

24   going to hand that to the agent.

25                   THE COURT:  You may.

1          MR. LINDER:  Thank you, Your Honor.

2   BY MR. LINDER:

3   Q.  Sir, could you please state your name for the record and

4   spell your name for the court reporter.

5   A.  It's Matthew Stahl, S-T-A-H-L.

6   Q.  Mr. Stahl, what do you do for work?

7   A.  I'm an FBI agent.

8   Q.  Special Agent Stahl, how long have you been an FBI agent?

9   A.  Approximately 17 years.

10  Q.  Special Agent Stahl, did you participate in the

11  investigation of the defendant, Nolan Brewer?

12  A.  Yes, I did.

13  Q.  Are you familiar with the facts developed throughout the

14  course of that investigation?

15  A.  Yes, I am.

16  Q.  Could you please summarize for the Court what the

17  Government's evidence would show if presented to a jury at

18  trial to sustain the defendant's conviction of Count 1 beyond a

19  reasonable doubt?

20  A.  Yes.  In the early morning hours of July 28, 2018, the

21  defendant and his wife drove to Congregation Shaarey Tefilla, a

22  Jewish synagogue, located in Carmel, Indiana.  They brought

23  with them cans of red and black spray paint, bandannas, rubber

24  gloves, a container of homemade napalm, which is a mixture of

25  gasoline and Styrofoam, Gatorade bottles with pieces of

1   aluminum foil inside, Drano cleaner and ceramic pieces of spark

2   plugs.

3       They planned to spray paint antisemitic symbols at the

4   synagogue and set fire to it.  They purchased the supplies the

5   day before at Walmart.  With the Gatorade bottles, aluminum

6   foil and Drano, they planned to create and detonate Drano

7   bombs, which were overpressure explosive devices.

8       A mixture of Drano and aluminum foil causes the release of

9   gas, which in a sealed container, such as a Gatorade bottle,

10  can build until the point of an overpressure explosion.  They

11  also purchased a pack of 200 Styrofoam plates at Walmart.  With

12  those, they concocted what the defendant referred to as

13  homemade napalm.  They purchased gasoline, combined with it the

14  plates, which melted the Styrofoam and created a viscous

15  flammable mixture.

16      The synagogue was located over 50 miles from their home in

17  Morgan County.  They drew maps on their cell phones showing

18  that they planned to park over one mile away to avoid

19  detection.

20      Their original plan, which the defendant later told the FBI

21  in an interview, was to use the ceramic spark plug pieces to

22  break windows, go inside and burn the synagogue.

23      Ultimately, they did not break into the synagogue.

24  Instead, they spray painted large antisemitic symbols, two Nazi

25  flags, and two Iron Crosses on two sides of an external

1    enclosure located on the rear property of the synagogue.

2        In addition, the defendant and his co-conspirator set fire

3    to two areas of the ground near the spray-painted structure

4    using homemade napalm.  Fire illuminated the antisemitic

5    graffiti on the walls, and defendant and his co-conspirator

6    took photographs of it using their cell phone.

7        In the days following, the defendant talked to several

8    people, including a friend and at least two co-workers about

9    attacking the synagogue.  He showed them the photographs he

10   took on his cell phone of the fire and antisemitic symbols he

11   had painted.

12       He also exchanged text messages with his friend and his

13   co-conspirator about the local and national news coverage of

14   the attack.  In general, the defendant was pleased, happy and

15   proud of what he had done.  The defendant and his

16   co-conspirator also talked with friends about wanting to burn

17   down the rabbi's house, and that they knew where the rabbi

18   lived.  The defendant also told his friend that they were

19   looking for new targets for another attack.

20       On August 15th, 2018, over two weeks after the incident,

21   FBI executed search warrants on the defendant's vehicle, the

22   defendant's residence, and cell phones of the defendant and his

23   co-conspirator.  In the trunk of the vehicle, there were cans

24   of red and black spray paint, bandannas, rubber gloves, ceramic

25   spark plug pieces, Gatorade bottles with aluminum foil inside,

1    the cap screwed on, and two bottles of Drano.

2        Several of the cans of spray paint and the Gatorade bottles

3    with foil were found tucked inside the defendant's backpack.

4    During an interview with the FBI, the defendant admitted to

5    attacking the synagogue.  He explained the supplies in the car,

6    and how they had planned to use them, including the Drano bombs

7    and ceramic spark plug pieces.  He also explained how they

8    concocted the homemade napalm and how they planned to use it.

9        The defendant also told the FBI about his antisemitic

10   motivations.  He stated he targeted the synagogue because it

11   was full of ethnic Jews.  He also referred to Adolf Hitler and

12   his belief that Jewish people have outsized influence relative

13   to their population.  He stated his intent to was to "scare the

14   hell out of them" and likely send a message to "get out."

15       Prior to, and at the time of the synagogue incident, the

16   defendant held beliefs in Nazism, white supremacy, and

17   antisemitism.  Co-workers described that he discussed such

18   views with them, and that he wore Nazi paraphernalia to work.

19       In addition, in the defendant's room at home, the FBI found

20   an Iron Cross pendant, a German flag, and a book by Adolf

21   Hitler.

22       Also, the defendant's cell phone contained multiple items

23   relating to Naziism, racism and antisemitism, including images

24   of swastikas, Iron Crosses, photos of himself and his

25   co-conspirator wearing swastika necklaces, and hate filled,

1    racist and violent Internet photo memes, including one that

2    stated "What is a Jew doing poking around the ashtray?

3    Studying his family history."

4          MR. LINDER:  That concludes the Government's factual

5    basis in support of Count 1, Your Honor.

6          THE COURT:  Do you have any examination for the

7    witness on the factual basis, Mr. Ansell?

8          MR. ANSELL:  None at this time, Your Honor.

9          THE COURT:  Okay.

10         MR. LINDER:  I should note, Your Honor, the Government

11   does request permission to recall Special Agent Stahl during

12   the sentencing portion of this proceeding.

13         THE COURT:  All right.  What about the objections to

14   the PSR?  Are you going to call him for that?

15         MR. LINDER:  Correct.  We'll address that during the

16   sentencing portion of the hearing, Your Honor.

17         THE COURT:  Okay.  Agree?

18         MR. ANSELL:  Yes, Your Honor.

19         THE COURT:  All right.  You may return to your seat

20   for now.

21         MR. LINDER:  Thank you, Your Honor.

22         THE COURT:  Mr. Ansell, if you and Mr. Brewer will

23   return to the lectern.

24         MR. ANSELL:  Thank you, Judge.

25         THE COURT:  Mr. Brewer, did you hear what the agent

1   just testified as to the factual basis?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Is what he stated the truth?

4           THE DEFENDANT:  No --

5           MR. ANSELL:  Judge, let me elaborate.

6           As the Court notes from our sentencing memorandum and

7   the objections that we submitted to the Presentence

8   Investigation Report, there are details included in the

9   Government's rendition of the factual basis that we do not

10  agree with, that we think are untrue or misleading.

11          However, the elements of the offense, he does admit to

12  those facts.  He admits that there was a conspiracy to commit

13  this act of vandalism, commit this act of antisemitic

14  vandalism, and as a part of an effort to deprive the members of

15  the Congregation of their free exercise of their Constitutional

16  and legal rights.

17          So what he admits to in terms of the acts that he

18  committed is the burning of the grass in front of the dumpster

19  enclosure, and the spray painting of the Nazi symbols,

20  including the swastika, the Iron Cross and the Nazi flags on

21  that structure on the synagogue property.

22          THE COURT:  He admits that he knowingly became a

23  member of this conspiracy with the intent to further the

24  conspiracy?

25          MR. ANSELL:  Yes, Your Honor.

1          THE COURT:  Is that correct, Mr. Brewer?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you think you have a sufficient factual

4    basis, Government?

5          MR. LINDER:  Your Honor, I'd like the defendant to

6    tell us which facts in the Government's factual basis he

7    disagrees with.  What I don't want to have happen is on appeal,

8    this is left ambiguous, and the defendant to claim "Well, we

9    didn't have a factual basis because we didn't really know what

10   we agreed to."

11         THE COURT:  All right.  Let's go through the first

12   paragraph.  In the early morning hours of July 28, 2018, the

13   defendant and his wife drove to the Congregation, to the

14   synagogue located in Carmel, Indiana, and they brought with

15   them red and black spray paint, bandannas, rubber gloves,

16   homemade napalm, a mixture of gasoline and styrofoam, Gatorade

17   bottles with pieces of aluminum foil, Drano cleaner and ceramic

18   pieces of spark plugs.  Do you admit to that, young man?

19         MR. ANSELL:  Your Honor -- and I think I can do this

20   more clearly so it doesn't confuse Mr. Brewer.

21         What he does admit to is that he and his wife on

22   July 28th, 2018, drove to the Congregation Shaarey Tefila.

23   They knew it was a synagogue of the Jewish faith.  They --

24         THE COURT:  Did they bring these items?

25         MR. ANSELL:  They brought those items.  It's not clear

1    whether he knew at the time all of the items that were brought.

2    He didn't pack the backpack that his wife had.  There was, as

3    you know that we've asserted, a discord or a difference between

4    what Nolan wanted to do and what his wife wanted to do, and

5    that's where the statements about "they planned this and they

6    planned that" aren't always true as we will present in the

7    sentencing phase of this.

8         However, they did spray paint antisemitic symbols on

9    the synagogue property.  They did set fire to the grass in

10   front of the symbols that they had sprayed.

11        THE COURT:  They purchased the supplies the day before

12   at Walmart?

13        MR. ANSELL:  They purchased the supplies the day

14   before at Walmart.

15        THE COURT:  With the Gatorade bottles, aluminum foil

16   and Drano, they planned to create and detonate Drano bombs?

17        MR. ANSELL:  Well, that is not quite clear.  They did

18   have those materials, but what they had learned is that the

19   Drano they bought wouldn't do what liquid Drano would do.  They

20   bought a gel form of Drano that does not cause the chemical

21   reaction to create the overpressure to explode a Gatorade

22   bottle.

23        THE COURT:  But they thought they were going to create

24   Drano bombs?

25        MR. ANSELL:  No, my client did not intend to ignite or

set off any Drano bombs at the synagogue.  What my client
intended to do was to go there, commit some act of vandalism
with the spray paint, but he did not intend to or plan to break
into the synagogue.  He did not intend --

THE COURT:  We're not saying that.

MR. ANSELL:  Well, the Government asked to say what we
disagree with, so --

THE COURT:  No, no, no, we need a factual basis right
now, okay?

MR. ANSELL:  Sure.

THE COURT:  We're going through paragraph 2,
Mr. Ansell.  Let's do it paragraph by paragraph, okay?

MR. ANSELL:  Okay.

THE COURT:  So did he -- with the Gatorade bottles,
aluminum foil and Drano, they planned to create and detonate
Drano bombs.  Did his wife plan to do that?  Because they're
co-conspirators.

MR. ANSELL:  She wanted to do that, but he did not.

THE COURT:  Okay.  So his wife wanted to do that.  A
mixture of Drano and aluminum foil, do you agree, causes a
release of gas, which in a sealed containers, such as a
Gatorade bottle, can build up until the point of an
overpressure explosion?

MR. ANSELL:  Yes.  However, they did not have the
right form of Drano for that to work.

1          THE COURT:  Agreed.  Did they also purchase a pack of

2    200 Styrofoam plates at Walmart, and that's what they used to

3    make the homemade napalm?

4          MR. ANSELL:  Yes.

5          THE COURT:  They purchased gasoline and combined it

6    with the plates which melted the Styrofoam and created a

7    viscous, flammable mixture, correct?

8          MR. ANSELL:  Yes.

9          THE COURT:  The synagogue was located over 50 miles

10   from their home in Morgan County.  They drew maps on their cell

11   phones showing they planned to park over one mile away to avoid

12   detection.

13         MR. ANSELL:  Correct.

14         THE COURT:  Their original plan, which the defendant

15   later told the FBI in interview was to use the ceramic spark

16   plug pieces to break windows, go inside and burn the synagogue.

17         MR. ANSELL:  That was not Mr. Brewer's original plan.

18   That was the plan --

19         THE COURT:  The conspiracy plan?

20         MR. ANSELL:  -- that his wife concocted with the

21   online person that she was communicating with, but Nolan did

22   not intend to do that.

23         THE COURT:  But he knew of the plan?

24         MR. ANSELL:  Well, there was only two of them.  So he

25   was going to keep that from happening.

1          THE COURT:  What do you mean two?

2          MR. ANSELL:  His plan was to dissuade her from doing

3    anything more serious than what they did.

4          THE COURT:  But did he tell the FBI that they were

5    going to use the ceramic spark plugs to break windows, go

6    inside and burn the synagogue?

7          MR. ANSELL:  He didn't say "our original plan."  He

8    said "the original plan," which he never adopted as his own.

9          THE COURT:  All right, but his co-conspirator --

10          MR. ANSELL:  That was what she wanted to do.

11          THE COURT:  Okay.  Ultimately, they did not break into

12    the synagogue, correct?

13          MR. ANSELL:  Correct.

14          THE COURT:  Instead, they spray painted the large

15    antisemitic symbols, two Nazi flags and two Iron Crosses on two

16    sides of the external enclosure located on the property of the

17    synagogue, agree?

18          MR. ANSELL:  Correct.

19          THE COURT:  In addition, the defendant and his

20    co-conspirator set fire to two areas of the ground near the

21    spray-painted structure using the homemade napalm, correct?

22          MR. ANSELL:  Yes.

23          THE COURT:  The fire illuminated the antisemitic

24    graffiti on the wall, and the defendant and his co-conspirator

25    took photographs of it using their cell phones, correct?

1          MR. ANSELL:  Correct.

2          THE COURT:  In the days following, Defendant talked to

3    several people including a friend and at least two co-workers

4    about attacking the synagogue.

5          MR. ANSELL:  Correct.

6          THE COURT:  He showed them the photographs he took on

7    his cell phone of the fire and antisemitic symbols he had

8    painted.

9          MR. ANSELL:  Correct.

10         THE COURT:  He also exchanged text messages with his

11   friends and his co-conspirator about the local and national

12   news coverage of the attack.

13         MR. ANSELL:  Correct.

14         THE COURT:  In general, the defendant was pleased,

15   happy and proud of what he had done.

16         MR. ANSELL:  Not correct.

17         THE COURT:  Okay.  I don't think that's a necessary

18   element to be happy about it.

19         The defendant and his co-conspirator also talked with

20   his friends about wanting to burn down the rabbi's house and

21   that they knew where the rabbi lived.

22         MR. ANSELL:  That statement was made by his

23   co-conspirator, not by him.

24         THE COURT:  To him.

25         MR. ANSELL:  It was made by the co-conspirator to Alex

1    Hitchcock.  To a third party.

2            THE COURT:  The defendant also told his friend that

3    they were looking for new targets in another attack.

4                    (Off-the-record discussion.)

5            THE COURT:  And the defendant's under oath.

6            MR. ANSELL:  He doesn't remember exactly, but he might

7    have said that.

8            THE COURT:  Okay.

9            On August 15th, 2018, two weeks after the incident,

10   the FBI executed the search warrants of the defendant's

11   vehicle, his residence and cell phone, and also of the

12   defendant and his co-conspirator.  In the trunk of the vehicle,

13   there were cans of red and black spray paint, bandannas, rubber

14   gloves, ceramic spark plug pieces, Gatorade bottles with

15   aluminum foil inside and the cap screwed on, two bottles of

16   Drano.  Several of the cans of spray paint and Gatorade bottles

17   with foil were found tucked inside the defendant's backpack.

18           Agree?

19           MR. ANSELL:  Except for the backpack.  The backpack

20   belonged to K.B., his co-conspirator.

21           THE COURT:  Okay, so it was his wife's backpack.

22           During an interview with the FBI, the defendant

23   admitted to attacking the synagogue.

24           MR. ANSELL:  Correct.

25           THE COURT:  He explained the supplies in the car and

1  how they planned to use them, including the Drano bombs and the

2  ceramic spark plug pieces.

3           MR. ANSELL:  He did not say he planned to do that.  He

4  described that as what had been discussed by his co-conspirator

5  with the person online that -- with whom she communicated, but

6  he did not admit to sharing that plan.

7           THE COURT:  He also explained how they concocted the

8  homemade napalm and how they planned to use it?

9           MR. ANSELL:  Again, he didn't plan to use it and he

10  didn't admit that he planned to use it in that way.

11          THE COURT:  Didn't they plan to use it to burn on the

12  ground in front of the swastika artwork?

13          MR. ANSELL:  I think what's being referred to here is

14  the supposed plan to break into the synagogue and set fire

15  inside the synagogue with the --

16          THE COURT:  Napalm?

17          MR. ANSELL:  -- homemade napalm which he did not plan

18  to do or intend to do.

19          THE COURT:  But he did plan and, in fact, did use the

20  napalm to set the fire at the site of the graffiti?

21          MR. ANSELL:  I think that is what they ended up doing

22  as a result of him convincing his co-conspirator not to try to

23  break into the synagogue, and so they had carried this cooking

24  pot full of this mixture of Styrofoam and gasoline, and they

25  ended up dumping it in front of the antisemitic graffiti and

1    setting it on fire.

2            THE COURT:  Okay, fine, fine, fine.

3            All right.  The defendant also told the FBI about his

4    antisemitic motivations.  He stated he targeted the synagogue

5    because it was full of ethnic Jews.  He also referred to Adolf

6    Hitler and his belief that Jewish people have outsized

7    influence relative to their population.  He stated that his

8    intent was to scare the hell out of them, and likely send a

9    message to get out.  That's all true?

10           MR. ANSELL:  It's all true.  The second sentence, he

11   doesn't know -- he doesn't know what an ethnic Jew is.  He

12   doesn't know --

13           THE COURT:  He explained it.  I the read the

14   transcript.

15           MR. ANSELL:  Right, but this was --

16           THE COURT:  It was something he learned.  He's very

17   intelligent, Counselor.

18           MR. ANSELL:  Correct.  He learned that, but what he --

19   it was the person that his wife was communicating with online

20   that had said "Oh, this is a place with ethnic Jews."  And that

21   was the reason why.

22           They didn't choose the target.  It was this K.B. with

23   the person online that she was communicating with, some white

24   supremacist that she met on Discord who chose the target and

25   explained to her, and then from her it went to him that that

1    was a reason to choose that location.

2         THE COURT:  Okay.  I read the transcript, Counsel.  So

3    I understand what he said in the transcript.

4         MR. ANSELL:  And am I missing something there, because

5    that's my memory of the transcript?

6         THE COURT:  He stated in the transcript, he said --

7    the portion was why did you -- how did you choose that, and he

8    admitted that it was from the third party.

9         MR. ANSELL:  Asbestos Pete?

10        THE COURT:  Asbestos Pete said here's a location that

11   has a large population, a large Jewish population of ethnic

12   Jews.

13        MR. ANSELL:  Correct.

14        THE COURT:  And then he talked about the difference

15   between ethnic Jews and religious Jews, and I guess things that

16   he had read in his Adolf Hitler books.

17        MR. ANSELL:  And I don't know if those

18   characterizations are true or not in terms of what an ethnic

19   Jew is or not, but --

20        THE COURT:  That's what he told them?

21        MR. ANSELL:  Yeah, that's what he believed at the

22   time, correct.  That's what he was thinking at the time.

23        THE COURT:  Prior to and at the time of the synagogue

24   incident, the defendant held beliefs in Naziism, white

25   supremacy and antisemitism.

1           MR. ANSELL:  Correct.

2           THE COURT:  Coworkers described that he discussed such

3   beliefs with them, that he wore Nazi paraphernalia to work.

4   Does he admit?

5           MR. ANSELL:  That's correct.

6           THE COURT:  In addition, the defendant's room, in his

7   room at home, the FBI found an Iron Cross pendant, a German

8   flag, and his book by Adolf Hitler.  Is that correct?  Were all

9   those things in your room?  Answer.

10          MR. ANSELL:  That was his wife's book, and that's the

11  room he shared with his wife.

12          THE COURT:  Okay.

13          MR. ANSELL:  But those things were in the room.

14          THE COURT:  They were in he and his wife's room?

15          MR. ANSELL:  Correct.

16          THE COURT:  Also on the defendant's cell phone, there

17  were multiple items related to Naziism, racism, and

18  antisemitism, including images of swastikas with Iron Crosses,

19  photographs of himself and his co-conspirator wearing swastika

20  necklaces, and hate-filled racist and violent internet photo

21  memes including one that stated "What is the Jew doing poking

22  around the ashtray?"  And the answer is "Studying his family

23  history."  Agreed?

24          MR. ANSELL:  That's correct.

25          THE COURT:  Okay.

1          MR. ANSELL:  And so I've articulated what --

2          THE COURT:  And I'm going to ask your client.

3          MR. ANSELL:  Correct.

4          THE COURT:  Sir, is everything that your attorney

5   stated as correct, are those things correct?

6          THE DEFENDANT:  Yes.

7          THE COURT:  We have a factual basis.  The Court is

8   going to find that a factual basis exists with a plea of

9   guilty, an independent record of the factual basis has been

10  made, and the factual basis consists of each of the essential

11  elements of the offense to which defendant is pleading guilty.

12         Mr. Brewer, I'm done asking you questions.  Do you

13  have any questions either from me or your lawyer about anything

14  that we've discussed thus far?

15         THE DEFENDANT:  No.

16         THE COURT:  Considering everything that I have

17  explained to you today, and upon advice from your attorney, how

18  do you plead to the charge against you in Count 1, conspiracy

19  to violate rights?

20         THE DEFENDANT:  Guilty.

21         THE COURT:  It is the finding of the Court in the case

22  the United States of America versus Nolan Brewer, that

23  Mr. Brewer is fully competent and capable of entering an

24  informed plea, he is aware of the nature of the charges and the

25  consequences of the plea.  His plea of guilty is knowing and

1  voluntary.  It is supported by independent basis in fact that

2  contains each of the essential elements of the offense.  The

3  plea is therefore accepted and the defendant is now adjudged

4  guilty of the offense, conspiracy to violate rights.

5          And it's my understanding, lawyers, that we're ready

6  to proceed with sentencing; is that correct?

7          MR. ANSELL:  Yes, Your Honor.

8          THE COURT:  And Government, are you prepared to

9  proceed with sentencing?

10          MR. LINDER:  Yes, Your Honor.

11          THE COURT:  Has the Government had an opportunity to

12  review the presentence report that was prepared by the United

13  States probation department?

14          MR. LINDER:  We have, Your Honor.

15          THE COURT:  Do you have any objections or corrections

16  to the presentence report?

17          MR. LINDER:  No, Your Honor.

18          THE COURT:  And, Mr. Ansell, have you and your client

19  reviewed the presentence report?

20          MR. ANSELL:  We have, Your Honor.

21          THE COURT:  And, Counsel, you have made several

22  objections which we can review at this time.

23          Your Objection No. 1 are to the paragraphs concerning

24  the offense conduct.  That would be paragraphs 8, 10, 14, 18,

25  20, 21 and 23.  So do you want to go through each of those

1    paragraphs?

2              MR. ANSELL:  Yes.

3              THE COURT:  Okay.  Paragraphs 8 and 10, the defendant

4    denies that he planned to set fire to the synagogue.  He's

5    saying that the plan was concocted by K.B. -- that's the wife,

6    the co-conspirator -- and somebody named Asbestos Pete?

7              MR. ANSELL:  Correct.

8              THE COURT:  Who was a white supremacist with whom his

9    wife had been communicating online.  When Nolan Brewer spoke to

10   the FBI, he says he withheld some facts.

11             MR. ANSELL:  At the time he spoke with the FBI, he was

12   not inclined to say anything that could be damaging to K.B.,

13   his wife.  And he didn't acknowledge that she was the one who

14   was pushing this, and that he was the one who was trying to put

15   the brakes on what she wanted to do, which is why, rather than

16   spray paint anything on the walls of the synagogue near where

17   people enter, rather than spray painting anything on the

18   sidewalks where people could see it when they were coming in,

19   they only spray painted the west and south walls of the

20   enclosure around the dumpster, which happened to be the walls

21   that were not facing the synagogue and were not facing the

22   parking lot of the synagogue, and were not observable from the

23   street.

24             THE COURT:  But he didn't tell the FBI that.

25             MR. ANSELL:  At the time, he did not want to throw his

1    wife under the bus.

2          THE COURT:  Okay.  All right.  What about paragraph

3    14?  You object to the characterization that your client was

4    gloating --

5          MR. ANSELL:  Yeah.

6          THE COURT:  -- when he told his friends, I guess,

7    about what had happened?

8          MR. ANSELL:  The -- paragraph 14 says that their

9    response online to seeing the news coverage was that he was

10   gloating, and I think that's a mischaracterization, and I

11   don't --

12         THE COURT:  How would you characterize it?

13         MR. ANSELL:  I would say that they were surprised and

14   excited and nervous.

15         THE COURT:  Okay.  All right.  Paragraph 18, only his

16   wife communicated with Asbestos Pete, and he never communicated

17   with Mr. Pete?

18         MR. ANSELL:  That's my understanding, Your Honor.

19   Nolan was working two jobs.  His wife was going to school

20   online, and was at home all day online, and was the one who was

21   spending her time on -- in white nationalist chat rooms on

22   Discord and at white nationalist propaganda sites such as

23   Stormfront.

24         THE COURT:  Okay.  Paragraph 20, Nolan Brewer and his

25   wife shared a bedroom at their residence.  The book by Adolf

1    Hitler belonged to the wife.  The German Iron Cross pendant was

2    a gift to Nolan from his wife.

3                MR. ANSELL:  Correct.

4                THE COURT:  Okay.  What about that story he told the

5    FBI about his grandfather?

6                MR. ANSELL:  Yeah, I spoke with his father about that.

7    His grandfather never lived in Germany.  So when he was first

8    picked up by the FBI and first interviewed, before the FBI

9    agent said, "Listen, we're investigating a crime.  If you lie

10   to me, it's a crime," he -- I don't know why, but he said some

11   ridiculous things at the beginning of that interview,

12   including --

13               THE COURT:  Not so ridiculous.  He said his

14   grandfather introduced him to Nazism.  His grandfather gave him

15   his first Celtic cross and shaped it into a swastika.  He said

16   that his grandfather grew up, and that was what his grandfather

17   did back in those times.

18               He said -- he didn't say his grandpa went to Germany.

19   He said that he got the camouflage outfit, the German

20   camouflage outfit from grandpa, and that it was a family relic.

21               MR. ANSELL:  He said his grandfather lived in Germany,

22   had been in the Hitler Youth.

23               THE COURT:  Yeah, he did say grandpa was a Hitler

24   Youth.

25               MR. ANSELL:  His grandfather was born in the United

1    States and never lived in Germany.  It was just nonsense, and I

2    can't explain it, but it was nonsense.  I described it as

3    ridiculous because it had no basis in fact.

4              THE COURT:  Okay.  But he said those things?

5              MR. ANSELL:  He said those things.

6              THE COURT:  Okay.  All right.  Paragraph 21, you

7    dispute the characterization of your client's beliefs as

8    "fervent"?

9              MR. ANSELL:  I think what I object to is using that

10   characterization in a Presentence Investigation Report.  I

11   think it should supply the facts and not give characterizations

12   of the facts.

13             THE COURT:  Okay.  Paragraph 3, Hitchcock told counsel

14   that he remembers K.B. made the comment about wanting to burn

15   down the Rabbi's house, but Nolan did not.  So you dispute that

16   your client had anything to do with that comment?

17             MR. ANSELL:  Correct.  And I've confirmed that with

18   Mr. Hitchcock again, that it was K.B. that made the statement,

19   and that Nolan didn't say anything like that.  He just said

20   something like "Well, let's just go home."

21             THE COURT:  Okay.  And then you object -- your

22   objection No. 2 is to paragraph 29.  The offense did not

23   involve the destruction or attempted destruction -- well,

24   that's the big one.

25             Let's deal with Objection No. 1 first.  Why don't you

1    go ahead and have a seat, and we'll have the Government respond

2    to the objections to the offense conduct paragraphs.

3              MR. LINDER:  Thank you, Your Honor.

4              The Government -- it probably makes most sense, the

5    Government has some evidence to present along these lines in

6    the form of witness testimony, and of course in the form of the

7    exhibits which have been filed.  That testimony and those

8    exhibits address both objections, so the characterizations as

9    well as the guidelines issue.  So if it pleases the Court, I

10   would just like to proceed with calling the Government's

11   witnesses and examining them on both topics.

12             THE COURT:  You may.

13             MR. LINDER:  Very well, thank you.

14             The first witness the Government would call is Special

15   Agent Matt Stahl.

16             THE COURT:  Special Agent, if you'd come on back to

17   the witness stand.  Mr. Ansell, he's going to also present on

18   whether or not the offense, in fact, involved the destruction

19   or attempted destruction of a place of public use.

20             MR. ANSELL:  I think that makes the most sense, and

21   then after the Government's presented their witnesses, we'll

22   present ours.

23             THE COURT:  You may.

24             MR. ANSELL:  Thank you.

25             THE COURT:  You're already under oath.  If you would

1    have a seat.

2           MR. LINDER:  Thank you, Your Honor.  At this time, the

3    defense just mentioned they have witnesses.  They haven't been

4    disclosed to the Government yet.  I'm surprised to hear there

5    are any.  So who are they?

6           THE COURT:  Who are your witnesses?

7           MR. ANSELL:  The witnesses are witnesses that don't

8    have any knowledge of the offense itself.  The witnesses that

9    we have are one of the Government's witnesses.

10           THE COURT:  Who's that?

11           MR. ANSELL:  Alex Hitchcock, and the other witnesses

12    are simply people that have known Nolan before the offense took

13    place.  They don't have knowledge of the offense, but they can

14    just speak to who they know him to be and what they know his

15    character to be, and how they saw his character change over the

16    course of the summer of 2018.

17           THE COURT:  Okay.  Now the Court has reviewed your

18    submission of letters.  So we don't need anything cumulative

19    because I did read all of those letters.

20           MR. ANSELL:  It won't be cumulative, Your Honor.

21           THE COURT:  Okay.  And those people all said how he

22    changed in his character.

23           All right, Counsel, you may examine your witness.

24           MR. LINDER:  All right, Your Honor, thank you.

25

**MATTHEW STAHL, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

**DIRECT EXAMINATION**

BY MR. LINDER:

Q.  Special Agent Stahl, you mentioned you're familiar with the
investigation of Nolan Brewer, right?

A.  Correct.

Q.  Can you explain to the Court how that investigation was
initiated?

A.  Sure.  The investigation was initiated based upon
information received, a report by the Congregation Shaarey
Tefilla, that sometime in the early morning hours of July 28,
2018, there were two large Nazi flags that had been painted on
a trash enclosure on the southwest corner of their property.
There's a flag painted on the south wall that was -- had Iron
Crosses on either side of it, and then there was also a flag
painted on the west wall.

     Also, at the location underneath the flags and right up
against the wall were some large burn marks which -- and
scorched earth, essentially, where it was obvious that a fire
had been set.

Q.  Special Agent Stahl, there's a binder in front of you of 67
exhibits that were previously filed with the Court.  Have you
reviewed them before testifying today?

A.  Yes, I have.

1  Q.  Were all of those exhibits developed or gathered during the

2  course of this investigation.

3  A.  Yes, they were.

4  Q.  And did they accurately depict or are in the same condition

5  as they were at the time that they were developed or gathered

6  during the investigation?

7  A.  That's correct.

8          MR. LINDER:  Your Honor, at this time to expedite

9  things, I'd like to move all of Exhibits 1 through 67 into

10  evidence.

11          THE COURT:  Any objection, Mr. Ansell?

12          These were all previously disclosed.

13          MR. LINDER:  Correct, Your Honor, and filed publicly.

14          MR. ANSELL:  Judge, I don't have any objections to

15  these exhibits.

16          THE COURT:  Government's Exhibits 1 through 67 are

17  admitted into evidence without objection.

18          (Plaintiff's Exhibits 1–67 received in evidence.)

19          MR. LINDER:  Thank you, Your Honor.

20  BY MR. LINDER:

21  Q.  Special Agent Stahl, if you would turn to Exhibit 1.  What

22  is that?

23  A.  It's a picture taken at the initiation of the investigation

24  of the scene I just described.

25  Q.  Does that also contain Exhibits 2 and 3?

STAHL - DIRECT/LINDER                    42

1    A.   Correct.

2    Q.   Were there any suspects developed at the early days of the

3    investigation?

4    A.   Upon establishment of a tip line with the Carmel Police

5    Department and the FBI, a call did come in that essentially

6    revealed that the defendant was involved in this matter.

7    Q.   And what steps did the FBI next take?

8    A.   The FBI then went out and further interviewed the

9    cooperator, the person who called in to gather some additional

10   information regarding what she had seen and what she knows.

11   Q.   And what was the cooperating witness -- what relationship

12   did that person have to the defendant?

13   A.   She was a co-worker.

14   Q.   And how did she claim to know the information that she

15   relayed?

16   A.   She claimed to know it based upon the defendant's admission

17   to her directly.

18   Q.   What steps did the FBI and law enforcement take upon

19   receiving the tip?

20   A.   So we went out and interviewed her to get some additional

21   information.  And at that time, in general, she stated that the

22   defendant had confided in her that he had done this, that he

23   had done the spray painting.  He at the time also showed her a

24   picture on his phone of the event that night that he had taken,

25   and he had also mentioned that the spray paint cans that were

STAHL - DIRECT/LINDER                    43

1    utilized were also still in his car at that time.

2    Q.  What happened next vis a vis your investigation?

3    A.  So the FBI wanted continued cooperation with this

4    individual, so in an effort to further gather additional

5    information about what transpired that night, there's a

6    recorded conversation that took place between this cooperator

7    and Mr. Brewer.

8    Q.  Is that located at Exhibit 67 in this binder?

9    A.  It is, yes.

10   Q.  It seems the Court is familiar with it so we won't go

11   through it at this time.

12       What additional steps did the FBI take to further

13   corroborate what Mr. Brewer had told this cooperating witness

14   and what was on tape?

15   A.  I'm sorry, what was on the tape?

16   Q.  Yeah, what did the FBI do to further corroborate that?

17   A.  So basically I guess starting with the tape for the first

18   recorded conversation, he reaffirmed with the cooperator what

19   he had done, showed the picture again, this time highlighting

20   what he referred to as napalm at the time, essentially the fire

21   burning in front of the picture.  Talked about planning it, and

22   then also discussed Mike -- Vice President Mike Pence tweeting

23   about it and so on and so forth.

24   Q.  What steps did the FBI take after that to corroborate what

25   had occurred?

1  A.  At the same time that these interviews were being

2  conducted, the FBI and task force officers were canvassing

3  local stores that may have sold the supplies to the defendant

4  and his co-conspirator at the time.  It was then determined

5  that a Walmart in Greencastle had surveillance video of

6  Mr. Brewer and his wife purchasing the supplies for that

7  evening to include the spray paint cans.

8  Q.  And if we take a look at Exhibit 8, does that show the

9  various supplies from a still photograph from Walmart

10  surveillance?

11  A.  Yes, it does.

12  Q.  What time is it?

13  A.  14:27, or 2:27 p.m.

14  Q.  And what are the supplies that it shows that they

15  purchased?

16  A.  We can see Styrofoam plates, the Gatorade bottles, some

17  Latex gloves, a spray paint, some bottles of Drano, and I

18  believe that's the aluminum foil right there above the Latex

19  gloves.

20  Q.  So those supplies were found in the defendant's car upon a

21  search?

22  A.  Correct.

23  Q.  What was the next step that was taken after the covert

24  recording and this Walmart surveillance information was

25  gathered?

1   A.  So based upon the information gathered at that time, search

2   warrants were obtained and conducted at Mr. Brewer's residence,

3   on his vehicle and for his phones.

4   Q.  If we turn to Exhibits 15 through 17, are these photographs

5   from the search of the home?

6   A.  Yes, they are.

7   Q.  This is the book by Adolf Hitler, the German flag above the

8   bed, and the Iron Cross hanging by the door?

9   A.  Correct.

10  Q.  And Exhibits 58 through 67, are those the photographs from

11  the search of the vehicle when Mr. Brewer was stopped and

12  searched?

13  A.  Yes, they are.

14  Q.  And turning to 59 there in the back of the –– what was

15  contained in the vehicle when it was found?

16  A.  Essentially all those elements that we just discussed at

17  Walmart.

18  Q.  Other than the Styrofoam plates?

19  A.  The Styrofoam plates were already dissolved in the

20  gasoline.

21  Q.  What was the date again of this search?

22  A.  August 15th, 2018.

23  Q.  Over two weeks after the synagogue incident?

24  A.  Approximately, yes.

25  Q.  Was Mr. Brewer's phone searched as well?

1    A.   Yes, it was.

2    Q.   And was his wife's phone searched?

3    A.   Yes, it was.

4    Q.   In general, what was found on their two phones?

5    A.   There's several categories.  I guess we'll categorize the

6    groups of information.  One, first group being maps of the

7    synagogue, the routes planned that evening to go from where

8    they were to park and how they were to get to the synagogue.

9    Q.   Is that Exhibits 4 and 5 in this binder?

10   A.   Yes.  That's correct.

11        The next category we describe is pictures of himself and

12   the co-conspirator wearing Nazi paraphernalia.

13   Q.   And those exhibits are at 18 through 23 in this binder?

14   A.   Correct.

15   Q.   All right.

16   A.   The next category, we would say essentially text messages

17   regarding the incident itself that evening, messages that could

18   be considered racist and text messages referring to the napalm.

19   Q.   And we see that as Exhibits 1154, -55 and -56?

20   A.   Correct.  There were also groups of -- there were many

21   images, but images that included memes that could also be

22   considered antisemitic and racially-themed memes.

23   Q.   And also images of swastikas or other Nazi imagery?

24   A.   Correct.

25   Q.   Is that Exhibits 26 through 54?

STAHL - DIRECT/LINDER          47

1    A.  Correct.

2    Q.  And is it true that all of those images came from the

3    defendant's phone, not from the co-conspirator's phone?

4    A.  Correct.

5           THE COURT:  26 through 54 were on the defendant's

6    phone?

7           MR. LINDER:  Yes, Your Honor.

8           THE COURT:  Okay.

9    BY MR. LINDER:

10   Q.  Any other categories, Special Agent Stahl?

11   A.  And then I would say a last category were photographs of

12   the incident that evening that were taken on location.

13   Q.  And are those at Exhibits 13 and 14?

14   A.  They are.

15   Q.  And those are photographs -- when you say "that evening,"

16   do they appear to be photographs that were taken at the scene?

17   A.  Correct.

18   Q.  And do you understand that to be true based on FBI

19   interviews with other witnesses as well?

20   A.  Yes.

21   Q.  Such as witnesses he showed those to?

22   A.  Correct.

23   Q.  Did the defendant also give a statement?

24   A.  He did.

25   Q.  Is that statement -- is a transcript of that statement at

1  Exhibit 10 in this binder?

2  A.  It is.

3  Q.  I won't go through it in detail.  It's clear that the Court

4  has read it.  I would ask, did it -- did he admit his

5  participation in the incident?

6  A.  Yes, he did.

7  Q.  Did he understand the effect that what he did would have on

8  the people of Congregation Shaarey Tefilla?

9  A.  Yes, he did.

10  Q.  What was that?  What was the effect it would have?

11  A.  He had given two answers to that question, two primary

12  answers to that question throughout the interview.  I believe

13  the first one, the first answer was along the lines of the

14  message that would be given was to "get out," and the second

15  time, that the question and answer came up, he responded "to

16  scare the hell out of them."

17  Q.  Did he talk about the supplies that they purchased at

18  Walmart?

19  A.  Yes, he did.

20  Q.  Did he talk about the intended use of the Gatorade bottles,

21  tin foil and Drano?

22  A.  Yes, he did.

23  Q.  What was that intended use?

24  A.  The intended use of the Drano and the Gatorade bottles and

25  the aluminum foil were to create over pressure devices,

1  exploding devices essentially.

2  Q.  Did he talk about the intended use of the Styrofoam plates?

3  A.  The intended use of the Styrofoam plates was to mix with

4  the gasoline to make the homemade napalm.

5  Q.  Did he talk about the intended use of the spark plug

6  ceramic pieces?

7  A.  The intended use of the spark plug pieces was to break

8  windows, to break the window at the synagogue.

9  Q.  Did he talk about traveling to the synagogue from his home?

10 A.  Yes, he did.

11 Q.  How far -- how far away was it?

12 A.  I would say approximately 50 miles.

13 Q.  The synagogue is 50 miles from his home?

14 A.  Correct.

15 Q.  Did he talk about where they planned to park to carry out

16 the offense?

17 A.  Yeah, he said that they had planned to park, which ended up

18 being a mile, approximately a mile away, and move to the

19 synagogue location.

20 Q.  And why did they -- did he say why they parked over a mile

21 away?

22 A.  It was essentially to avoid detection.

23 Q.  And did he say they -- how did they get there, that mile

24 after they parked, how did they get to the synagogue?

25 A.  They walked.

1   Q.  And how did they get the supplies there?

2   A.  There was a backpack that was located in the vehicle, so a

3   backpack and then apparently hand-carried the pot.

4   Q.  So they walked and hand-carried the supplies, including the

5   napalm and the spray paint and other supplies over a mile?

6   A.  Correct.

7   Q.  What did he say was the intended use upon getting to the

8   synagogue of these items?

9   A.  The plan -- the plan, as he shared it, was essentially to

10  break into the synagogue using the spark plug pieces to break

11  windows.  They were going to utilize the overpressure devices,

12  the Gatorade bombs, the homemade napalm was to be poured on top

13  of it, and then the resulting explosion would essentially

14  disburse that flaming liquid jelly substance, homemade napalm,

15  if you will, and cause internal damage to the structure.

16  Q.  Did they break into the synagogue?

17  A.  No, they didn't.

18  Q.  Did the defendant say why they did not break in?

19  A.  He gave several responses during the course of the

20  interview.  One of the first responses to that question was

21  that they were fearful when they got there essentially when

22  they noticed security lights and cameras on location, and that

23  was one of the first reasons that the original plan was

24  abandoned.

25      Another reason that he gave later on was that as he was --

1    he and his wife were traveling somewhere on 465 on the way to

2    the synagogue, that they decided to abandon that part of the

3    plan.  And then thirdly, later in the interview, he stated that

4    he wasn't able to find windows at the synagogue so he wasn't

5    able to deploy the spark plug pieces.

6    Q.  Did he say who, if anyone, inspired what he did at the

7    synagogue?

8    A.  He mentioned that throughout the course of the interview,

9    that Asbestos Pete or Asbestos Peter was communicating with his

10   wife on this Discord, and he was inspiring this plan of attack.

11   Q.  And did he say -- who is -- did he say who this Asbestos

12   Peter was?

13   A.  Some kind of white nationalist from -- potentially from

14   Romania but had possibly been visiting Kiev in Russia.  He did

15   not have or did not provide much information regarding Asbestos

16   Peter.

17   Q.  Did he say what the purpose of doing this was, whether it

18   was the online persona Peter that he was carrying out or his

19   own?  Did he say what the purpose was?

20   A.  The -- the purpose -- and he talked about this a couple of

21   times -- it was essentially to radicalize or to show this act

22   of radical behavior in an attempt to show others that -- who

23   they are and what they can do and to give these people a voice.

24   Q.  In looking at the transcript just briefly, are you

25   referring to, on page 28, when asked by the FBI "What's the

1    purpose of doing this?"  The defendant says "Peter said if we

2    got -- if there were news headlines about it, he would -- he

3    said it would be able to spark more radicalism and then get it

4    to be known more of a social issue."  The FBI asked "Why do you

5    want to spark radicalism?"  And the defendant responded "Not

6    radicalism.  Just, like, knowledge of the movement."  And the

7    FBI says "What's the movement?"  And the defendant says "The

8    movement is like national socialism," which the FBI confirms

9    with him he knows to be Naziism.

10        Is that what you're referring to?

11   A.  Correct, the sparking radicalism was a first instance that

12   I'm referring to.

13   Q.  And he says it again on page 78, does he not?

14   A.  Yes, he does.

15   Q.  So again, the FBI says "Did Peter ever tell you ultimately

16   what the purpose was, why he wanted to do this at a synagogue?"

17   And the defendant says "He night have told my wife the motive."

18   And then the defendant continues "like directly word for word

19   what his motive was, I don't recall it.  All I can say is it

20   probably was to stir people up to see if they can cause a huge

21   news headline.  There are going to be underlying groups that

22   come in and be like whoa, people are actually doing things,

23   maybe we can have a voice."  And the agent says "But what does

24   it do to the people at the synagogue?"  And the defendant says

25   "Scare the hell out of them."

1      Is that what you're referring to when you talked about the

2   purpose?

3   A.  Correct.

4           MR. LINDER:  All right.  Thank you, Your Honor.  No

5   further questions for this witness.

6           THE COURT:  Okay, you may cross-examine.

7           MR. ANSELL:  Thank you, Judge.

**CROSS EXAMINATION**

9   BY MR. ANSELL:

10  Q.  Good afternoon, Agent Stahl.

11  A.  Good afternoon.

12  Q.  When you say that all of the exhibits from 26 to 54 were on

13  Nolan Brewer's phone, but not on K.B. Brewer's phone, is that

14  because -- did you mean to say that they were not on his

15  phone -- on her phone or just that they were on his phone?

16  A.  I'm sorry, 26 to 54?

17  Q.  Yes, the memes, the racist and antisemitic memes?

18  A.  I am not saying that they were not on her phone.  Just that

19  they were known to be on his phone is my understanding.

20  Q.  I wanted to clarify that.

21      Now, you said that he gave several responses to the

22  question "Why didn't you attempt to break into the synagogue?"

23  Is that correct?

24  A.  I believe it was why they did not stick to the original

25  plan.

*STAHL – CROSS/ANSELL*                    54

1   Q.  So he wasn't asked "Why didn't you break into the

2   synagogue," correct?

3   A.  He was, at one point, yes, that's correct.

4   Q.  But that wasn't -- the three answers that you described

5   that he gave were not all in response to that question, right?

6   A.  That response was intended to -- the overall plan, I guess,

7   is what we were referring to at that point.

8   Q.  So when he said that they didn't go any closer to the

9   walls, it was because he saw the lights and the cameras?

10  A.  That was one of his answers early on, yes.  They saw lights

11  and cameras, and they --

12  Q.  And that was why they didn't approach the synagogue itself,

13  correct?

14  A.  Correct.

15  Q.  Because they saw the lights and cameras, they didn't want

16  to get any closer?

17  A.  They saw the lights and cameras, and yes, did not want to

18  get any closer.

19  Q.  And is there any evidence that they ever went closer than

20  the trash enclosure?

21  A.  There is a photo on K.B.'s phone, I believe, that shows a

22  picture from that evening that -- it appears to be a silhouette

23  but we can't identify who that is necessarily standing next to

24  the synagogue.

25  Q.  Standing next to the synagogue, like all the way up next to

1    it?

2    A.  It appears to be.

3    Q.  When you say "it appears to be"?

4    A.  It's dark.  It's a dark picture.

5    Q.  So you can't tell?

6    A.  We can't say definitively, no.

7         MR. ANSELL:  Can you give me just a moment, Judge?

8    I'm looking for a particular part of the transcript.

9         THE COURT:  Sure.

10   BY MR. ANSELL:

11   Q.  Did he tell the FBI that the Drano that they had bought

12   didn't actually work to create a pressure bomb?

13   A.  Yes, he did.

14   Q.  And that was the gel form of the Drano?

15   A.  He bought the -- or they bought the gel form instead of --

16   I believe he referred to it as "the purple kind."

17   Q.  Did you confirm that the gel form does not actually result

18   in an overpressure explosion like the liquid does?

19   A.  I don't know if the gel form does or not.

20   Q.  The FBI never checked that?

21   A.  No.

22   Q.  You don't have any reason to dispute it, do you?

23   A.  No.

24   Q.  Did the FBI not speak with an expert that agreed that it's

25   likely that the gel form would not work?

1   A.   That I'm unfamiliar with.

2   Q.   Were you present at the detention hearing?

3   A.   I was.

4   Q.   You don't remember any testimony to that effect, any

5   acknowledgment by the FBI that –– does it ring a bell?

6   A.   I don't remember that.  I don't.

7   Q.   No memory of it at all?

8   A.   No.

9   Q.   Did they ever buy a different kind of Drano that you know

10  of?

11  A.   Not that I know of.

12  Q.   Not ever found in his possession?

13  A.   Not that I know of.

14  Q.   Do you know if the ceramic pieces would have broken any

15  glass at the entrances?

16  A.   I don't.

17  Q.   So you don't know if that would be effective or not?

18  A.   No.

19  Q.   What was the third response that you said that seemed to be

20  along the lines of why they didn't try to get into the

21  synagogue?

22  A.   The defendant had mentioned, in regards to the spark plugs,

23  that they couldn't find any windows.

24  Q.   Now the front entrance is all glass, is it not?

25  A.   There's a lot of glass up there.

1    Q.  A lot of glass?

2        So anyone who looks at the front of the synagogue would see

3    that there's glass, correct?

4    A.  Sure.

5    Q.  But they approached from the west and the south, did they

6    not?

7    A.  According to their statement, it was somewhere from the

8    south and west, correct.

9    Q.  And that was corroborated by the maps on their phones,

10   correct?

11   A.  Correct.

12   Q.  So if they approached from the south and the west, and

13   didn't go any closer to the building because they were afraid

14   to, they might not have ever seen any glass, correct?

15   A.  Correct.

16   Q.  Now, isn't it true that when Mr. Brewer threw out there

17   that "we didn't see any glass," he had already been asked 10 or

18   12 times if they intended or wanted or tried to break into the

19   synagogue, correct?

20   A.  Correct.

21   Q.  And he had already denied it every time, correct?

22   A.  Correct.

23   Q.  So after denying it 10 or 12 times when he was asked again,

24   one of the things he said was "We didn't see any glass,"

25   correct?

1   A.  Correct.

2   Q.  Okay.  When did the tip come in from the co-worker?

3   A.  I believe it was July 30th, the day that the media picked

4   up on the incident.  I believe it was at that time.

5   Q.  So there were news stories on July 29th, correct?

6   A.  Correct.

7   Q.  Which was the day after it could have been discovered?

8   A.  That would have been the Sunday, I believe, yes.

9   Q.  So it happened late Friday, early Saturday morning?

10  A.  Correct.

11  Q.  It was discovered on Saturday at some point, correct?

12  A.  I believe it was discovered on Saturday by a neighbor who

13  then made contact.

14  Q.  Was it a neighbor who was mowing his lawn or something?

15  A.  I believe so.

16  Q.  Now the view of the enclosure, the dumpster enclosure that

17  was spray painted, there's nothing there, correct?  There's

18  no -- it's not -- that would not be visible from the synagogue,

19  correct?

20  A.  Correct.  It's on the opposite -- it's on the opposing

21  side.

22  Q.  So had a neighbor not been mowing the very back of his

23  property, it might not have been discovered right away,

24  correct?

25  A.  It's possible.

1    Q.  Okay.

2            MR. ANSELL:  No more questions.  Thank you, Judge?

3            THE COURT:  Thank you.

4            Any redirect?

5            MR. LINDER:  No, Your Honor.

6            THE COURT:  All right, thank you.  You may step down.

7            Any other witnesses?

8            MR. LINDER:  Yes, Your Honor, several more.  I think

9    these will be quicker though.

10           At this time, the United States would call Christina

11   Hirzel.

12           THE COURT:  Come right up here to the witness stand.

13           Come this way, ma'am.  Right over here, ma'am.

14           Come on up that step.  If you would face me and raise

15   your right hand.

16        **CHRISTINA HIRZEL, PLAINTIFF'S WITNESS, SWORN**

17                    **DIRECT EXAMINATION**

18           THE COURT:  You may have a seat, and we're going to

19   need you to speak loud and clear into that microphone.

20   BY MR. LINDER:

21   Q.  Ma'am, could you please tell the Court your name and spell

22   your name for the court reporter?

23   A.  Christina Hirzel, H-I-R-Z-E-L.

24   Q.  And Ms. Hirzel, what do you do for work?

25   A.  A cashier.

1    Q.   Where?

2    A.   GetGo.

3    Q.   What's GetGo?

4    A.   A gas station.

5    Q.   How long have you worked there?

6    A.   Almost three years.

7    Q.   And do you know the defendant, Nolan Brewer?

8    A.   Uh-huh.

9    Q.   How do you know him?

10   A.   We work together.

11   Q.   At the GetGo Gas Station?

12   A.   (Nodded.)

13   Q.   At some point in time, did he talk to you about what he did

14   at a Jewish synagogue?

15   A.   Yeah.

16   Q.   I have two sets of questions for you today.  The first set

17   is about Mr. Brewer more generally, about your experiences with

18   him.  And the second set is specifically what he talked to you

19   about with regard to the synagogue, okay?  So we'll start with

20   the first set of questions about your experiences with

21   Mr. Brewer.

22        When did you first meet him?

23   A.   When he started working there.

24   Q.   And roughly when was that?  What time of year was it?

25   A.   I don't know.  Like maybe mid summer.  I'm really not quite

1    sure.

2    Q.   Was it prior to the event at the synagogue?

3    A.   Uh-huh, yes.

4    Q.   And months prior?

5    A.   Yes.

6    Q.   Do you two talk to one another while at work --

7    A.   Uh-huh, yeah.

8    Q.   -- as co-workers do?

9    A.   Yeah.

10   Q.   Would you describe the defendant as talkative or quiet?

11   A.   Both.

12   Q.   What do you mean by that?

13   A.   It's just depending on what kind of mood he was in, but

14   that's basically everybody.

15   Q.   Right.  Can you turn in that binder in front of you there

16   to tab No. 18.

17   A.   (Complied.)

18   Q.   Sorry, 18?  There you go, it's just behind 18.  You got it.

19   Do you recognize that person?

20   A.   Uh-huh.

21   Q.   Is that the defendant?

22   A.   Uh-huh.

23            THE COURT:  Can you say yes or no?

24   A.   Yes.

25

1              THE COURT:  Thank you.

2    BY MR. LINDER:

3    Q.  Do you recognize the camouflage outfit that he's wearing?

4    A.  Yes.

5    Q.  Had you had seen it before?

6    A.  Uh-huh, yes.

7    Q.  How about the necklace that he's wearing, do you recognize

8    that?

9    A.  No.

10   Q.  The camouflage outfit, has he ever talked to you about

11   that?

12   A.  He said it's some kind of a military coat.

13   Q.  All right.  Did he say where it's from?

14   A.  He said it was German.

15   Q.  Why -- in what circumstance did he talk about his jacket?

16   A.  He just said it was like all weatherproof and knife proof

17   and indestructible.

18   Q.  Did he talk about Germany to you at any point during your

19   work with him?

20   A.  Yes, a little bit.

21   Q.  Did he talk about Naziism with you?

22   A.  Yes.

23   Q.  What did he talk about Naziism?

24   A.  Something about a movement or white supremacy.  I'm not

25   quite sure.  I -- I don't like that kind of stuff, so I just

1   kind of put it out of the back of my head after he would talk

2   about it.

3   Q.  Did he talk about it prior to the events at the synagogue

4   occurring?

5   A.  Yes.

6   Q.  How far prior?  Months prior?

7   A.  Yeah.

8   Q.  Did he ever talk about Adolf Hitler?

9   A.  Yes.

10  Q.  What did he say about Adolf Hitler?

11  A.  That he just idolized him, wanted to be like him.

12  Q.  This was at work when he would mention this?

13  A.  (Nodded.)

14  Q.  All right.  Let's move to talk about the synagogue

15  incident.  Do you recall the first time you talked with the

16  defendant about the synagogue incident?

17  A.  Yes.

18  Q.  When was that?

19  A.  The Saturday when I came in after he had performed what he

20  had done.

21  Q.  How did it come up?

22  A.  We clocked in, and I went up to the registers, and he said,

23  "I have good news and bad news."  And like any normal person, I

24  thought, oh, you know, somebody's pregnant or somebody's

25  getting married.  That's good news.  But then he showed me the

1  photo of what they did, and I said, "Well, what's the bad

2  news?"  And he said, "If we get caught, you know."

3  Q.  What was the good news presumably?

4  A.  Apparently the good news was what they had done.

5  Q.  Can you turn in the book here -- what -- when you say show

6  you a photo, where was the photo?

7  A.  On his phone.

8  Q.  And in the book in front of you, can you turn to tab -- the

9  one behind No. 14, please?

10  A.  This?

11  Q.  Do you recognize that?

12  A.  Yes.

13  Q.  Is that what he showed you?

14  A.  Uh-huh.

15  Q.  What was his demeanor like as he talked about it?  Was he

16  sad?  Happy?

17  A.  He was happy.

18  Q.  Was he scared?

19  A.  No.

20  Q.  Was he proud?

21  A.  He seemed to be.

22  Q.  Did he tell you what his plan was in doing this?

23  A.  I don't remember.

24  Q.  Did he talk about going in the synagogue?

25  A.  He said something to the fact that they were going to break

1  in or they wanted to, but they got spooked or scared or

2  something to that effect.

3  Q.  What did you say to him about when you saw this?

4  A.  I was shocked and said, "Why did you do that for?"

5  Q.  What was his response?

6  A.  Well, there were people up front, so he just kind of gave

7  me that "you know why" look, and then we had to kind of go our

8  separate ways because we were getting customers.

9  Q.  Did he ever talk to you about the news reaction to the

10  incident?

11  A.  Yes.

12  Q.  And what did he have to say about that?

13  A.  He just said it would probably be on the news.

14  Q.  At that point, this is the Saturday after the incident,

15  right?  What did you do?  Did you call law enforcement?

16  A.  My husband did.

17  Q.  And did you talk with law enforcement?

18  A.  Yes.

19  Q.  And did you cooperate with law enforcement?

20  A.  Yes.

21  Q.  And did you talk with the defendant again at another -- at

22  a later date about this incident?

23  A.  Yes.

24  Q.  And was that recorded?

25  A.  Uh-huh, yes.

1  Q.  Can you turn in your binder there to Exhibit 57, the one

2  right behind 57?

3  A.  (Complied.)

4  Q.  And if you turn to page 3, let me just ask you again,

5  during this conversation -- was this conversation the same day

6  or a few days later?

7  A.  The same -- what do you mean?  I mean --

8  Q.  I'm sorry, was this conversation the same day as your

9  original conversation with Nolan Brewer or was it a few days

10  after that, after that Saturday?

11  A.  When all this?

12  Q.  The second conversation.

13  A.  Yeah.

14  Q.  It was a few days later?

15  A.  Yes.

16  Q.  Was the defendant -- what was the defendant's demeanor if

17  you -- during that conversation?

18  A.  I don't remember.

19  Q.  Was he sad?

20  A.  No.

21       MR. ANSELL:  Objection, go ahead.

22  A.  He didn't --

23  BY MR. LINDER:

24  Q.  Can you recall if he was sad?

25  A.  No, he wasn't.

1   Q.  Do you -- in the middle of page 3 there, there's a

2   discussion about -- you say in the middle, "this is getting

3   national attention," and he responds, "Yeah, I know.  There's

4   2.5K bounty on us."  Do you remember him saying that?

5   A.  Yes.

6   Q.  Was he scared as he said that?

7   A.  He didn't seem to be.

8          MR. ANSELL:  (Inaudible.)

9          COURT REPORTER:  I'm sorry, I can't hear you.

10         MR. ANSELL:  I started to object but then I stopped.

11         THE COURT:  Okay.  Well, stop doing that unless you

12   have an objection.  Stand, and then we'll know you're about to

13   object.

14         MR. ANSELL:  All right.

15   BY MR. LINDER:

16   Q.  What was his demeanor like as he was telling you that?

17   A.  Happy, upbeat.

18   Q.  On the next page -- again this is page 4.  In the middle of

19   the page, it says -- and this is you talking -- "I'm making you

20   smile."  Do you recall if the defendant was smiling when he was

21   talking with you?

22   A.  Yes.

23   Q.  And you say "So you just got up, and, like, what time did

24   you say?  1:30 in the morning, you just decided to do it?"  And

25   he said, "No, we planned it."  Do you remember him saying that?

1   A.  (Nodded.)

2   Q.  What is he saying when he said he planned it, planned what?

3   A.  What they were going to do.

4   Q.  At the synagogue?

5   A.  Uh-huh.

6   Q.  At the bottom there, it says "'Cause we went -- the

7   defendant says "'Cause we went to -- made the napalm, got the

8   spray paint and everything."  Do you see that?

9   A.  Yes.

10  Q.  Do you remember him saying that?

11  A.  No.

12  Q.  Has he ever mentioned the word "napalm" before to you?

13  A.  Some -- a little bit.  He just mentioned how he knew how to

14  make homemade napalm, which I thought was kind of odd.

15  Q.  Previously he had mentioned that?

16  A.  (Nodded.)

17  Q.  Again, was that close in time to the incident or was that

18  months in advance?

19  A.  I'm not sure.

20  Q.  Finally, again page 5, near the top, the defendant says

21  "You know you got me smiling over here."  Again was the

22  defendant smiling throughout this conversation?

23  A.  Yes.

24  Q.  Did he seem happy?

25  A.  Yes.

*HIRZEL — CROSS/ANSELL*     69

Q.  All right.  Finally, were you surprised by what he had

done?

A.  Yes.

Q.  Why?

A.  I -- I get that he's in a group that he believes in, but to

know Nolan, I've never expected behavior like that from him, so

I was pretty shocked.

        MR. LINDER:  No further questions.

        THE COURT:  You may cross-examine.

        MR. ANSELL:  Thank you, Judge.

                      **CROSS EXAMINATION**

BY MR. ANSELL:

Q.  Good afternoon.  It's not fun testifying, is it?

A.  No.

Q.  It will be over soon.

    You said that Nolan started working at the GetGo in maybe

mid summer you said?

A.  Yeah, I'm not really sure.  I -- I don't know the exact

dates.  I don't have access to that kind of thing.

Q.  About how long do you think you had known him before he

mentioned this vandalism that he committed?

A.  About six months, almost a year.

Q.  So he had been working there quite a while?

A.  (Nodded.)

Q.  Now, when he first started working there, how did he strike

1   you?

2   A.  Just like anybody else.

3   Q.  Was he a good worker?

4   A.  Oh, yeah.

5   Q.  Would you say he was an unusually good worker?

6   A.  He's very well driven, but in a way, I mean, I am, too.

7   You know, we both would go in and we knew what we had to do and

8   we got it done.

9   Q.  So he wasn't the kind of worker that had to be told every

10  little thing that needed to be done?

11  A.  No.

12  Q.  He would figure out what needed to be done and he would

13  handle it; is that correct?

14  A.  Right.

15  Q.  And you appreciate that from a co-worker, don't you?

16  A.  Right.

17  Q.  Had he ever said anything that struck you as -- and let me

18  set the time frame for this.  For the first six or eight months

19  that you knew him, up to several months before the crime that

20  he committed, had you ever known him to utter any kind of

21  racist or antisemitic remark?

22  A.  Just off and on weird little jokes that I'm not -- I can't

23  really remember what the jokes were about, but they were kind

24  of -- what is the word I'm looking for -- unusual.

25  Q.  Did it seem unusual coming from him?

A.  No, not once I figured him out, you know, in how he believed in the movement and all of that Nazi stuff.

Q.  Was there a time when you guys spoke where there was no mention at all of Naziism, and no jokes or comments by him that would suggest that?  I'm saying like the first several months that he worked there.

A.  You mean did he talk about it all the time?

Q.  Well, I'm saying was there a time when he started talking about it?

A.  I don't remember the exact time.

Q.  Did it surprise you when he did?

A.  A little bit because I didn't know that people still believed in that kind of thing.

Q.  How many other people would work together during a single shift?

A.  Let's see, four or five.

Q.  Was he outgoing and communicative with everyone?

A.  Oh, yeah.

Q.  Are you able to describe, if you know, what the source seemed to be of these beliefs that he had?

A.  I don't know.

Q.  You don't know if he was raised with them?

A.  I have no -- like I said, I only know Nolan from working with him.  I don't know him outside of work, so I really couldn't say.

1  Q.  So his -- are you able to put a time frame on -- and

2  forgive me if you've answered this.  I just want to make sure.

3  Are you able to put a time frame on when he started making

4  comments that were racist or antisemitic?

5  A.  Huh-uh.

6  Q.  And when you say he didn't seem scared, you don't know if

7  he was scared or not, do you?

8  A.  Well, no, I --

9  Q.  Have you ever known someone who smiles when they're

10 nervous?

11 A.  Not really -- well, I guess everyone probably does.

12 Q.  Okay.  Now he said the bad news was that they might get

13 caught, right?

14 A.  Yes.

15 Q.  And he said that they were afraid to get any closer to the

16 synagogue; is that true?

17 A.  Yes.

18 Q.  All right.

19          MR. ANSELL:  No more questions, Judge.  Thank you.

20          MR. LINDER:  Nothing further, Your Honor.

21          THE COURT:  Thank you, ma'am, and you may be excused.

22          THE WITNESS:  May I say something?

23          THE COURT:  No, you may not.  I'm sorry.  There's no

24 question before you.  Why don't you go talk to Mr. Linder and

25 see if he wants to ask you some more questions.  Okay?

1           THE WITNESS:  Okay.

2                     (Off-the-record discussion.)

3           THE COURT:  Your microphone is on.  We can hear

4      everything you're saying.

5           MR. LINDER:  Sorry, Judge.

6                     (Off-the-record discussion.)

7           THE COURT:  You do have another question?

8           MR. LINDER:  Yes, Your Honor.

9           THE COURT:  All right, you may be seated, ma'am.

10     BY MR. LINDER:

11     Q.  Ma'am, what would you like to tell the Court?  What do you

12     believe --

13     A.  I just wanted to say that Nolan is a very, very good

14     person, a wonderful spirit.  I just think he was misguided by

15     the wrong people.

16           THE COURT:  Okay.

17           MR. LINDER:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           Any other witnesses?

20           MR. LINDER:  Yes, Your Honor.

21           THE COURT:  Is this a short one?

22           MR. LINDER:  Yes, we'll move as quickly as we can,

23     Your Honor.

24           THE COURT:  Then we'll take a break after this one for

25     the court reporter.

1          MR. LINDER:  Very well, Your Honor.

2          At this time, the United States would call Christian

3    Young.

4          THE COURT:  Christian Young, come right up here to the

5    witness stand.  And, sir, if you would remain standing and

6    raise your right hand.

**CHRISTIAN YOUNG, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

9          THE COURT:  You may have a seat.

10   BY MR. LINDER:

11   Q.  Sir, can you please tell the court your name and spell your

12   name for the court reporter.

13   A.  Christian Young, Y-O-U-N-G.

14   Q.  And, Mr. Young, what do you do for work?

15   A.  I am currently in between.

16   Q.  And where did you work last?

17   A.  I worked at Speedway.

18   Q.  And where did you work before that?

19   A.  I worked at the GetGo.

20   Q.  And GetGo is a gas station as we heard just a moment ago?

21   A.  Yes, sir.

22   Q.  Do you know the defendant, Nolan Brewer?

23   A.  I do.

24   Q.  And do you know him from working with him?

25   A.  Uh-huh.

1    Q.  Do you know him outside of work?

2    A.  I do not.

3    Q.  Did he at any point talk to you about what he did at a

4    Jewish synagogue?

5    A.  Yes, he did.

6    Q.  All right.  As with the witness before, I'm going to ask

7    you two sets of questions, first generally about his

8    background, and then about the incident itself, okay?

9         First, when did you first meet him?

10   A.  I met Nolan the first few months of me actually working at

11   GetGo.

12   Q.  And when was that?

13   A.  I started working at GetGo November 29th of 2017.

14   Q.  And did you talk to one another while at work?

15   A.  Yes, we did.

16   Q.  And would you describe the defendant as talkative or quiet?

17   A.  Because I am also a talkative person, we kind of have the

18   same talkative aspect of it.

19   Q.  If you take a look at Exhibit 18 in the book in front of

20   you there, it's the photo right behind 18.

21   A.  (Complied.)

22   Q.  That's the defendant, right?

23   A.  Correct.

24   Q.  And you see that camouflage jacket that he's wearing?

25   A.  Yes, I do.

1   Q.  Do you recognize that?

2   A.  Yes, I do.

3   Q.  When was the first time you saw that?

4   A.  Again when I first -- when I -- around the times when I

5   first met Nolan.

6   Q.  And did he say anything about the jacket when you met him?

7   A.  He said it was a German coat.  Nothing really else with it.

8   Q.  How about the necklace?  Have you seen that necklace

9   before?

10  A.  I have not.

11  Q.  Did the defendant ever talk to you about Naziism?

12  A.  He would talk to me, and I'd say loosely, about his beliefs

13  because when I'm working, I typically don't pay that -- too

14  much attention to the conversations that we would have, but he

15  did say that he, you know, believes in the Nazi belief, that --

16  he didn't really -- he didn't say anything about -- about his

17  feelings towards, you know, just any other race; more so like,

18  I could see -- I could see him saying the outsourcing, you

19  know, the thing with the Jewish, but I just knew that he, you

20  know, believed in the, you know, Nazi belief.

21  Q.  And when was the first time that he mentioned the Nazi

22  belief to you, do you think?

23  A.  One of the nights that we worked third shift, because at

24  the time I was working third shift.

25  Q.  When would that have been in time?  Close to when you

1    started or close to when you left?

2    A.  Sometime -- it felt like early 2018.

3    Q.  Did he -- did the defendant ever talk to you about having

4    German or Nazi heritage?

5    A.  Yes, he did.

6    Q.  And did he ever show you -- if you would, turn to No. 25.

7    A.  (Complied.)

8    Q.  Have you ever seen this picture?

9    A.  I do not recall.

10   Q.  All right.  Has he ever talked to you about going to events

11   or Nazi-related conventions, meetings?

12   A.  Yes, he did.

13   Q.  What did he say about that?

14   A.  Just said that he had attended conventions.  I didn't even

15   know that there were even such conventions, but again, I didn't

16   really -- I didn't pay too much mind to it because I was

17   working.  I was focused on my work.

18   Q.  Now let's move to the incident itself, the synagogue

19   incident.  If you would turn to Exhibit No. 13, please.

20   A.  (Complied.)

21   Q.  Have you seen that photo before?

22   A.  Yes, I have.

23   Q.  And who showed it to you?

24   A.  Nolan.

25   Q.  When?

1    A.   The day after the incident.

2    Q.   And where were you guys?  Were you at work?

3    A.   Yes.

4    Q.   Can you describe the conversation?  Why did he show it to

5    you?

6    A.   He came up to me and said, "Hey, look at this.  Look at

7    what I've done" and showed me the picture, and that was really

8    the only extent to the conversation there.

9    Q.   Can you describe his demeanor?  Was he happy?  Sad?

10   A.   Previously I said that he was gloating about it.  I think

11   more so proud.  He wasn't sad about it.  He wasn't too overly

12   eccentric about it.  Just proud of it.

13   Q.   Proud of what he had done?

14   A.   Uh-huh.

15   Q.   Yes or no?

16   A.   Yes.

17   Q.   All right.

18         MR. LINDER:  No further questions.

19         THE COURT:  You may cross.

20         MR. ANSELL:  No cross, Judge.

21         THE COURT:  Okay.  All right, thank you very much,

22   sir.  You may step down.  We'll take a five-minute break for

23   the court reporter's sake.

24                    (Recess taken.)

25         THE COURT:  You may be seated.

1          Mr. Linder, do you have any other witnesses?

2          MR. LINDER:  Yes, Your Honor, we have three witnesses

3     left, one of which is a witness that the defense intended to

4     call.  So we'll do some double duty right now if that's all

5     right.

6          THE COURT:  That's fine.

7          MR. LINDER:  All right.  At this time, the Government

8     would call Alex Hitchcock.

9          THE COURT:  Mr. Hitchcock, come up to the witness

10    stand.  Sir, if you would remain standing and raise your right

11    hand.

12         **ALEX HITCHCOCK, PLAINTIFF'S WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14         THE COURT:  You may have a seat.

15         Counsel?

16         MR. LINDER:  Thank you, Your Honor.

17    BY MR. LINDER:

18    Q.  Sir, could you please tell the Court your name and spell

19    your last name for the court reporter.

20    A.  Alex Hitchcock, H–I–T–C–H–C–O–C–K.

21    Q.  Mr. Hitchcock, what do you do for work?

22    A.  I am a cook at the Guckenheimer Cafe in the Medina building

23    in Greencastle.

24    Q.  Where do you live?

25    A.  Eminence, Indiana.

1    THE COURT:  Can you spell your city?

2    THE WITNESS:  E-M-I-N-E-N-C-E.

3    THE COURT:  Thank you.

4  BY MR. LINDER:

5  Q.  Mr. Hitchcock, do you know Nolan Brewer?

6  A.  I do.

7  Q.  How do you know him?

8  A.  He's a friend.

9  Q.  How long have you known him?

10 A.  I want to say since the eighth grade.

11 Q.  And how would you describe your relationship?  Is a he

12 friend or a best friend?

13 A.  I would say he's probably my best friend.

14 Q.  And did you -- how old are you now?

15 A.  I am 19.

16 Q.  So you've known him for at least five years?

17 A.  Yes.

18 Q.  In the 2018 time frame, that year, did you see one another?

19 A.  Yes.

20 Q.  Did you hang out?

21 A.  Uh-huh, a lot.

22 Q.  I was going to ask; how often?

23 A.  Over the summer, it was pretty much every weekend.  During

24 like the college year and stuff, it varied due to like, you

25 know, work and the college schedules and everything.

1  Q.  In July of 2018, did he talk to you at some point about

2  what he and his wife did at a Jewish synagogue?

3  A.  I think it was the very end of July.

4  Q.  Again, as with the other witnesses, I'm going to ask you

5  some background as well as about the incident itself.

6      Has the defendant, Nolan Brewer, ever talked to you about

7  Nazi Germany?

8  A.  Yes.

9  Q.  And what has he talked to you about with regard to Nazi

10 Germany?

11 A.  Most of it was pretty much just facts.  I don't think too

12 much of the Nazi Germany part really tied in with his beliefs

13 until like a lot later when he was talking about that.

14 Q.  When you mean -- "a lot later," when is that?

15 A.  Like more towards like the summer, like, leading up to

16 this.

17 Q.  And what would he say to you during that part?

18 A.  Umm, I want to say like his views started to turn a little

19 bit more radical alongside, you know, like K.B.'s whose were

20 already kind of there.

21 Q.  We'll talk about his wife in a moment, K.B. Brewer.

22     Let's talk about him.  When you say his beliefs were

23 turning radical, what do you mean?

24 A.  He seemed to be wanting to talk about it a little bit more

25 than like before, like bringing it up more often and trying to,

1   like, figure out how all of us would like respond to his

2   beliefs, his group of friends.

3   Q.  Did he ever talk about Adolf Hitler?

4   A.  Yes.

5   Q.  What did he have to say about Adolf Hitler?

6   A.  Mostly just like facts about history, not anything like --

7   I don't -- not very much about his views I don't think.

8   Q.  And what were those facts if you recall?

9   A.  Like pretty much like how he was raised and, you know,

10  things about his death and --

11  Q.  Do you recall Nolan talking about white supremacy or white

12  nationalism?

13  A.  Yes.

14  Q.  And what did he have to say about that?

15  A.  Most of that I don't really recall too much of what was

16  actually said.  At some point, I know they went to Identity

17  Evropa -- Europa.  Aside from that, I don't know of anything

18  else.

19  Q.  And what is -- do you know what Identity Evropa, Europa is?

20  A.  It is, I believe, like a neo-Nazi type-esque party.

21  Q.  What did he talk about with respect to that group?

22  A.  During that time, I actually didn't know that that's what

23  it was.  I thought at first that it was just like a scholarship

24  opportunity or something for K.B., and I didn't know what it

25  was until the first time I was questioned by the FBI.

1  Q.  And you mentioned Mrs. Brewer, and by Mrs. Brewer, I mean

2  Nolan's wife.  You said her views were radical.  Can you

3  describe that?

4  A.  Umm, Nolan had a friend.  I don't know their name or

5  whatever, but they had like a set of, like, beliefs or whatnot

6  that were slightly different than like K.B.'s, and she kind of

7  made mention of wanting to burn down his house due to those

8  beliefs.  Naturally, like, at the time, Nolan was like "Yeah,

9  no, let's not."  The rest of us were kind of like "I don't know

10  if she's serious."  It was kind of hard to tell like what she

11  was really, you know, thinking or what was going through her

12  mind at the time.

13  Q.  So was that at some point over the summer?

14  A.  I want to say yes.

15  Q.  Did you give that just now as an example of her potentially

16  being violent or having extreme tendencies?

17  A.  Yes.

18  Q.  And is it fair to say that you -- that she rubbed off on

19  Nolan?

20  A.  Yes.

21  Q.  What do you mean by that?

22  A.  Before they got together, like, I would -- never heard

23  Nolan really talk about, you know, Hitler, or white supremacy

24  or anything.  And even at first, it was just like wearing the

25  German fatigue, and, you know, more like just being proud of,

1   like, a certain heritage than their, you know, beliefs in, you

2   know, like the supremacy and stuff.

3   Q.  So are you saying that Nolan was previously proud of German

4   heritage before --

5   A.  Yes, like, in a way like outside of Hitler and what he

6   ended up doing.

7   Q.  Did Nolan ever make jokes or otherwise make statements

8   about the Jewish people?

9   A.  Yes.

10  Q.  And what do you recall about that?

11  A.  I believe that the one in here -- I don't remember what the

12  picture is, but the one about like the Jews digging around the

13  ashtray.

14  Q.  Let's turn to 51 in that binder.  And it's right behind tab

15  51.

16  A.  (Complied.)

17      That would be the one.

18  Q.  Do you remember -- do you remember seeing this image on his

19  phone or do you remember him telling you this joke --

20  A.  He said it out loud.

21  Q.  -- or purported joke?

22      When was that?

23  A.  It was in the car.  As to when I have no idea.

24  Q.  Let me just ask this for completeness.  Did you hold

25  similar beliefs, you personally, to Nolan and his wife?

A.  Like the supremacy?

Q.  Correct.

A.  No.

Q.  Did he know that?

A.  I assume so.

Q.  Why do you say that?

A.  Umm, I was born and raised in a very religious family.
Like, we went to church every Sunday and I've never expressed
interest in that.

Q.  Did he at points in time seem reluctant to talk about those
beliefs around you knowing your upbringing?

A.  Towards the beginning of when he would talk about that
stuff, I would say yes.  And then he kind of got, I'd say, more
comfortable with just, you know, expressing his views in that
matter.

Q.  Can you give a time frame to that, if you would?  When did
that start and transition to become more comfortable in his
views?

A.  I would say maybe like a year ago would be when he started
to get comfortable enough to, like, actually say stuff more
commonly about that.  Before then, like it was an every now and
then thing.  Mostly when K.B. was around.

Q.  All right.  Let's move to the incident itself.  So late
July 2018.  I want to go first to Exhibit No. 11 on here, which
is a text message string from Nolan's phone.  And they are

1  messages, as you can see -- that's the one (indicating), you've

2  got it -- sent to and from recipient named Kona Chan or Chan

3  Kona.  Who is that?

4  A.   That is a nickname for me.

5  Q.   And elsewhere in this binder, there's a text message string

6  relating to a Q chan or Chan Q.  Is that you?

7  A.   Q is not me.

8  Q.   Who is Q?

9  A.   That would be Cody.

10  Q.   Is that another part of the friend group?

11  A.   Uh-huh.

12  Q.   In this, in the one in front of you, the third line down

13  says "Okay, we'll be grabbing the can to fill it up, run to

14  Camby and come back."  Do you know what he's referring to by

15  "can"?

16  A.   He's referring to a gas can.

17  Q.   All right.  Now, I want to stop for a moment.  Did you talk

18  with the FBI in connection with this case?

19  A.   Yes.

20  Q.   And did they ask you whether you had any text messages?

21  A.   Yes.

22  Q.   Did you at first tell them "no"?

23  A.   Yes.

24  Q.   Was that a lie?

25  A.   Yes.

1    Q.  Why did you tell them "no" at first?

2    A.  I'd like to view myself as like a reliable kind of a

3    friend, and I don't like to throw people really under the bus

4    for, you know, like making mistakes.

5    Q.  Did you ultimately talk to them about the text messages?

6    A.  Yes.

7    Q.  Including this one we just saw?

8    A.  Yes.

9    Q.  Do you know why the defendant was getting a gas can and the

10   date of this is the 27th of July?  Do you know why?

11   A.  In the text string, I don't think it's on this page, but

12   they messaged me saying that they had an experiment and that

13   they wanted to borrow the gas can. And then later on that

14   night, they came over and we made napalm, and then they ended

15   up leaving with the napalm.

16   Q.  Let me unpack that just for a moment.  When you say

17   "napalm," what are you referring to?

18   A.  The mixture of gasoline and Styrofoam.

19   Q.  And did you see them make it that evening?

20   A.  Yes.

21   Q.  And what was the Styrofoam that was being used to make

22   that?

23   A.  It was Styrofoam plates.

24   Q.  Do you know where he got those?

25   A.  From the Walmart in Greencastle.

1    Q.  Did he tell you that?

2    A.  No.

3    Q.  How do you know that?

4    A.  Only from it being said here.

5    Q.  Okay.  And just to be clear, if you would respond only to

6    what you personally remember as opposed to what you've heard

7    here?

8    A.  Okay.

9    Q.  I know that's confusing.

10       Do you know when Nolan learned how to make the napalm?

11   A.  No, I do not.

12   Q.  Was it that very day?

13   A.  No.

14   Q.  Had you made it previously?

15   A.  Yes.

16   Q.  What did you do with it previously?

17   A.  We put it on like swords and lit them on fire, and we lit a

18   coconut on fire with it, too.

19   Q.  If you would just turn to 12.  It's the very next one.

20   A.  (Complied.)

21   Q.  Do you recognize that?

22   A.  Yes.

23   Q.  What does that look like?

24   A.  That is the pot of napalm.

25   Q.  Now, you said Nolan had brought the Styrofoam plates,

1    right?

2    A.   Yes.

3    Q.   Did they -- did he and his co-conspirator bring anything

4    with him when he met with you on that Friday to make the

5    napalm?

6    A.   I feel like they might have been drinking the Gatorade from

7    the bottles, and I feel like he brought in cans of aerosol.

8    Q.   Spray paint?

9    A.   I think it's like an air spray or a hair spray or

10   something, not spray paint.

11   Q.   Did they tell you what they planned to use the napalm for?

12   A.   No.

13   Q.   Other than an experiment?

14   A.   They did not.

15   Q.   All right.  And did you otherwise know what they were using

16   it for?

17   A.   No.

18   Q.   All right.  Let's turn to tab -- well, after the fact,

19   after the incident, did you hear -- did you eventually learn

20   what they used it for?

21   A.   Yes.

22   Q.   What was that?

23   A.   They didn't end up using much of it, but I think they used

24   it for the fire in front of the trash --

25   Q.   The enclosure?

A.   Yeah, the enclosure.

Q.   All right.  If you'd turn to 56, please.

A.   (Complied.)

Q.   These are two picture messages from the defendant's phone to you, Kona Chan, on that day.  Do you recall receiving these messages from him on –– this is July 30th, so the day after the incident?

A.   Yes.

Q.   And at the end of this, this is a series of text messages with you; is that right?

A.   Yes.

Q.   And do you recall receiving these messages from Nolan?

A.   Yes.

Q.   What was your reaction when you received this?

A.   I was pretty unsure of how to react.

Q.   What do you mean?

A.   Because I don't really believe in the views of, you know, doing things radically in that way, but at the same time, I didn't want to be extremely negative towards my friend.

Q.   At the bottom, it says that he, Nolan, texted you "Google it!  The word "synagogue" is trending in Indiana and soon to go regional."

A.   Yes.

Q.   What did you think he meant by that?

A.   The fact that it would be a more popular subject on media.

1    Q.  Did that indicate to you that he was proud of what he did?

2    A.  I would say so.

3    Q.  Did you see Nolan later that day?

4    A.  Yes.

5    Q.  Did he come over to your house with his wife?

6    A.  Yes.

7    Q.  And some other friends were there as well?

8    A.  Uh-huh.

9    Q.  Did he show you a photo of the incident itself from his

10   cell phone?

11   A.  Yes.

12   Q.  And can you turn to tab 13?

13   A.  (Complied.)

14   Q.  Did he show you that photo?

15   A.  I want to say it was the photo that was closer to the

16   enclosement [sic].

17   Q.  How about 14?

18   A.  It was like that, but it still had the torches lit.

19   Q.  So some other photo that's not present here?

20   A.  (Nodded head.)

21   Q.  You have to answer audibly.

22   A.  Yes.

23   Q.  What did he say about it?

24   A.  On that, I don't really remember that.

25   Q.  What was his demeanor as he told you about it?

A.  It was more of a matter-of-fact-type of conversation than a necessarily like, you know, a really proud or a really sad type of reaction or what he was coming off as.

Q.  Did he talk to you about whether this was their original plan or whether they planned to do something else?

A.  They did mention that they were wanting to do more.

Q.  And what was the "more"?

A.  The breaking into the synagogue and using the napalm to make a symbol on the floor or something, and then the mentioning of the rabbi's house.

Q.  Let's unpack that just a minute.  Who said the breaking into the synagogue and the symbol on the floor?

A.  That was Nolan.

Q.  Who said that they would go to the rabbi's house?

A.  That was K.B.

Q.  Were they talking to you at the same time, like a conversation?

A.  This is two different conversations on the same day.

Q.  Were they both present for those conversations?

A.  On the second one, they were.  On the first one, I'm not sure if K.B. was necessarily within earshot.

Q.  On the first conversation, when he talked about potentially breaking into the synagogue and burning a design, let's turn to Exhibit 33.

A.  (Complied.)

HITCHCOCK – DIRECT/LINDER                    93

1   Q.   Do you recognize that?

2   A.   Yes.

3   Q.   What is that?

4   A.   It is a picture from a art app.

5   Q.   Who made it?

6   A.   Nolan.

7   Q.   How do you know that?

8   A.   Because I'm pretty sure he was drawing it right in front of

9   me.

10  Q.   And is this relevant to you in the context of burning in

11  the synagogue?

12  A.   Yes.

13  Q.   How?

14  A.   That is the symbol that they were going to burn into the

15  floor.

16           THE COURT:   What exhibit are we looking at?

17           MR. LINDER:   33.

18  BY MR. LINDER:

19  Q.   During that portion of the conversation, was K.B. present

20  right there with you?

21  A.   I believe she was probably within earshot for that.

22  Q.   Who was talking with you, though?

23  A.   It was Nolan.

24  Q.   You had a second conversation later with both of them,

25  right?

1   A.  Yes.

2   Q.  And it is at that time that K.B. talked about burning the

3   rabbi's house?

4   A.  Yes.

5   Q.  What did Nolan say about that?

6   A.  For that conversation, he mostly stayed quiet.

7   Q.  Did they talk about looking for another target?

8   A.  Yes.

9   Q.  Who talked about that?

10  A.  That was more K.B.

11  Q.  And what did she say?

12  A.  Pretty much like staying outside of a 50-mile radius of

13  their house, and aside from that, like they hadn't really

14  narrowed anything else down yet.

15  Q.  And did Nolan have anything to say about that?

16  A.  He remained silent.

17          MR. LINDER:  No further questions, Your Honor.

18          THE COURT:  You may cross-examine.

19                      **CROSS EXAMINATION**

20          MR. LINDER:  Thank you, Judge.

21  BY MR. ANSELL:

22  Q.  Good afternoon, Mr. Hitchcock.

23  A.  Good afternoon.

24  Q.  So I want to start back in eighth grade when you guys first

25  became friends.  What did you have in common at the time?

A.  Umm, we ended up doing track together, and I was, like,

into, like, certain games and like TV shows, like anime and

stuff, that we kind of were able to talk over and everything.

Q.  And you mentioned that you were raised in a very religious

household, correct?

A.  Yes.

Q.  Did you share that in common with Nolan?

A.  Yes.

Q.  He also was raised in a household that went to church every

Sunday?

A.  Yes.

Q.  In eighth grade and ninth grade and through high school,

did it seem to you, you're best friends, did it seem to you

that you had similar values?

A.  Yes.

Q.  And what -- how would you describe those values?

A.  I would say something along the lines of, like, pretty much

I follow the Ten Commandments.  You know, you kind of believe

like, you know, Jesus came to die for our sins, and pretty much

like everything that most normal Christian households would

entail in that.

Q.  Would that include the golden rule?

A.  As to what the golden rule is?  I don't know.

Q.  Well, it's been a while since I've been to Sunday school

but the Golden Rule "Do unto others as you would have them do

1  unto yourself"?

2  A.  Yes.

3  Q.  Would you just say that that would be one of the

4  foundations of your ethics as you grew up?

5  A.  For mine, yes.

6  Q.  Did Nolan seem to share that view with you?

7  A.  I think so.

8  Q.  Did you ever know him to treat people badly?

9  A.  No.

10  Q.  Did you know him to be kind?

11  A.  Yes.

12  Q.  Did you know him to be generous?

13  A.  Uh-huh, yes.

14  Q.  Did you know him to be respectful to others?

15  A.  Yes.

16  Q.  Did you know him to be tolerant of the differences that

17  other people might have?

18  A.  Yes.

19  Q.  Did you know him to be someone who respected authority and

20  followed rules?

21  A.  Yes.

22  Q.  With respect to respecting authority and following rules,

23  how strongly do you think that Nolan believed in following

24  rules?

25  A.  In school, I don't think I remember him ever getting in

1  trouble.

2  Q.  So as far as you know, he always followed the rules?

3  A.  Yes.

4  Q.  Now, did any of that change before he became involved with

5  K.B.?

6  A.  I do not think so.

7  Q.  You never observed it?

8  A.  No.

9  Q.  And when he became involved with K.B., what were some of

10 the first things that you noticed about his personality or

11 about his views?

12 A.  He seemed willing to change.

13 Q.  Did you have the opportunity to observe the two of them

14 together?

15 A.  Early on in their relationship, no.

16 Q.  But later, yes?

17 A.  Yes.

18 Q.  And when you say he seemed willing to change, did you have

19 the impression that that was willing to change to please K.B.?

20 A.  Yes.

21 Q.  So were you under the impression that that was important to

22 him?

23 A.  Yes.

24 Q.  And is that something that you were able to observe

25 firsthand when you saw the dynamic between the two of them?

1   A.   Yes.

2   Q.   Can you describe it?

3   A.   K.B. seemed more, like, outgoing and talkative and, you

4   know, just wanting to get everybody to pretty much, like,

5   believe what she believed.  And at first, Nolan wasn't like

6   that.  Like, he didn't really talk too much about his beliefs

7   or anything.  And the more, like, they hung out, the more, you

8   know, talkative and into talking about his beliefs and stuff he

9   became.

10  Q.   Did that become awkward at all seeing him change right

11  there amongst all your friends?

12  A.   There were a few conversations where I pretty much remained

13  silent because I didn't want to necessarily say anything to

14  what they were talking about.

15  Q.   Were you afraid of provoking K.B.?

16  A.   Yes.

17  Q.   Now, the fear of provoking K.B., what's the basis of that?

18  A.   I think she's a pyromaniac.  I think she's too willing to

19  want to go and burn stuff down.

20  Q.   Was she aggressive in terms of how she wanted Nolan to be

21  or to act?

22  A.   As to that, I do not know.  I didn't notice anything

23  myself.

24  Q.   Did you ever notice her being aggressive with him or trying

25  to be pushy, for instance?

1    A.  Only in some of their conversations.  I feel like she would

2    kind of look to him for, like, assistance or help in arguing

3    with, like, some of our friends about, like, her beliefs.

4    Q.  And would he give that assistance?

5    A.  A little bit.

6    Q.  Did he seem reluctant?

7    A.  Yeah, kind of.

8    Q.  Now, how many friends would -- that summer before the --

9    the summer that the incident happened, how many friends would

10   hang out at your house every weekend?

11   A.  Six.

12   Q.  So that was like the core group?

13   A.  Yes.

14   Q.  And you were all good friends?

15   A.  Yes.

16   Q.  Were all of you the same religion or race?

17   A.  I think one or two of them didn't really have a religion,

18   and then Chase is a African-American.

19   Q.  And Chase was a member of the group, right?

20   A.  Yes.

21   Q.  And how long had Chase been part of the group?

22   A.  I would say, like, three or four years.

23   Q.  And that whole time, Nolan was part of the group, too?

24   A.  Yes.

25   Q.  And did you ever observe Nolan to harbor or communicate any

1  kind of racist beliefs before he became involved with K.B.?

2  A.  No.

3  Q.  Did he seem accepting of all races?

4  A.  Yes.

5  Q.  Did K.B. seem to have any kind of a problem with Chase?

6  A.  Not that I noticed.

7  Q.  Now, you said that you guys played around with the homemade

8  napalm?

9  A.  Yes.

10  Q.  You had done that on several occasions prior to the

11  incident, correct?

12  A.  I believe it was only just that one day before.

13  Q.  How long before?

14  A.  I want to say it was earlier in July or maybe the end of

15  June.

16  Q.  And at the time, was it -- what was the purpose of it?

17  A.  Pretty much just to have a little bit of fun.

18  Q.  Was it like the kind of -- was it sort of like an

19  experiment?

20  A.  I would say something more along the lines of just to waste

21  away an afternoon.

22  Q.  It was fun to make this mixture and then burn it in

23  different ways?

24  A.  Yes.

25  Q.  Was there anything else that you did besides that along

1  those lines?

2  A.  I don't think so.

3  Q.  And what about -- did you know anything about the so-called

4  Drano bombs?

5  A.  I did not.

6  Q.  When you would hang out, what else would you guys do?

7  A.  Normally we would watch like either anime or play video

8  games.

9  Q.  When did you first hear about the Drano bombs?

10  A.  I wanted to say Thursday with my meeting with the

11  prosecutor.

12  Q.  Okay.  Now, you mentioned earlier that K.B. seemed to have

13  this -- that you think she's a pyromaniac.  On what basis do

14  you make that statement?

15  A.  Aside from hearing, you know, that she wanted to burn down,

16  you know, like the rabbi's house and, you know, use napalm in

17  the synagogue, there was the one time when she said something

18  about burning down one of Nolan's friend's house for his

19  beliefs.

20  Q.  Do you think that Nolan really wanted to break into the

21  synagogue or was he just trying to say what would make K.B.

22  happy?

23  A.  To say what would make K.B. happy.

24  Q.  Is that something that you observed time and again?

25  A.  Yes.

Q.   Did he seem reluctant to confront her directly?

A.   Yes.

Q.   Would you -- is it fair to say that rather than confront her directly, he might resist her more passively?

A.   Yes.

Q.   Was it fair to say that rather than confront her directly, he might maybe try to redirect her?

A.   Yes.

Q.   So would it surprise you that Nolan went along with K.B.'s plan but always wanted to hold her back?

A.   It would not surprise me.

Q.   So it wouldn't surprise you that he wanted to hold her back from doing worse than they did?

A.   Yes.

Q.   Does that seem consistent with your observations of the two of them together?

A.   Yes.

Q.   Have you had occasion to hang out with Nolan since this has happened?

A.   No.

Q.   And is that because you were listed as a witness?

A.   Yes.

Q.   Otherwise would you hang out with him?

A.   Yes.

Q.   The basis -- the bases of these beliefs that were

communicated at these gatherings, did they seem to have some

kind of supposed factual or intellectual basis?

A.  They were presented in a way that would definitely come off

as intellectual.

Q.  So did it seem that they had been reading things?

A.  Yes.

Q.  And so they would share these views with sort of a

bibliography of this, this, this, these are the reasons this is

true?

A.  As facts, yes.

Q.  Do you believe Nolan would have ever done this had he not

been influenced by K.B.?

A.  No.

Q.  And that's consistent with a lifetime of following the

rules, correct?

A.  Yeah.

Q.  Thank you.

            MR. ANSELL:  I have no other questions.

            MR. LINDER:  Nothing, Your Honor.

            THE COURT:  Okay.  Thank you.  You may step down.

            You have two more witnesses?

            MR. LINDER:  Two more, Your Honor.  The United States

calls Eric Martin.

            THE COURT:  Sir, if you'd come right up here to the

witness stand, and if you would remain standing and raise your

1    right hand.

2                    **ERIC MARTIN, PLAINTIFF'S WITNESS, SWORN**

3                         **DIRECT EXAMINATION**

4            THE COURT:  You may have a seat.

5    BY MR. LINDER:

6    Q.  Good afternoon, sir.

7    A.  Good afternoon.

8    Q.  Could you please tell the Court your name and spell your

9    name for the court reporter?

10   A.  Eric Martin, M-A-R-T-I-N.

11   Q.  Thank you.  Mr. Martin?

12   A.  Yes, sir.

13   Q.  How are you employed?

14   A.  I am with Direct Shot, an employee or what -- I'm sorry.

15   Q.  What did you do prior to working at Direct Shot?

16   A.  I actually worked for Tradesmen International, which is a

17   construction company.

18           THE COURT:  Sir, can you please talk into the

19   microphone?

20           THE WITNESS:  I'm sorry.  Tradesmen International, it

21   was a construction company.

22   BY MR. LINDER:

23   Q.  Is it a staffing firm for --

24   A.  Yes.

25   Q.  -- construction laborers?

1   A.  Yes, sir.

2   Q.  Did you work there in 2018?

3   A.  Yes, sir.

4   Q.  What did you do there?

5   A.  I basically did whatever needed to be done, cleaned the

6   different -- did different projects, cleaned out landscapes,

7   filled apartments with appliances, stuff like that.

8   Q.  Do you know the defendant, Nolan Brewer?

9   A.  Yes, I do.

10  Q.  How do you know him?

11  A.  Work associate.

12  Q.  At which work?

13  A.  Tradesmen International.  He was actually on both of my job

14  sites on different occasions.

15  Q.  And where were those job sites?

16  A.  One was the IU facility, the site right by IU.

17  Q.  In Bloomington?

18  A.  Yes.

19  Q.  And the other?

20  A.  Accent Apartments in Plainfield.

21  Q.  And what was the time period you worked with Nolan Brewer

22  at Accent Apartments?

23  A.  I wanted to say within, like, May or April.

24  Q.  And how about in Bloomington?

25  A.  Early July.

1    Q.  Did you two talk to one another while at work as

2    co-workers?

3    A.  No, just typical regular mumbo-jumbo, "how are you doing

4    today," "good", stuff like that.

5    Q.  If you could turn to Exhibit No. 18 please.

6    A.  (Complied.)

7    Q.  And is that Mr. Brewer?

8    A.  Yes, sir.

9    Q.  And do you recognize that jacket he's wearing there?

10   A.  Yes, sir.

11   Q.  Did he ever talk about that jacket?

12   A.  It was a gift from his grandfather from Germany.

13   Q.  How about the necklace that he's wearing?

14   A.  Yes, I noticed that one as well.

15   Q.  Do you know what that symbol is?

16   A.  It is a swastika.

17   Q.  Did he wear it around work?

18   A.  Yes.

19   Q.  Did he ever talk about it?

20   A.  He was just talking about his national socialist beliefs.

21          THE COURT:  Speak up.

22          THE WITNESS:  He would talk about him being a national

23   socialist and his beliefs.

24   BY MR. LINDER:

25   Q.  To your understanding, is Nazism short for national

1  socialism?

2  A.  Yes.

3  Q.  And what were his beliefs that he would talk about?

4  A.  He was talking about creating -- either creating a movement

5  or being part of a movement.

6  Q.  Did he ever talk about Adolf Hitler?

7  A.  Yes, he would talk highly of him.

8  Q.  And what do you mean "highly"?

9  A.  Like it was his idol.

10  Q.  Adolf Hitler?

11  A.  Like he was his idol.

12  Q.  When was that?  In Bloomington or at Accent Apartments?

13  A.  It was Accent Apartments.

14  Q.  So April/May time frame?

15  A.  Yes.

16  Q.  Did he ever talk about white supremacy?

17  A.  Little bits here and there.

18  Q.  Did he ever say anything about being superior to other

19  races?

20  A.  No, not entirely.  He would be -- like give out a little

21  small talk about certain -- with some people working there, and

22  then others not so much.

23  Q.  Was there ever a situation where a person of another race

24  was put in charge as his temporary supervisor?

25  A.  Yes.

1   Q.  Describe that if you would.

2   A.  We were doing a landscape.  We were doing landscaping --

3   cleaning off the landscape for the Accent Apartments.  And

4   Freddie, our supervisor, was away for the day.  So they

5   actually appointed who we call Carolina.  We didn't know his

6   real name.  He was just a tall African-American gentleman.  And

7   he was appointed to be our temporary supervisor for that day.

8   Q.  Did Mr. Brewer have anything to say about that?

9   A.  He was, like -- he was, like, "Why do we have to listen to

10  him?  Why is he our supervisor?"

11  Q.  Was it in connection with the fact that he was

12  African-American?

13  A.  Yes.

14  Q.  Did he talk about people of the Jewish faith?

15  A.  He would say a comment in German which I don't remember how

16  it went.

17  Q.  Do you know -- did you ever learn what the comment meant?

18  A.  Stupid Jew.

19  Q.  How often did he say that?

20  A.  Not all the time, but little times here and there.

21  Q.  Did he ever talk about the Nazi's treatment of the Jewish

22  people?

23  A.  Yes.

24  Q.  What did he say about that?

25  A.  He would actually say that the Jews actually deserved it.

1    Q.  Deserved what?

2    A.  The treatment that they were given.

3    Q.  Was he referring to the Holocaust?

4    A.  Yes.

5    Q.  Did Nolan Brewer ever show you -- did this have an impact

6    on the workplace?

7    A.  No, not -- no, not really because it was never actually

8    brought to light.  But Freddie, our Hispanic supervisor, did

9    ask him about his swastika and everything.  And they were

10   basically calling him "Nazi."

11   Q.  Who was calling him "Nazi"?

12   A.  Members of the group.

13   Q.  The other workers?

14   A.  The supervisor.

15   Q.  Was that because he openly wore the Nazi necklace?

16   A.  Because he openly wore the swastika necklace, yes.

17   Q.  Did Nolan Brewer ever show you pictures or images on his

18   cell phone?

19   A.  Yes, he would show multiple backgrounds of swastikas,

20   racial memes.

21   Q.  Let me just flip through them quickly if we could.  Let's

22   start with 25.  And it's the -- right after the tab?  Have you

23   ever seen that image before?

24   A.  Yes, it was actually his sister at what he told me was an

25   awards ceremony.

1    Q.   Did he say anything about it being a play?

2    A.   No.

3    Q.   How about 26?  Ever seen that?

4    A.   Yes, that was actually his phone lock screen.

5    Q.   You've seen his lock screen before?

6    A.   Yes.

7    Q.   His wallpaper, when you get a phone call, that's what you

8    see?

9    A.   Yeah, that was his actual background.  That was actually

10   wallpaper background.  Sorry.

11   Q.   How about 31, have you ever seen that on his phone?

12   A.   Yes, it was one of his gallery photos.

13   Q.   What's a gallery photo?

14   A.   Pictures that you take or have created or saved.

15   Q.   Pictures on his phone that he showed you?

16   A.   Yes.

17   Q.   32, have you seen that one?

18   A.   Yes.

19   Q.   And again, he showed you that?

20   A.   Yes, sir.

21   Q.   How about 35?  Did he show you 35?

22   A.   Yes, he did.

23   Q.   How about 36?  I'm sorry, do you know what 35 is?

24   A.   Yes, it's an Iron Cross.

25   Q.   And 36, did he show you that?

1  A.  Yes.

2  Q.  Have you ever seen him wear an Iron Cross on a necklace?

3  A.  No, he would -- actually, yeah, one time, and that was at a

4  Bloomington --

5  Q.  In the Bloomington job?

6  A.  Yeah.

7  Q.  If you turn to Exhibit 40, please.  This was a screen shot

8  on his phone, an image.  It's after tab 40, sorry.

9  A.  Okay.

10  Q.  You got it.  And it looks like a text message to an Eric

11  Martin.

12  A.  Yes.

13  Q.  Do you recall receiving this text message?

14  A.  Yes, I did.

15  Q.  All right.  And he talks about being a national socialist,

16  correct?

17  A.  Yes, he talks about his beliefs and how he feels about this

18  subject, and I did not respond after that to the text message.

19  Q.  And next, 41, is a diagram.  Have you ever seen that?

20  A.  Yes, I did.

21  Q.  And what was the context of seeing that?

22  A.  He was trying to -- it was basically like it was a diagram

23  of what leader -- what kind of leader he would be or what kind

24  of leader that he would exemplify I want to say, or be.

25  Q.  And what kind of leader was he trying to be?

A.  He was trying to be basically a national socialist leader.
So he did like a diagram of his neoliberalism which I don't
know what it is.

Q.  Did he talk about Adolf Hitler in this diagram?

A.  Yes.

Q.  What did he say?

A.  He was saying that he was that close to being Hitler.

Q.  In his beliefs?

A.  In his beliefs, yes.

Q.  When was that, in Bloomington or back at Accent Apartments?

A.  Accent Apartments.

Q.  So April, May?

A.  Yes.

Q.  Lastly, if you turn to 51, please.  Sorry it's the one
after tab 51.  I know these tabs are tough.  This is the one
that's been talked about a couple times here regarding the
ashtray.  Have you seen this before?

A.  Yes, he did show me the meme on his cell phone.

Q.  He showed this to you?

A.  Yes.

Q.  Did he laugh when he showed it to you?

A.  He was laughing, yes.

        MR. LINDER:  No further questions.

        THE COURT:  You may cross-examine.

        MR. ANSELL:  Thank you, Judge.

*MARTIN – CROSS/ANSELL*                                    113

## CROSS EXAMINATION

(Off-the-record discussion.)

BY MR. ANSELL:

Q.  Mr. Martin, how long did you work with Nolan?

A.  For a few weeks at one job site, which is the Ascent Apartments, and then two days at IU Bloomington.

Q.  How many weeks at Ascent Apartments?

A.  I would say about three to four.

Q.  And this was in May or June?

A.  It was roughly in May.

Q.  Early or late May?

A.  I want to say late May, if I remember correct, yes.

Q.  Was it late May into June?

A.  Yes.

Q.  And you never knew him before that, right?

A.  No, sir.

Q.  Did you ever meet his wife?

A.  No, I did not.

Q.  Did you know anything about her?

A.  I'd been shown pictures of her, yes, but other than that, that is -- nothing else.  There's nothing else besides that.

Q.  Were you the one he talked to the most about this stuff?

A.  Not really.  Like, he would go on a little bit, you know, express, like, freely express how he feels and everything.  I was just, like, "Okay, man."

1  Q.  Was it primarily what he thought about the economics and --

2  basically the economics of the system?

3  A.  Yes.

4  Q.  And where you said that chart placing him on the two axis

5  close to Hitler, that's a political spectrum chart, right?

6  A.  Yes.

7  Q.  Have you ever seen one of those online?

8  A.  I mean, I haven't seen one of those online.  He

9  actually just showed it to me on his phone.  I did not see that

10  on the Internet.  He did show me on his phone, the political

11  diagram.

12  Q.  So Hitler's got a point on there, and Margaret Thatcher's

13  got a point, right?

14  A.  Yes.

15  Q.  Stalin's got a point?

16  A.  Yes.

17  Q.  Milton Friedman's got a point on there, correct?

18  A.  Yes.

19  Q.  And Gandhi, right?

20  A.  Yes.

21  Q.  So the four axes are -- to the far left is

22  communism/collectivism.  To the far right is neoliberalism and

23  libertarianism.  Do you understand what those two concepts are

24  in terms of economic thought?

25  A.  Not entirely.

*MARTIN – CROSS/ANSELL*                    115

Q.  Now, the other axis, the vertical axis goes from
authoritarian/fascism down to anarchism/libertarian.  Are you
familiar with those concepts?

A.  No.

Q.  So when he was talking about where he falls on this, it was
right in the middle between neoliberalism and communism,
correct?

A.  Yes.

Q.  But much closer to authoritarianism than anarchism,
correct?

A.  Yes.

Q.  And that's what plotted his position close to where whoever
created this had plotted Hitler's position, correct?

A.  Yes.

Q.  So when he's talking about this, he's talking mainly about
economic philosophy and law and order versus liberalism?

A.  Yeah.

Q.  Is that what you understood?

A.  Yes.

Q.  Okay.  I just wanted to clarify that.

        THE COURT:  Are you sure you understood that?

        THE WITNESS:  Like, back in the day I was kind of
clueless.  Then like -- because I actually like -- I have -- I
really had no idea really what he was talking about.

        THE COURT:  Okay.  You've never studied any of these

theories?

THE WITNESS:  No.

THE COURT:  Okay.  Most people have not.

BY MR. ANSELL:

Q.  When you say what kind of a leader, you don't really know if that's what he was talking about?

A.  No.

Q.  Or at the time you didn't really know what he was talking about?

A.  At the time, I didn't know what he was really talking about.

Q.  Okay, that's fair enough.  Was he the kind of person that would work hard at work?

A.  He was actually a very hard worker.

Q.  Was he the kind of person that liked to follow the rules?

A.  Yes, to a certain -- to -- yeah, never mind, yeah, to an actual extent, yes.

Q.  Okay.  All right.

MR. ANSELL:  No more questions.  Thank you.

THE COURT:  Nothing further?

MR. LINDER:  Nothing, Your Honor.

THE COURT:  Thank you, sir.  You may step down and you may be excused.

And your final witness?

MR. LINDER:  Yes, Your Honor, United States calls

BAUMGARTNER – DIRECT/LINDER          117

1   Austin Baumgartner.

2          THE COURT:  If you'd come right up here to the witness

3   stand, please, and if you would remain standing and raise your

4   right hand.

5      **AUSTIN BAUMGARTNER, PLAINTIFF'S WITNESS, SWORN**

6                  **DIRECT EXAMINATION**

7          THE COURT:  You may have a seat.  And if you could

8   talk right into that microphone.

9          You may, Counsel.

10         MR. LINDER:  Thank you, Your Honor.

11  BY MR. LINDER:

12  Q.  Sir, could you please tell the Court your name and spell

13  your last name for the court reporter?

14  A.  Austin Baumgartner, B-A-U-M-G-A-R-T-N-E-R.

15  Q.  Mr. Baumgartner, what do you do for work?

16  A.  I'm a project superintendent.

17  Q.  For which company?

18  A.  Buckingham Construction.

19  Q.  Is that residential construction?

20  A.  Multi-family.

21  Q.  Do you know Nolan Brewer?

22  A.  Yes.

23  Q.  How do you know him?

24  A.  He was one of my temp laborers when I was a superintendent

25  at the Ascent.

1   Q.   And what time frame was that roughly?

2   A.   That was July, maybe early June -- or late June of last

3   year.

4   Q.   And did you know Eric Martin actually who just testified?

5   A.   Yes, he was one of my other laborers I had out there.

6   Q.   As superintendent, what do you do?

7   A.   I manage the entire project.  So from the insides to the

8   outsides of the buildings, I control what people are doing and

9   what we need to get done.

10  Q.   And at that time, were you Nolan Brewer's boss?

11  A.   Yes, I was.

12  Q.   All right.  And how many people did you have working for

13  you?

14  A.   Over the entire job site, close to 150.

15  Q.   Was it a diverse group?  Racially?  Ethnically?

16  A.   Very diverse.

17  Q.   What kind of work did Nolan Brewer do?

18  A.   Nolan -- mainly we had him cleaning out flower beds,

19  picking up trash, cleaning up units and things like that.

20  Q.   If you would turn to Exhibit 18.

21  A.   (Complied.)

22  Q.   Is that Nolan Brewer?

23  A.   Yes.

24  Q.   And do you recognize it?  Have you seen that jacket before?

25  A.   Yes, I have.

1  Q.  And has he ever talked about that jacket to you or to

2  others?

3  A.  Yes, he has.

4  Q.  What has he said about it?

5  A.  He just told us that it was a German jacket, and he really

6  would never take it off.

7  Q.  Did he seem proud of it?

8  A.  Yes.

9  Q.  And how about the necklace that he's wearing, do you see

10 that?

11 A.  Yes.

12 Q.  Have you seen it before?

13 A.  Yes, I have.

14 Q.  Do you know what it is?

15 A.  Iron Cross -- or no, that's the swastika one.  Sorry.

16 Q.  Have you seen him wear an Iron Cross as well?

17 A.  Yes, I have.

18 Q.  Actually while we're talking about that, if you'd turn to

19 27 -- I'm sorry, not 27.  Sorry, 17.

20 A.  (Complied.)

21 Q.  And looking on the green there, if you kind of look in the

22 middle of it?

23 A.  Yes.

24 Q.  Do you see the necklace?

25 A.  Yes, that's the necklace.

1   Q.  Is that an Iron Cross?

2   A.  Yes.

3   Q.  Have you seen him wear it?

4   A.  Yes.

5   Q.  Did he wear both necklaces around the job site?

6   A.  Yes, I saw -- not at the same time, just randomly one day I

7   noticed them.

8   Q.  Also Exhibit -- let's turn to Exhibit 26.

9       I should ask, did you ever see the background of Nolan

10  Brewer's phone?

11  A.  Yes.

12  Q.  And did others at the job site ever see the background in

13  Nolan Brewer's phone?

14  A.  Yes, they did.  A lot of times when he was in the groups,

15  he would try to keep it hidden, not let a lot of people see

16  what was going on.

17  Q.  Were there times when people did see it?

18  A.  Yes.

19  Q.  And is Exhibit 26 what was on the background?

20  A.  Yes.

21  Q.  Do you know what Exhibit 26 is?

22  A.  Yes.

23  Q.  What is it?

24  A.  Swastika on a flag.

25  Q.  Did Nolan Brewer talk about Nazism or national socialism?

A.  Yes, he did.

Q.  Can you describe what he would talk about?

A.  He would mainly describe his beliefs.  I was not one that he would speak directly to about it.

Q.  Who would he speak to about it?

A.  I had my intern come up to me and tell me, and I had multiple other laborers come up and tell me.  And I also had people across the job site that would say they overheard him talking about it.

Q.  And how about white supremacy or white nationalism, did you hear that being talked about by Nolan Brewer?

A.  It would be social nationalist is what he would use.

Q.  National socialist?

A.  Or national socialist, yes.

Q.  You mentioned your intern.  Did your intern describe to you what Nolan Brewer would say to him?

A.  Yes, he actually came up to me once or twice and said he felt uncomfortable because he felt Nolan was trying to recruit him.

Q.  Recruit him for what?

A.  He didn't really say exactly.  He just said he felt like he was trying to be recruited by Nolan to the national socialist.

Q.  It was in reference to national socialist?

A.  Yes.

Q.  Did Nolan talking about Nazism, national socialism and

1   wearing a swastika in the workplace have an impact on the

2   workplace?

3   A.   It made people feel uncomfortable, but the way we dealt

4   with it was kind of put him off by himself more so that he

5   wasn't around the large groups of people that were

6   uncomfortable.

7   Q.   How many folks would you say roughly came up to you and

8   told you that they felt uncomfortable?

9   A.   I probably had 10 to 15.

10   Q.   Did you end up talking with Nolan Brewer about that?

11   A.   I did not.

12   Q.   Did anyone talk to him with whether he should stop wearing

13   the necklace or stop showing off his phone?

14   A.   By the time that he was actually -- I talked -- I didn't

15   talk to him directly.  I talked to his boss at Tradesmen

16   International about it and had told him to have a conversation

17   about it.

18   Q.   So you spoke to Nolan Brewer's boss at the temp agency?

19   A.   Yes.

20   Q.   Did it change his behavior?

21   A.   This was kind of towards right before he was no longer at

22   our job site.  So I couldn't really tell if it changed his

23   behavior through there.

24   Q.   Lastly, do you recall hearing about the incident at the

25   synagogue in late July last year?

*BAUMGARTNER - CROSS/ANSELL*          123

1   A.   Yes.

2   Q.   And did you send a text message to Tyler Wood -- I'm sorry,

3   your intern that Monday?

4   A.   Yes.

5   Q.   And what did you say?

6   A.   I said, "Look who was not here Friday, and is here today,"

7   and sent the news article.

8   Q.   And why did you say that?

9   A.   Well, I just -- I didn't really know, and he had talked

10  about he had a speaking engagement and things like that.  And

11  there were some things that just didn't sound right, and it was

12  kind of one of those just talking to somebody, and saying, you

13  know, just kind of what comes to mind, not even if it was true.

14  That's why nobody acted on it.

15  Q.   Is it fair to say you're not surprised that Nolan did what

16  he did?

17  A.   That is correct.

18          MR. LINDER:  No further questions.

19          THE COURT:  Any cross examination?

20          MR. ANSELL:  Just briefly, Judge.

21                    **CROSS EXAMINATION**

22  BY MR. ANSELL:

23  Q.   For about how long did you supervise this group that

24  included Nolan Brewer?

25  A.   The group was all different people.  So it was -- I mean

*BAUMGARTNER – CROSS/ANSELL*          124

1  Nolan could have been there for four weeks, and another person

2  had been there a day and I got a new laborer sub because they

3  weren't working the way I needed them to.

4  Q.  So Nolan was working for you just for about four weeks?

5  A.  I would say so.  It's hard for me to remember back then

6  exactly how long because I went through many different

7  laborers.

8  Q.  Aside from describing his belief in Nazism and showing

9  people his Iron Cross and swastika, was there anything else

10 about him that you noticed?

11 A.  I just –– I would notice that, like, he was a good worker,

12 but at times, you would go to find the group, and he would have

13 kind of gone off by himself to separate from the group, but he

14 would still be working.  He would just kind of be more

15 secluded.

16 Q.  So you noticed him separating himself a lot from others?

17 A.  Yes.

18          MR. ANSELL:  Thank you.

19          THE COURT:  No redirect?

20          MR. LINDER:  No, Your Honor.

21          THE COURT:  Thank you, sir.  You may be excused.

22          MR. LINDER:  And that's all the witnesses and evidence

23 for the Government, Your Honor.  Thank you.

24          THE COURT:  All right, thank you.

25          All right, do you have any witnesses?

1        MR. ANSELL:  Yes, Judge.  I'd like to call Darla

2   Brewer.

3        THE COURT:  Miss Brewer, if you'd come right up here

4   to the witness stand.  If you would remain standing and raise

5   your right hand.

6            **DARLA BREWER, DEFENDANT'S WITNESS, SWORN**

7                     **DIRECT EXAMINATION**

8        THE COURT:  You may have a seat.

9        You may examine your witness.

10       MR. ANSELL:  Thank you.

11  BY MR. ANSELL:

12  Q.  Please state your name.

13  A.  Darla Brewer.

14  Q.  And you are Nolan's mother?

15  A.  Yes.

16  Q.  And first, I'd like to just ask you, as Nolan was growing

17  up, grade school, middle school, high school, what kind of a

18  kid was he?

19  A.  He was a really good kid, very responsible, little, you

20  know, hyper and talkative, but never had any trouble out of

21  him.

22  Q.  So he followed your rules?

23  A.  Yeah, almost to a fault.

24  Q.  Do you know of him ever getting in trouble at school?

25  A.  I was informed that he got, like, two detentions, like

1    lunch detention, mostly for not doing his homework.

2    Q.   And the family would attend church together?

3    A.   Oh, yeah.

4    Q.   How often would you attend church?

5    A.   Every Sunday.

6    Q.   And did you do any kind of volunteer work or anything like

7    that as well?

8    A.   We would go on a yearly mission trip out to Oklahoma and

9    teach Bible school, as well as other community projects like,

10   you know, working the Ronald McDonald House and community bake

11   sales and, you know, various things.

12   Q.   What kind of values did you try to instill in your

13   children?

14   A.   Always be good, do the right thing.

15   Q.   Was there any kind of racism or antisemitism that the

16   family subscribes to?

17   A.   No, we actually have biracial grandchildren.

18   Q.   And when did you first meet K.B.?

19   A.   A couple of years ago.  I don't recall, but it was at a

20   family get together that my sister-in-law, it was her best

21   friend's niece that happened to be there and they got

22   introduced.

23   Q.   So they eventually started dating?

24   A.   Yes.

25   Q.   Was it shocking to you that they got married?

1    A.   Yeah.

2    Q.   You found out after the fact?

3    A.   Well, no, I found out like two or three days before.

4    Q.   Do you know why they got married?

5    A.   No.

6    Q.   But you allowed them to live in your home together?

7    A.   Yes.

8    Q.   Did you notice any kind of a change in Nolan?

9    A.   Yes.  After she moved in, he got to where he, you know,

10   would hardly talk to me, and he would be trying to talk to me

11   but she was like in the background keeping him quiet, you know,

12   bringing him in the other room so that he couldn't finish his

13   conversations with me.  And, you know, it was just really weird

14   that my son that would tell me everything would -- was no

15   longer talking to me.

16   Q.   Did you ever see the swastika?

17   A.   His necklace?

18   Q.   Right.

19   A.   Yeah.

20   Q.   The swastika or the Iron Cross did you see?

21   A.   Well, the Iron Cross.

22   Q.   What about the swastika?

23   A.   I can't say that I really specifically saw that one.

24   Q.   Move to -- in that binder, look at Exhibit 18.

25   A.   (Complied.)  No.

1    Q.   You never saw that?

2    A.   No.

3    Q.   But the Iron Cross you had seen?

4    A.   Yeah.

5    Q.   Did you know that that had any kind of antisemitic

6    symbolism?

7    A.   No.

8    Q.   Now, I want you to also look at Exhibit 25.

9    A.   Okay.

10   Q.   Do you recognize that picture?

11   A.   Yes.

12   Q.   Is it a mirror image of a picture that you've seen before?

13   A.   Yes, it's a mirror image of a picture I took.

14   Q.   So the picture you took has what appears -- what in this

15   picture looks like a Nazi flag, correct?

16   A.   Right.

17   Q.   But the actual image, was it a reverse of the flag?

18   A.   Yes.

19   Q.   And was that a part of a play or a musical?

20   A.   Yes, it was a prop in the musical, the Sound of Music.

21   Q.   And that flag is in there because it was part of the story?

22   A.   Right, part of the story.

23   Q.   But is there something about the story where it's like

24   supposed to be a mirror image of the actual Nazi flag?

25   A.   Well, the school had this so that it was not the actual

1   Nazi flag.

2   Q.  So the school as the prop had flipped it so it was like a

3   backwards --

4   A.  Right.

5   Q.  -- flag?

6   A.  Right, so that it was not really there.  It was there for

7   the symbolism.

8   Q.  Okay.  So this is a reverse of that?

9   A.  The photo is the flip of the actual thing.

10  Q.  Who's the girl standing there?

11  A.  She is my great niece.

12  Q.  So your great niece wasn't actually at a Nazi rally?

13  A.  No, she was in a school play.

14  Q.  She was in the cast of the Sound of Music?

15  A.  Yes.

16  Q.  And that's why she's standing next to this flag?

17  A.  Right.

18  Q.  I just wanted to clarify that.

19      Since Nolan was arrested for this offense, have you seen

20  any development in his ideas or opinions or attitudes?

21  A.  To the good, yeah.  I mean, he's pretty much back to the

22  Nolan he was before she got involved.

23  Q.  Did he start talking to you again?

24  A.  Yes.

25  Q.  And did he give you any insight into what had gone wrong or

1    where he had gone wrong?

2    A.  He was just trying to be a good husband so that he would be

3    a good father like she was convincing him he needed to be.

4    Q.  So does he have a sort of -- would you describe him as

5    passive or aggressive?

6    A.  He's pretty passive.

7    Q.  Would you describe him as someone who goes along with more

8    aggressive personality sometimes?

9    A.  Not until she came around.

10   Q.  And have you observed any efforts on his part since he was

11   arrested to educate himself?

12   A.  Yes.

13   Q.  Describe what you've seen.

14   A.  He's read some books, and we've watched some documentaries,

15   and he's gone to counseling.  And he just, you know, is really

16   trying to be a good worker at his job now, and do the right

17   thing, and, you know, does anything, no questions asked, as far

18   as we need him to do around the house.

19   Q.  Do you think he understands better the pain that he caused?

20   A.  Yes.

21   Q.  What's your impression of his understanding or his level of

22   regret?

23   A.  He is deeply pained and he did cause some pain.  He had no

24   idea to the extent that she was the influence until she got out

25   of the picture.  And, you know, he just -- he just feels so

1    sorry in pain sometimes that you just, you know, "You're going

2    to be all right, buddy, you're going to get through this."

3            MR. ANSELL:  I have no more questions.

4            THE COURT:  Any questions?

5            MR. LINDER:  No, Your Honor.

6            THE COURT:  Thank you, ma'am.  You may step down.

7            Do you have any other witnesses?

8            MR. ANSELL:  Yes.

9                    (Off-the-record discussion.)

10           The defense calls Stephen Lester.

11           THE COURT:  If you'd come up here to the witness

12   stand.  If you would remain standing, raise your right hand.

13       **STEVEN LESTER, DEFENDANT'S WITNESS, SWORN**

14                   **DIRECT EXAMINATION**

15           THE COURT:  You may have a seat.

16   BY MR. ANSELL:

17   Q.  Good afternoon.  Please state your name.

18   A.  Steven Lester.

19   Q.  And L-E-S-T-E-R?

20   A.  L-E-S-T-E-R.

21   Q.  Is it Steven with a P-H or a V?

22   A.  V.

23   Q.  And how do you know Mr. Brewer?

24   A.  We moved when I entered the sixth grade, and Nolan –– and

25   Nolan was in the same grade as I was.

1    Q.  You've been friends with him ever since?

2    A.  Yes, I met him when -- there's a church at the very end of

3    our driveway, the church that Nolan's family attends, and I met

4    him outside of that church one Sunday afternoon, and Mom

5    encouraged me to go talk to him.

6    Q.  And you became friends?

7    A.  And we became friends.

8    Q.  How often would you see him?

9    A.  I would see Nolan whenever I could.  He lived a good

10   distance away from me, so sometimes our parents weren't willing

11   to drive us to each other's houses, but as often as we could.

12   Once a week if we were lucky, but, you know, at least once or

13   twice a month I'd go visit his house or then we'd see each

14   other at school every day.

15   Q.  Would you describe him as someone who was inclined to

16   follow the rules?

17   A.  Yes.

18   Q.  And how strongly do you think that -- how much of a rule

19   follower was he if you could put it on a spectrum?

20   A.  I never would have worried about him getting in trouble

21   with any authority figures.  And yeah, he would just do

22   whatever the teacher said when I saw him.  And I generally

23   assumed that he would just do what was right.

24   Q.  He seemed like someone who wanted to do what was right?

25   A.  It was an honor to be his friend, yes, sir.

Q.  Was he kind?

A.  He was my only friend for me when I was too arrogant to

make other friends, and he was able to see through the person

that I was making myself to be, and care for me for who I truly

was.

Q.  He helped you?

A.  He did.  He was my friend up until tenth grade when I

finally was able to open myself up more to other people, and

I've -- I'm so grateful to him for the friendship and love that

he provided to me when I needed it.

Q.  And your friendship continued through high school?

A.  Yes, up until now, and I'm still his best friend.  It's an

honor and I consider him family.

Q.  Were you part of the group that hung out at Alex's house?

A.  Last summer?  Yes, I was one of the six.

Q.  Did you notice a change in Nolan at some point?

A.  I've been off at college for about three quarters of the

year now, so I was only able to see him every now and then, but

then just before the summer end -- and I knew him, and we would

have conversations while he was dating K.B.  And he would tell

me about their relationship and the things -- and the way

things had been progressing.  And however, although I had

thought that he would get married to her from the way he was

talking about her, he seemed to love her very much and wanted

to provide the most that he could for her, but I was surprised

when I came home one summer and found out that he was married.
He had not told me about it, and it seemed that it was a very
sudden decision, but that summer I came home and he was
married.

Q.  So that summer, did you have the opportunity to hang out
with him and also with his wife?

A.  We would all six of us, including his wife and him, would
be together at the house every Sunday, if possible.

Q.  So it was six, including Nolan, and then she would be the
seventh?

A.  Including K.B., she was the sixth.  There was Nolan, his
wife, the previous witness, Alex Hitchcock, me and then two
others.

Q.  What did you observe in terms of the dynamics between K.B.
and Nolan?

A.  I had only met her once previously when we went to prom,
and I didn't really get to see too much of her then because it
was only a few hours, but then over the summer, I was -- it
seemed to me that especially when it came to the radical
beliefs that they would propose together, it seemed to me that
Nolan was really just more of a sounding board for K.B., and
the things that she would bring forth and then he would, to a
weaker extent, confirm them.

Q.  Did you notice any changes in Nolan between how he was
before he was with K.B. and how he was while he was with her?

A.  Over the course of the summer, it seemed that Nolan's expressions became much stonier, and he seemed less responsive to a lot of things that were happening.  And he would be talking about such beliefs such as democratic socialism, and all of the other things -- but it was always in proxy of his wife.  And it just seemed that as time went on, he became a lot more dismissive of a lot of different things.  And I never got to have a more personal conversation with him over the summer, which I deeply regret, but he seemed to be inching away from the person that I knew and it was difficult to really understand why he had been doing that.

Q.  Have you had any occasion to spend time with him or to communicate with him since his arrest?

A.  About a month and a half after I was informed that he had been arrested by my mom, just by proxy, I was also told then that he was put under house arrest, and I was encouraged to give him a call.

And in that phone call, I asked him what he had done, and in particular, the specific thing that I said to him was that because you're my friend and I love you, I'm going to hold you accountable to the actions that you've taken, but I'm not going to left them define who you are.  And then I asked him who he wanted to be.  And he told me that while he was in prison, he met God again, and that he had learned the depths that he had fallen while he was in his relationship with K.B., and he

overestimated the strength of his own personal disposition and
allowed himself to become controlled by her.

He had just wanted to be a loving husband and he wanted to
provide for her because he cared about her, but he had become
controlled by the ideas that she had introduced to him.

Q.  Did he describe how he came to educate himself about the
inherent lies in the views that he had adopted?

A.  I believe he informed me at one point about the books that
he had been reading, and the documentaries that he had been
watching as a part of that, and a part of the counseling
program.  And then also just continuing to do daily Bible
studies and just to continue to grow spiritually so that he
could continue to become stronger from within.

Q.  What did he tell you about the books and the documentaries?

A.  He mentioned them in passing.  They were -- he mentioned --
we had been able to meet together, I believe it was over winter
break, the following winter break after the incident.  We had
been able to meet together because we had been confirmed that I
wasn't a collaborative witness so that I could meet with him.
And we spent a lot of time together that week.

And right near the end, we had a very important
conversation where we discussed the heart of the issue about
where he had been and where he was.  And he -- you know, he was
telling me about how hard it was to consider having to take the
consequences of his actions, but I encouraged him to be true to

1   himself and to continue to try to grow into the person that he

2   wanted to be, and not allow his past actions to define who he

3   was.

4        And as far as the books and such, he didn't go into

5   specific details about those, but I had just -- I had been

6   seeing him push further into trying to grow into somebody

7   stronger.

8   Q.  What kind of a person did he describe who he wanted to be?

9   A.  He realized when he was in his relationship with K.B. how

10  weak and how -- how much he was able to be persuaded into other

11  beliefs.  So he wanted to be able to become strong in his sense

12  of justice and righteousness, and to, especially by growing

13  spiritually, become a more just individual in following things

14  that would be more accepting and loving towards other people.

15  Q.  Do you remember or did he mention the general topic of the

16  books and the documentaries?

17  A.  I don't believe so.

18  Q.  Thank you.

19           MR. ANSELL:  No more questions.

20           MR. LINDER:  Nothing, Your Honor.

21           THE COURT:  All right, thank you, sir.  You may be

22  excused.

23           Do you have any other witnesses?

24           MR. ANSELL:  Yes, Judge.  Jeffrey Brewer.

25           THE COURT:  Mr. Brewer, if you'd come up to the

1   witness stand, remain standing and raise your right hand.

2              **JEFFREY BREWER, DEFENDANT'S WITNESS, SWORN**

3                       **DIRECT EXAMINATION**

4              THE COURT:  You may have a seat.

5              You may examine your witness.

6              MR. ANSELL:  Thank you, Judge.

7   BY MR. ANSELL:

8   Q.  Sir, please, state your name.

9   A.  Jeff Brewer, B-R-E-W-E-R.

10  Q.  You're Nolan's father?

11  A.  Yes.

12  Q.  I don't want to -- a lot of this has already been testified

13  to --

14             THE COURT:  I don't want to hear anything we've

15  already heard.  The hour's late.  Thank you.

16  BY MR. ANSELL:

17  Q.  What can you tell the Court about the efforts that Nolan

18  has made to educate himself since he was released from jail?

19  A.  Well, like has already been said, he's went to counseling

20  and he's been reading books.  I can't recall the name --

21  Diary of Anne Frank, and I'm not remembering the other one, but

22  anyway, he watched a couple of documentaries about the Mengele

23  twins that were Holocaust victims, and were used in

24  experiments.  And he watched a documentary about the lady that

25  has a Holocaust museum down in Terre Haute.  And he actually

BREWER – DIRECT/ANSELL                139

1   was trying to get permission to go down there to visit that

2   facility.

3   Q.  Did you observe how he reacted to these materials?

4   A.  Actually, they watched the documentaries while I was at

5   work.  He told me in passing about it, that he understood how

6   much of a tragedy it truly was, and he's really remorseful

7   about the things that he did and how he got himself to the

8   point that he was in.

9   Q.  Has he disavowed the beliefs that he adopted during the

10  last summer?

11  A.  Certainly, yes.

12  Q.  Do you believe he's sincere?

13  A.  I think that he pretty much had disavowed them when he was

14  serving the time in Henderson, Kentucky.  He'd never even been

15  away from the house more than a couple of nights staying with

16  friends before that, and I think that was a real shock to his

17  system kind of thing, you know, culture shock, the realization

18  that this is real, beyond real.

19  Q.  Okay.

20                  (Off-the-record discussion.)

21          MR. ANSELL:  No more questions for this witness,

22  Judge?

23          MR. LINDER:  Nothing, Your Honor.

24          THE COURT:  All right, thank you, sir.  You may return

25  to your seat.

1          Do you have any other witnesses?

2          MR. ANSELL:  Very briefly, Judge.

3          THE COURT:  Okay.

4          MR. ANSELL:  Cody Gott.

5          THE COURT:  If you'd come up to the witness stand.

6    Would you raise your right hand.

7              **CODY GOTT, DEFENDANT'S WITNESS, SWORN**

8                      **DIRECT EXAMINATION**

9          THE COURT:  You may have a seat.

10   BY MR. ANSELL:

11   Q.  Please state your name.

12   A.  Cody Gott, G-O-T-T.

13   Q.  And how long have you known Nolan Brewer?

14   A.  Eighteen plus years.  I've known him since -- way before we

15   knew what best friends even were.

16   Q.  Did you know him in the time -- so you knew him in the time

17   before he got married?

18   A.  Yes.

19   Q.  Did you know him while he was married?

20   A.  Yes, I did.

21   Q.  And have you had occasion to spend time with him since he

22   separated and divorced?

23   A.  Yes, I have.

24   Q.  And could you describe to the Court who he was before, who

25   he seemed to be at the -- while he was in that relationship,

1    and where he has gone since then?

2    A.  Before he was married, my favorite thing about him was that

3    no matter what our views were on different -- anything, we

4    could have a civilized discussion about it.  Even if we didn't

5    agree with each other's views, we could discuss it, and we

6    would come to an understanding of each other's just as talk.

7    Me and him both loved to learn things and stuff like that.

8        When he got married, I noticed that our conversations would

9    be cut short more, and it also got to the point where we

10   weren't spending as much time with each as we used to because

11   of K.B., and the things she was pouring into his mind, stuff

12   like that.

13   Q.  Prior to K.B., he had differing views about things, but had

14   he ever expressed extreme views?

15   A.  Never.  He never had any radical ideas like that.  He was

16   more just let people be who they want to be.

17   Q.  Did he ever express any kind of racism?

18   A.  Never.

19   Q.  What about any kind of antisemitism?

20   A.  Never.

21   Q.  Did you have any conversations with him since his arrest

22   that gave you kind of a glimmer of who he had been that he was

23   still there, that he was coming back?

24   A.  The Nolan that I knew and loved and still very much care

25   for since this whole thing has happened, and the more I hang

GOTT - DIRECT/ANSELL                142

1    out with him, I've seen him start to come back.  Now that she's

2    not around, I have seen him definitely start to rewind to be

3    the person he was before she became around.

4    Q.  Setting aside the abhorrent beliefs that he ascribed to,

5    was he ever the kind of person that would commit an act of

6    vandalism regardless of his beliefs?

7    A.  Never.

8    Q.  Was he someone who was always a rule follower?

9    A.  Yes.

10   Q.  So would you describe what he did as abhorrent behavior?

11   A.  Very much.

12   Q.  All right.

13           MR. ANSELL:  I have no more questions.

14           MR. LINDER:  Nothing from the Government, Your Honor.

15           THE COURT:  Okay.  Thank you.

16           MR. ANSELL:  I have one more who's even shorter.

17           THE COURT:  Thank you, ma'am.  You may step down.

18           MR. ANSELL:  Stanley Gott.

19           THE COURT:  Sir, if you'd come right over here to the

20   witness stand.  If you would remain standing and raise your

21   right hand.

22              **STANLEY GOTT, DEFENDANT'S WITNESS, SWORN**

23                        **DIRECT EXAMINATION**

24           THE COURT:  You may have a seat.

25

1    BY MR. ANSELL:

2    Q.   Sir, please state your name.

3    A.   Stanley Gott, G-O-T-T.

4    Q.   And how long have you known Nolan Brewer?

5    A.   Since he was born.

6    Q.   Are you friends with his family?

7    A.   Known them ever since -- grew up with his mom.

8    Q.   You're Cody Gott's father, the previous witness?

9    A.   That's correct.

10   Q.   Now you've heard the testimony about who he's always been,

11   who he became at the time of this offense, and who he seems to

12   be now.  Is there anything that you would add to that?

13   A.   Just what my daughter expressed, you know.  He -- he has

14   always been the only person I would trust my daughter to spend

15   time with all the years growing up.  He was well mannered, well

16   behaved, well respected by, you know, teachers at school.  You

17   see Nolan in the store at bake sales for different -- you know,

18   raising funds for different things.

19        And Cody told me -- my daughter told me about -- a little

20   bit, because she didn't share everything with dad, but shared a

21   little bit with me about how K.B. was influencing him, or he

22   was changing.  There wasn't no specifics but she could see a

23   change in Nolan.  And it bothered her because they were so

24   close.  They were together every day almost, you know, in

25   school and from kindergarten on.  And it had a big affect on

GOTT - DIRECT/ANSELL                          144

1   her.

2   Q.  Would you have ever imagined that he would commit an act of

3   vandalism?

4   A.  No.

5   Q.  Would you ever imagine that he would commit an act of

6   vandalism involving antisemitic symbolism and do something so

7   cruel to the members of a house of worship?

8   A.  No.

9   Q.  Would you say that that, for him, was abhorrent behavior?

10  A.  He -- he was -- he was the only -- he was the only teenage

11  boy that I would let my daughter even hang out with because of

12  his beliefs, and I know his family.

13      My parents and his grandparents would play cards together.

14  That's how far back I know this family, and none of them have

15  those kind of beliefs.

16  Q.  So you had seen him grow up and, to your mind, he had

17  proven himself to be someone you could trust to do the right

18  thing?

19  A.  The only one I trusted my daughter with.

20  Q.  So was it shocking to you what he did?

21  A.  Yeah, I wanted to shake him but -- yeah, I was shocked.

22  Q.  All right.  I have no more questions.  Thank you.

23          MR. LINDER:  Nothing, Your Honor.

24          THE COURT:  Thank you, sir.  You may return to your

25  seat.

1          All right.  Any argument on the objections?  I don't

2     really need any on the objections.

3          MR. LINDER:  With regard to the guidelines, Your

4     Honor.

5          THE COURT:  You may.

6          MR. LINDER:  Are we addressing it?

7          THE COURT:  Okay, let me do the ruling real quick on

8     the first objection, Objection No. 1.

9          MR. LINDER:  All right.

10         THE COURT:  These are the specific paragraphs.  With

11    respect to paragraphs -- oh, is my probation officer well?  She

12    got faint, but she can look at the transcript, right, court

13    reporter?

14         With respect to the objections to paragraphs 8 and 10

15    that the defendant denies that he planned to set fire to the

16    synagogue, the Court's going to overrule that objection.  The

17    evidence is that the defendant joined in the plan with his

18    wife, and he told Ms. Hirzel "We planned it."  He told the FBI

19    "We planned it."  And all throughout his statement to the FBI

20    agent, he used the terminology and the phraseology "we," not

21    necessarily that K.B. did everything.  So those paragraphs --

22    those objections are overruled.

23         Paragraph 14, the Court's going to overrule the

24    objection regarding the fact that the defendant was gloating.

25    Maybe we won't use the term "gloating," but the defendant was

1    proud of his actions just based on the testimony of not only

2    the defendant's own statements to the agent, but also the

3    statements to Ms. Hirzel and his other co-workers and friends.

4           Paragraph 18, the Court's going to -- I'll sustain the

5    objection to the phrase that -- the Court does agree that K.B.

6    communicated with Mr. Pete alone.  So with respect to that

7    particular statement, the Court will sustain that objection.

8           Paragraph 20, Nolan Brewer and K.B. shared a bedroom

9    at their residence.  The defendant wants to say that the Hitler

10   book belonged to K.B., and the German cross pendant was a gift

11   to K.B -- from K.B.  That's fine.  The Court will accept that.

12          Paragraph 21, the Court will strike the term

13   "fervent," otherwise your objection is overruled.

14          And paragraph 23, that Hitchcock told counsel that he

15   remembers K.B. made the comment about wanting to burn down the

16   rabbi's house, not Nolan Brewer.  Mr. Hitchcock confirmed that.

17   Mr. Hitchcock also stated that the defendant alone was the

18   person that made certain other statements.  So with respect to

19   the other statements, the objection is overruled.

20          Objection No. 2, you may make your argument on that

21   one, Government.

22          MR. LINDER:  Thank you, Your Honor.  The standard on

23   this, the question is, as we've briefed, is whether the

24   defendant committed an attempted destruction of the synagogue,

25   and the evidence shows that he did.  He planned for it,

1   prepared for it, intended to do it.  And I think more than

2   anything, the notion of conspiracy, you're in for a penny,

3   you're in for a pound.  He knew -- even assuming the

4   defendant's version is right, which frankly I don't buy, that,

5   you know, the wife was a mastermind behind everything and he

6   had very little to do with it, even assuming that, he knew

7   about it, went along with it.  You own what you do when you're

8   part of a conspiracy.  That's the nature of relevant conduct.

9        The facts show that they did plan to and had the

10  intent to break in, and that they committed a substantial step

11  towards that.  You have the defendant's statements to the FBI

12  to that effect regarding why they bought the various materials,

13  including the pieces of the spark plug that were to be thrown

14  at the window.  There is no reason to have that other than to

15  break in, per the defendant's own word.

16       So in addition to that, he told Ms. Hirzel he wanted

17  to break in, and he told Mr. Hitchcock he wanted to break in

18  and burn the symbol that he drew on his phone in front of

19  Mr. Hitchcock at Exhibit 33.

20       That is certainly evidence of intent to break in as

21  well as a substantial step in bringing -- in gathering all

22  those materials, making the napalm, prepping the Drano bombs,

23  driving 50 miles to the synagogue, parking a mile away, hauling

24  all of that, including a pot full of the napalm substance, a

25  mile by foot.  And then according to everybody, they wanted to

1    get in, including himself, but he got scared.

2            All of that leading up to that point is a substantial

3    step, Your Honor.  So the elements here are met, both the

4    intent is there, and the substantial step.  Thank you.

5            THE COURT:  You may.

6            MR. ANSELL:  All right, Judge.

7            Your Honor, what he did was participate in spray

8    painting the south and west walls that were the garbage dump

9    enclosure.  He did not attempt to get into the synagogue.  He

10   did not attempt to burn it down.  If he ever had any intent to

11   go along with that crazy plan, he abandoned it.

12           His better judgment said, "No, we're not going to do

13   that."  In fact, they didn't even go anywhere near the

14   synagogue.  An attempt to get into the synagogue to burn it

15   requires more than him bragging to people that he wanted to do

16   this or wanted to do that.  What I believe and what I think

17   that the evidence shows is that they had prepared for something

18   that could have included that, and as they -- and you can see

19   it in the transcript.  He says to the FBI agent, "On the way,

20   we talked about it, and we were both like 'no, we're not going

21   to try to break into the synagogue, that would be crazy.'"

22           And he said the original plan -- he didn't say "my"

23   original plan, "our" original plan.  The original plan that

24   K.B. and Asbestos Pete came up with was to do that.  But then

25   when it came down to it, when it came down to his actual

actions, it was anything but that.  It was like no, we
shouldn't get close to the synagogue.  No, let's just stay back
here on the far side of the garbage dumpster.  This is not a
situation -- in his entire history, his entire history shows
him to be someone who would not do such a thing.

If he talks about something like that, when he thought
that he had sympathetic ears to the crazy ideas that he had
adopted while he was in this relationship, based on the
propaganda that he was reading, he talked about it.  Talk is
talk.

When it came down to his actual actions, he kept them
away from the synagogue.  He kept them on the far side of the
garbage dumpster.  He kept that -- he limited the amount of
damage that they did.  He limited the scope of the crime.  He
did that consciously.

He didn't attempt and got frustrated by some -- by
something else.  He consciously said, "No, we should not do
this."  And as he told the FBI, the conversation he had with
K.B. on the way was "No, we are not going to break in."

And so by the time they got there, yes, he admitted
"Yes, we wanted to go and deface the wall on the actual
building itself."  But they got there, and he said, "No, K.B.,
look.  There's lights, there's cameras, let's stay away.  Let's
just do this."  And she agreed.

He limited what was done.  They had a plan.  He was

1   not really on board with it because it's not in his nature.

2   It's in his nature to say yes to his wife and to do what she

3   wants.  It's in his nature to try not to oppose her directly.

4   It was in his nature to go along.  And he bought into the

5   propaganda.  He read the stuff she gave him.  He was working

6   two jobs.  She was home all day on Discord chatting online with

7   white supremacists, and downloading articles from Breitbart and

8   from Stormfront.  And he read that stuff and he bought into

9   some horrible lies, and he bought into a terrible, terrible

10  world view that is inherently wrong, inherently evil.  He fell

11  for that.

12          But when the time came, he was not someone who wanted

13  to ever break into the synagogue.  Yes, he said "Oh yeah, we

14  wanted to do this, we wanted to do that."  He said it to

15  Nolan -- or he said it to Alex and he said it to the

16  co-workers, and he bought into this idea.  And he talked a lot.

17  He's a talkative person.

18          And he was ignorant and stupid, but did he attempt to

19  burn down the synagogue?  No, he did not attempt to do that.

20  He tempered the impulses of his very radical, very enthusiastic

21  partner.  He limited the crime to what it was.

22          Had they prepared?  He didn't pack the backpack.  She

23  packed the backpack.  Had they discussed what they were going

24  to do?  Maybe they had.  But as he told the FBI on the way, he

25  clarified with her "We're not going to actually break in and

1    burn the place down."  No, of course not.

2         Then once he got there, he limited it even further.

3    She wanted to go to the wall, or they wanted to go to the wall.

4    "No, let's not do that.  Over here."

5         And happily, it was just the parts of that enclosure

6    that wouldn't be seen.  So that it didn't happen that people

7    arriving for services saw it.  It was observed.  It was

8    investigated as it should be.  He was found out as he should

9    have been.  But the enhancement for attempted destruction of a

10   place of public use should not apply.  The facts don't support

11   it.

12        THE COURT:  Okay.  Lawyers would you look at -- under

13   2K1.4(2), the base offense level is 20 if the offense

14   endangered a place of public use.

15        MR. ANSELL:  Endangered a place of public use?  I

16   don't have the guidelines in front of me.

17        THE COURT:  Well, that's what it says.

18        MR. ANSELL:  Okay.

19        THE COURT:  So based upon the evidence that's been

20   presented by the Court, the Court is going to find that the

21   base offense level is 20, and that is -- that the base offense

22   level is 20 under Section 2K1.4(2)(c).  If the offense

23   endangered (i) a dwelling, (ii) a structure other than a

24   dwelling, or (iii) an airport, aircraft, mass transportation

25   facility, mass transportation vehicle, maritime facility,

vessel, public transportation system, a state or government facility, an infrastructure facility or a place of public use.

I don't believe there's any dispute that the synagogue was a place of public use.  The location where the defendant and his wife did the destruction and set their fire was on the campus of the synagogue, and there is substantial evidence that the defendant and his wife, their original plan was to cause some type of destruction or endangerment to that public facility, that public place.

The defendant and his wife shopped for the products he and his wife carried.  He says his wife packed the backpack, but I'm certain that she didn't carry the pot of homemade napalm and the backpack with the spark plugs, Drano, matches, spray paint.

The defendant also told Mr. Hirzel and Mr. Hitchcock that their intent that day was to cause some type of endangerment to that facility, the synagogue.  So the Court's going to find the base offense level is 20.

MR. ANSELL:  Judge, may I ask a question?  Is that on the basis of an attempt to cause -- an attempt to endanger a place of public use?

THE COURT:  This says if the offense endangered.

MR. ANSELL:  So the graffiti on the --

THE COURT:  And the fire.

MR. ANSELL:  And the fire in the grass --

1          THE COURT:  The fire in the grass endangered the

2     public place.

3          MR. LINDER:  Your Honor, is it in addition to that the

4     attempt, the fact that they brought those items with them and

5     were capable of --

6          THE COURT:  Endangering the facility?

7          MR. LINDER:  Correct.

8          THE COURT:  Yes.  And the statements that they made.

9     He told Mr. Hirzel.  He told Mr. Hitchcock.  He told the agent

10    that they were going to go into the facility if they could.

11    They had the spark plugs to try to break the window.  They

12    didn't see the windows, but they looked at the facility and

13    they saw -- did not see the windows because they didn't go onto

14    that side of the building.  So all of the evidence that the

15    Court heard today, the Court's going to find that the base

16    offense level is level 20.

17          All right, lawyers, any other objections or

18    corrections?  I see he had an objection about paragraph No. 4.

19    Oh, how long the conspiracy lasted.  Your client says he

20    withdrew from the conspiracy when?  The day they got caught?

21          MR. ANSELL:  After the offense.

22          THE COURT:  Okay.

23          MR. ANSELL:  He no longer was interested in doing

24    that.

25          THE COURT:  Well, he made some statements.  I'm going

1  to overrule the objection.  He made some statements and that's

2  when they were still Googling to find other locations to do

3  additional vandalism or fires or whatever they were going to

4  do.

5          MR. ANSELL:  Who was Googling, Judge?

6          THE COURT:  "They." He said, "We Googled," which means

7  he and his wife.

8          MR. ANSELL:  Who did he say that to?

9          THE COURT:  It's in the transcript.

10         MR. ANSELL:  To the FBI?

11         THE COURT:  To the FBI agent, and I think Mr. --

12         MR. ANSELL:  It didn't have a timeline, though, right?

13         THE COURT:  -- Hitchcock also gave that testimony.

14      Well, they said after they did the fire and the

15  vandalism, they were still looking for places to do additional

16  acts, additional conduct.

17         MR. ANSELL:  That was said the night of the offense to

18  Alex Hitchcock.  I agree with that, that it was said, but I

19  don't think that after that they did anything.

20         THE COURT:  All right, lawyers.  Any other objections

21  or corrections to the presentence report?

22         MR. LINDER:  None from the Government, Your Honor.

23         MR. ANSELL:  Nothing from the defense, Judge.

24         THE COURT:  The Court's going to accept the

25  presentence report for the record under seal with the rulings

1    that were stated.   In the event of appeal, counsel on appeal

2    will have access to the report but not the recommendation

3    portion which shall remain confidential.

4           Based upon the sentencing guidelines, the Court has

5    found that the base offense level is level 20.   The

6    victim-related adjustment applies.   The Court is going to find,

7    beyond a reasonable doubt, that the defendant intentionally

8    selected a victim and property as an object of the offense of

9    conviction because of the national origin or the ethnicity or

10   the religion of the victims.

11          The adjusted offense level is 23.   The defendant is

12   entitled to the two-level reduction for acceptance of

13   responsibility because he's pled guilty.

14          Is there a motion with respect to the additional one

15   level?

16          MR. LINDER:  Yes, it's so moved.

17          THE COURT:  That motion is granted.   An additional

18   one-level reduction is afforded.   The defendant gets the full

19   three-level reduction and that puts us at total offense level

20   20.   And level 20, the defendant has no criminal history.   So

21   he's in criminal history category one, and that produces a

22   guideline sentencing range of 33 to 41 months imprisonment.

23          All right.   Come on up to the lecturn, Mr. Ansell.   Do

24   you and your client -- did you have any additional witnesses, I

25   hope not, or evidence to present.   And, Counsel, you're allowed

to make an argument, and, Mr. Brewer, you're allowed to make a

statement of allocution, which means you can say whatever you

would like to say.  How will you proceed?

MR. ANSELL:  With allocution and argument.

THE COURT:  All right.  You may make your statement,

Mr. Brewer.  Whatever you want to say, you can say.

THE DEFENDANT:  First, I'd just like to start with

saying I'm genuinely sorry for all the pain that I caused, and

for -- destroying the property is probably a miniscule cost to

the amount of pain that I've caused to people emotionally.  I'm

genuinely sorry for all of that, and I hope it's obvious that

if I could take it back, I would.  I'd go back in time, but

that's not possible.  I'd clean up the mess if I could somehow.

THE COURT:  Okay, thank you, sir.

MR. ANSELL:  Your Honor, Judge, what Mr. Brewer did

was terribly cruel.  It was something that caused a lot of

pain, and I think it caused pain that he couldn't even

understand because he's not -- he's not been there.  He's not

been in a community that's been oppressed, that's suffered.

And he was ignorant and young and stupid, and bought into ideas

that if he had just kept studying, he would have seen the

obvious counterarguments.

If he had watched those documentaries and read those

books, instead of just reading these -- the nonsense from

Stormfront and this propaganda that was brought to him through

1    the Discord platform that's been used by white supremacists to

2    communicate amongst themselves.  Nolan understands the mistake

3    that he made, and he understands the mistake -- the mistakes

4    that led to the mistake that he made.  He understands that.

5          He can't go back and be that person again.  He's

6    educated himself beyond that.  He is sorry for what he did.  He

7    is not someone that we have to worry about coming back and

8    doing something like this again.

9          He's someone who has learned from his mistake.  He's

10   someone who has compassion for other people.  He has shown it

11   through a lifetime of being a good person up until the summer

12   of 2018 when he became --

13          THE COURT:  A Nazi.

14          MR. ANSELL:  -- a Nazi.  He became a Nazi.  Yeah, he

15   adopted a philosophy that seemed to him to make sense that

16   yeah, there should be law and order, there should be an

17   authoritarian government because it can accomplish more, that

18   the economic philosophies that were described in the propaganda

19   that he read made sense to him.

20          He bought into lies that minimized the Holocaust or

21   denied the Holocaust.  He said horrible things.  He casually

22   shared memes that were terrible, and it's just not who he had

23   ever been before.  He had never been that person.

24          He had always been a person who cared about other

25   people.  He had always been a person who wanted to follow the

1    rules.  He had always been a person who was kind to other

2    people.  He had always been a person who was generous.  That's

3    who he was.

4         He got into a mindset, and you can see in the PSR, his

5    therapist gave him an initial diagnosis of dependent

6    personality disorder.  He is that kind of person.  He's

7    passive.  He buys into things sometimes when if -- he's easily

8    influenced.  And he was in the midst of the most powerful

9    influence I think a 20-year-old-man can have.

10        His first ever real girlfriend who had a very troubled

11   life, and a very troubled upbringing, and in order to try to

12   save her he married her so she could move into the house with

13   him and his parents.  And he wanted so much for that to be real

14   and for that to be something that could sustain over time.

15        He wanted to be a good person.  He wanted to be a good

16   husband.  And he bought into radical ideas.  And part of it was

17   that he's the kind of person who's intellectually curious and

18   open-minded and wants to explore ideas and learn, and he got

19   stuck on some very bad ideas.  And he ran with it for a while.

20   And he knows that he was wrong.  He understands now.  He's

21   educated himself beyond that state of ignorance.

22        He's not a person who ever really had the

23   emotionally-based hatred for other races or for other

24   religions.  That's not him.  He wasn't raised to just hate

25   other people.  He never felt that.

1          He bought into this pseudo-intellectual propaganda

2     combined with the fervent beliefs of his partner who really

3     wanted to do something stupid, wanted to do this, wanted to go

4     and make a stand.  And you can see from the record, and you can

5     see from what we submitted with our sentencing memorandum that

6     she actually had a history that he didn't know about that

7     involved breaking into places and setting fires.  And we've

8     heard testimony about -- she talked about setting fires, and

9     Nolan just got caught up in all of that.

10          So what's the right thing to do?  A sentence should be

11     sufficient but not greater than necessary to afford a just

12     punishment, to protect the public from further crimes of the

13     defendant, to deter crimes by others.  He understands that he's

14     got to pay and he's willing to do that, which is why he's here

15     pleading guilty.

16          But what is necessary here?  For a kid like Nolan

17     who's always been just a model son, student, community member,

18     church member, is a guideline sentence necessary?  It's not

19     just that he's never committed a crime before.  No one is aware

20     of him ever breaking a rule before.  Twice in his entire

21     education, he had lunchtime detention for not finishing his

22     homework or not doing his homework.

23          That's extraordinary.  I don't know anyone like that

24     who had just never broken a rule until they went -- and boy,

25     did he commit a doozy when he finally did break a rule.  But

1   it's not him.

2           A guideline sentence for him would be excessive.  What

3   is most appropriate for Nolan in my view, based on his history

4   and characteristics, based on the circumstances surrounding his

5   offense, the circumstances that are unlikely to ever recur, a

6   sentence of probation is appropriate with a thousand hours of

7   community service work, dialogue with members of community,

8   dialogue with members of the congregation.  A heartfelt apology

9   from him.  He could talk to people.  He can tell his story.  "I

10  became a Nazi and I realized how stupid it was."

11          He was never anything like that, and then he did.  And

12  fortunately for him, he got caught because it forced him to

13  learn the mistakes that he was making.  It forced him to

14  educate himself with some guidance from his parents that said

15  "No, you need to read this.  You need to read the Diary of Anne

16  Frank.  You need to see this documentary.  You need to learn

17  about these things that you were ignorant about because you

18  bought into some things that were dangerous."

19          And he did.  He learned.  He educated himself.  The

20  best answer to extremism is education.  It's facts.  It's

21  knowledge.  He is immune from that now.  He has learned.  He

22  can never go back.

23          This isn't like someone who -- well, I mean, if he

24  gets desperate enough, he's going to go rob another convenience

25  store, or if he falls off the wagon, he's going to start using

cocaine again, or if he, you know, he might start selling it
again.  It's not that kind of a situation.  This is a situation
where he intellectually bought into a belief system that he has
intellectually worked his way out of.  Getting caught pushed
him in the right direction, but he wouldn't have gone in
that -- he needed to be the one who moved in that direction.
He needed to -- he needed to be willing to learn, to have an
open mind and an open heart, and he does, because that's the
kind of person he is.

His parents showed him.  He was on home detention.  He
could only go to work.  He could only go to church.  They
helped him because that's the kind of people they are.  They
are good people.

There's no history of racism in his family.  There's
no history of antisemitism in his family.  They have always
just been -- they've got their beliefs, their religion.  They
want to help other people.  They do missionary work every year
out on an Indian reservation in Oklahoma.  They support a local
charity.  There's an association of churches that all come
together and run a -- it's like a Goodwill store but
everything's free.  And a food bank that they volunteer at.
He's just not a bad person.  He did a bad thing.

Prison is not necessary.  I understand if the Court
imposes a prison sentence, but it should not be a guideline
sentence.  It should be a below guideline sentence.

1        He is going to continue to try to make it right.  And

2   it's just -- prison's not necessary for him.  He's going to

3   continue to make the right choices as he has since he got

4   caught.  And he's going to continue to be a better person.  He

5   could be on probation for five years.  He could have community

6   service work.  He could pay restitution.  He could pay a fine.

7   He could do all those things.

8        He can satisfy -- he can satisfy what the congregation

9   wants, which is justice.  He can do that by showing them who he

10  is, by communicating with them, by communicating with others,

11  by communicating with other people who might buy into this

12  mindset.  He can do that.  If he could fall into this mindset,

13  other people could, too, and he can help to prevent that.

14       So I would ask the Court to impose a below guideline

15  sentence.

16       THE COURT:  Okay.

17       MR. ANSELL:  Thank you, Judge.

18       THE COURT:  Thank you.  Have a seat.

19       Mr. Linder.

20       MR. LINDER:  Thank you, Your Honor.  May it please the

21  Court.

22       You know, just this past weekend, three synagogues

23  were burned in Boston.  Over the past several years, a couple

24  of years really, the attack on people of faith and the attack,

25  in particular, on the people of Jewish faith, has increased in

1  this country exponentially.

2       And this man was a part of that.  He said he was a
3  part of it.  He told the FBI he wanted to be a part of it.  He
4  wanted to incite more radicalism.  Those were his words.  There
5  are hardly more offensive -- no, not offensive, threatening
6  symbols to people of the Jewish faith than those that the
7  defendant painted and that he burned.  Fire and Nazism, there
8  are hardly more threatening symbols.

9       Your Honor, this case is much more than spray paint.
10  This is not a kid deciding to do some childish vandalism.  This
11  was a premeditated act of hate and terror on a community that
12  was directed by the defendant's beliefs.

13       He understood the pain that he wanted to cause.  Not
14  just now standing up here saying "I understand what I did," he
15  understood then what pain it would cause.  It's why he did it.

16       The reason we called all of those witnesses today was
17  to show that -- anticipating what the defense was going to talk
18  about today, that he was a good kid, that he was misguided,
19  shown the wrong path by his wife.

20       Now his wife may well have radicalized him.  That's
21  how radicalism works.  People get radicalized.  What I hear the
22  defense saying is like those who fall victim to ISIS, and
23  traveling overseas to join them, and wanting to come back and
24  wanting mercy for that.  You have to own something.  The
25  defense wants to own nothing.

1           But he knew what he was doing.  That's why we put

2    these witnesses on the stand.  It was not a fly-by-night snap

3    decision.  The folks that the Government called, except for

4    Mr. Hitchcock, who did tell the truth and said he wanted to go

5    burn the place, and did make antisemitic jokes, but the other

6    folks, they weren't his friends.  They were just co-workers,

7    people who had no loyalty to him at all.

8           And they said, "Yeah, he talked about Nazi ideology

9    all the time."  He talked about it at work.  He wore his

10   swastika proudly.  He talked to us about antisemitic views.

11   Didn't like the fact that he had a black supervisor on the job.

12          To say those kinds of things out loud to your

13   co-worker reflects, I'm sorry, a fervent belief.  It is not

14   something that the defendant just fell into.  And the notion

15   that it's simply just his wife?  Your Honor, I think we all do

16   a lot of things to please our spouses, but becoming a Nazi?

17   And not only becoming a Nazi and harboring these beliefs, but

18   at the end of the day, it's a hate crime.  It's hate plus a

19   crime.  He certainly had the hate, but then he committed the

20   act.  He took the hate and he went and did something with it,

21   something terribly dangerous.

22          That doesn't happen.  That is not just trying to

23   please your wife.  That is not a credible excuse.  In so doing,

24   the defendant completely lacked empathy for the people he

25   harmed and threatened.  But not only that, after the fact --

1    again, that's why we put those witnesses on the stand because

2    the defense again talks about the books he's read and

3    documentaries he's watched, but, Your Honor, that's after he

4    got arrested, and character is who you are when no one is

5    looking.  And the person who he was after the incident occurred

6    was someone who was proud of what he did, who told multiple

7    people what he did, and that he was happy about it.  It was

8    good news as he told Ms. Hirzel.  That's what he believed.

9    Those aren't economic philosophies.  That's a real hate he did.

10   It's not some philosophy.

11          So for the characteristics of this defendant -- sure,

12   they show a misguided individual.  They show a person who was

13   radicalized and acted out on radical hate, but a sentence

14   within the guidelines, Your Honor, is important in this case

15   because society can't tolerate this behavior.  It can't.

16          Again, this past weekend, three synagogues in Boston.

17   A month ago, it was a synagogue in Poway, San Diego, with a

18   shooter.  And in October or November of last year, it was the

19   Tree of Life synagogue in Pittsburgh.

20          This is a scourge on our society and for -- that's why

21   we're here.  That's why we're here in federal court.  That's

22   why we put these witnesses on today.  That's why we filed the

23   brief we did.  That's why we take this so seriously because

24   society cannot -- cannot tolerate this.

25          And so a sentence of 40 months, a within-guideline

1    sentence of 40 months is reasonable, is sufficient but not

2    greater than necessary under 3553(a) to promote deterrence for

3    this defendant because I'm not convinced he's yet deterred.

4         It took only several months with his wife to be

5    radicalized into somebody who would do what he did and now he's

6    read a few books and documentaries and we're supposed to think

7    we're safe?  No.  Deterrence for him, but also deterrence

8    generally.  We have to tell society "You can't do this."  In

9    the United States, people are allowed to practice religions

10   that they want to believe.

11        So again, the United States would submit a sentence of

12   40 months as sufficient but no greater than necessary.  And I

13   know he had some discussions about the guidelines issue, but

14   frankly, Your Honor, the Government's position is, under

15   3553(a), a sentence of 40 months is appropriate regardless of

16   that guideline.  Thank you.

17        THE COURT:  Okay.  Mr. Ansell, if you and your client

18   would return.

19        Any comments?

20        MR. ANSELL:  No, Your Honor.

21        THE COURT:  The Court is prepared to state what the

22   sentence will be, and Counsel, you will each have a final

23   opportunity to state any legal objections before sentence is

24   finally imposed.

25        Pursuant to the Sentencing Reform Act of 1984, it is

the judgment of the Court that the defendant, Nolan Brewer, is here by committed to the custody of the Bureau of Prisons to be imprisoned for a term of 36 months.  The defendant shall make restitution to the following victim:  Congregation Shaarey Tefilla in the amount of $700.  The payment is to be made directly to the Clerk of the United States District Clerk for disbursement to the victim.

        The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing address that occurs while any portion of the restitution remains unpaid.  Any unpaid restitution balance shall be paid during the term of supervision at a rate of not less than ten percent of the defendant's gross monthly income.

        The defendant shall notify his probation officer of any material change in economic circumstances that might affect his ability to pay restitution.

        The Court finds that the defendant does not have the ability to pay interest and waves the interest requirement. The Court is ordering that the defendant pay a fine in the amount of $1,000.

        A term of supervised release of two years is ordered based on the nature of the offense to serve as a deterrent, to protect the public and to allow the Court to monitor the defendant's efforts towards satisfying any financial obligations as well as to assist in his rehabilitation.

1            While on supervised release, the defendant shall not

2       commit another federal, state or local crime.  He shall

3       cooperate with the collection of a DNA sample.  Refrain from

4       any unlawful use of a controlled substance.  Submit to one drug

5       test within 15 days of placement on supervised release, and two

6       periodic tests thereafter as directed by his probation officer.

7            The Court intends to order the additional conditions

8       of supervised release that are listed in the presentence

9       report.

10           Mr. Ansell, did you and your client review those

11      conditions?

12           MR. ANSELL:  Yes, Judge.

13           THE COURT:  Do you have any objection to any of those

14      conditions?

15           MR. ANSELL:  No, Your Honor.

16           THE COURT:  And since you and your client have

17      reviewed them and you do not object to any of these conditions,

18      would you waive the Court reading them into the record?

19           MR. ANSELL:  Yes, Your Honor.

20           THE COURT:  The same questions, Mr. Linder.  Have you

21      reviewed the conditions, do you have any objection to any, and

22      will you also waive a formal reading.

23           MR. LINDER:  We've reviewed them, no objections.  We

24      would waive the reading.

25           THE COURT:  Mr. Brewer, I'm going to order all the

additional conditions of supervised release that are listed in the presentence report.  A majority of these conditions are administrative requirements of supervision.  Some of these conditions will hopefully reduce the risk of recidivism and provide for public safety, and allow you to make reparation to the community, the eight hours of community service per month for the first year of supervised release.

The Court is also going to order that you pay the mandatory special assessment fee of $100.  Payment of the fine, restitution, and special assessment are due immediately.

The sentence that the Court intends to impose is within the advisory guideline range.  After the Court's consideration of the 3553(a) factors, including the nature and circumstances of the offense, the defendant's lack of criminal history, the defendant's characteristics, the need for the sentence to reflect the very seriousness of this offense, promote respect for the law, provide just punishment, as well as adequate deterrence to criminal conduct of this nature by others who might try to do similar things.

Nolan Brewer is a 21-year-old-man before the Court for his involvement in a conspiracy to violate rights.  Mr. Brewer conspired with his then wife to participate in vandalizing the property of the Congregation Shaarey Tefilla, the Jewish synagogue located in Carmel, Indiana.

The defendant and his wife conspired to endanger this

1   place of public use by not only vandalizing with graffiti, but

2   setting a fire on the premises, and bringing with them

3   materials to break out the windows of the synagogue, the spark

4   plugs, as well as a plan to throw napalm, their homemade napalm

5   or some Drano bombs into the building, and to put something on

6   the floor of the synagogue.

7          The Court is mindful that a sentence should be

8   sufficient but not greater than necessary to accomplish the

9   goals of sentencings.  The Court must impose a sentence viewed

10  in the context of the policy goals and empirical data of the

11  United States Sentencing Commission as determined by the

12  advisory sentencing guidelines.  And the Court notes that the

13  guidelines are advisory in nature.

14         Regarding his history and characteristics, Mr. Brewer

15  was born in Bloomington, Indiana, into a loving, supportive,

16  two-parent home.  His parents are still married.  They are here

17  today.

18         The defendant is one of five children.  He described a

19  pleasant childhood absent of any abuse and neglect.  His needs

20  were always met.  He spent time playing outdoors.  They had

21  pets.  The family was very active in their church.  They

22  participated in Christian missionary trips during his

23  childhood.

24         The letters reflect the defendant was a model student

25  in his Bible class.  He was a "teacher's treasure" was a quote

from one letter writer.  He comes from a family that had a very good reputation in the community of being kind and caring.

The defendant is a very intelligent young man.  He's a high school graduate.  He has an associate's degree that he says he was able to obtain in just one year.  The defendant was married to his co-conspirator.  They are now divorced and he has not fathered any children.

Mr. Brewer does not suffer from any physical health concerns or substance abuse issues.  He had been attending some mental health counseling which was a condition of pretrial supervision.  He is employed and has a solid work history.

According to the defendant and his parents, he was introduced to white nationalism and Nazism by his ex-wife.  And while she may have introduced the defendant, he was not an innocent bystander, and there is sufficient -- a plethora of evidence that these beliefs were fully engrained in the defendant.

The defendant told the FBI and one of his coworkers that he got his German Flecktarn, the Army jacket, from his grandfather and that it was a family relic.  He reported that his grandfather gave him his first Celtic necklace and that he made it into a swastika, and he said his grandpa was raised that way.  The swastika was another family relic.

He claimed that his grandfather was a Hitler Youth, and that at family gatherings, grandfather would say "Heil,

Hitler." I don't know why the defendant would make up something
of that nature because the evidence the Court's heard today is
that that's not true.

The defendant told his co-worker, Mr. Young, that he
had Nazi or German heritage, and that he had attended Nazi
meetings and conventions.  That's probably accurate.
Throughout his statement to the FBI, the defendant always
stated "we" or "us" when describing their conduct.

When considering the serious nature and circumstances
of the offense, the seriousness cannot be overstated.  The
heinous nature and circumstances of the offense are
overwhelming.  This defendant intentionally and specifically
targeted this place because of the characteristics he told the
agents, that they were specifically targeting a synagogue with
a large population of ethnic Jews rather than religious Jews
because that was the deal for Hitler.  So he was targeting the
Jewish race.

This is a very personal crime, a message crime
intended to have a very special emotional and psychological
effect on the victims and their community.  The defendant
admitted that his purpose was to intimidate and make an entire
community feel vulnerable and unprotected by the law.

He said he wanted them "to get out," whatever that
means, and to "scare the hell out of them."  These types of
incidents, as argued by the Government, can damage the fabric

of our society and fragment communities, and the negative

effects of hate crimes are very long lasting.

As is his right, for several months this defendant

espoused Nazism and white nationalism, and he has a First

Amendment right to do that.  He talked about it with his

coworkers.  He wore his Nazi paraphernalia.  According to

Ms. Hirzel, he idolized Adolf Hitler and wanted to be like

Hitler.

All of these actions were corroborated by his

coworkers' testimony.  His cell phones were replete with Nazi

paraphernalia and racist and antisemitic symbols and memes.

And as the Court stated, he had a First Amendment right to do

all of those things, but Mr. Brewer acted out in violation of

federal law.

He violated the law when he went to that synagogue and

posted those -- he and his wife posted those symbols and

started a fire, and brought with them tools and equipment to

burn or do some other illegal activities within the church.

This was not a spontaneous crime or a youthful prank.

The defendant admitted to the FBI that he and his wife planned

this crime to a certain level to maximize the impact of their

conduct.  They intentionally shopped for the merchandise to

carry out the crime the day before.  They drove for over

50 miles and parked at a Mormon church in Carmel, and then

hiked one mile to the synagogue.  They carried with them the

1   backpack and a pot, a big pot of homemade napalm.

2           And they used tape, taped around it with duct tape, or

3   some kind of tape so they wouldn't spill it.

4           They even told the detective that they carried with

5   them in the backpack the homemade -- the Drano, which he bought

6   the wrong kind of Drano to create a bomb, the spray paints, the

7   lighters, and they hiked for over a mile from their parking

8   spot in the dark of night.

9           They had the ceramic spark plug pieces that they

10  believed could help break windows.  They stopped for a minute

11  behind a shed to take a breather is what he told the agent.

12  They walked around the synagogue to see if there was a camera.

13          The Court considers the victim's impact statement.

14  They wrote that "Short of injury or death, nothing instills

15  more intense emotion in the Jewish community than images and

16  language from the Nazi era when six million Jews were murdered.

17  Two massive Nazi flags flanked by Iron Crosses and a patch of

18  scorched earth struck fear into the congregation and members of

19  the Jewish community throughout central Indiana.

20          Mr. Brewer knew this.  Indeed, as with many hate crime

21  offenses, instilling fear was his purpose for committing this

22  brazen act, and the defendant admitted that he wanted to

23  instill fear.  His actions resulted in enhanced security.

24          Luckily, a member of the congregation donated at least

25  $56,000 for security, and there's a recurring annual cost of

1   $15,000 to maintain that security.

2         Some congregants no longer find pleasure in coming to

3   synagogue.  This was once a place of refuge from violence, and

4   now it's a symbol of chaos and insecurity.  So the lasting

5   effect of the victims is something that this Court has

6   considered.

7         The Court next considers the need to protect the

8   public from further crimes of the defendant and to afford

9   adequate deterrence for others who might commit these same

10  types of crimes.  The Court disagrees with the defendant's

11  counsel regarding deterrence in your sentencing memo.

12        The Court finds that deterrence for -- not only for

13  your client but for other members of this nation, and of the

14  Southern District of Indiana who might commit these same types

15  of crimes, they need to know that this is a very serious

16  offense, and it's taken seriously.  Congress recognizes the

17  strong enforcement of these civil rights laws can have a

18  deterrent impact, and can limit the potential for hate crime

19  incidents and conduct of this nature.

20        It's also -- this defendant could be so easily

21  influenced by a 17-year-old-girl -- I know he loved her, but

22  imagine what he would do if someone else attempted to influence

23  him.  There's evidence before the Court that the defendant and

24  his wife discussed -- well, the wife discussed burning down the

25  rabbi's home, and she knew where he lived.  And there are other

locations.  They Googled other locations to commit similar acts
and conduct.

The defendant's co-workers all testified that he was
proud of his conduct and proud of what he had done.  He was
proud that Vice President Pence commented on him.  He was proud
of the national recognition that his criminal conduct acquired.

He told his best friend, one of his best friends,
Mr. Hitchcock, that they planned to do more, breaking into the
synagogue and use the napalm to burn swastika symbols on the
floor of the synagogue.

The Court has considered all of the relevant factors
presented by the defendant and given them appropriate weight.
The Court recognizes Mr. Brewer's remorse, and I believe today
he is genuinely remorseful.  The defendant's offense level was
reduced by three for his acceptance of responsibility.  He did
accept responsibility, and he saved the victims from having to
testify at a trial.

The defendant appears to be sincere in his quest for
rehabilitation and renouncement of his Nazism and his conduct
and those beliefs.  The defendant stated that he's painfully
aware of the harm that he's caused his victims, and the Jewish
community in general, and this nation in general.

And the Court understands and has taken into
consideration that he came from a good family, that he's well
loved.  He had plenty of support, plenty of friends.  The Court

1   has considered the influence of his wife, but the Court finds

2   that all of those factors, there's no excuse for this

3   defendant's conduct.

4           The defendant's philosophy at that time was deeply

5   engrained.  His wife was not with him when he was at work

6   making these statements.  The defendant is very -- was very

7   intellectualized in his antisemitic beliefs.  He studied them.

8   He studied white supremacy.  He studied national socialism.

9   His conversations with the agent with the FBI were intelligent

10  and informative.  He was very knowledgeable about every single

11  thing that he was doing.

12          So for all of these reasons, the Court is going to

13  find that a sentence within the guideline range of 36 months is

14  sufficient but not greater than necessary.

15          As the Court stated earlier, he had every right.  If

16  you want to be a Nazi in the United States of America, you can

17  be a Nazi.  You can be a white supremacist, but you cannot act

18  on your beliefs by committing illegal acts as this defendant

19  did.  And so the Court finds the sentence is sufficient but not

20  greater than necessary.

21          The Court's imposed the restitution, which is required

22  as requested, and the departed fine of $1,000 because the Court

23  doesn't believe he can pay a fine within the guideline amount.

24  And the two years of supervised release, the Court stated the

25  reasons why that is imposed.

1          So, Counsel, those are the reasons the Court intends

2     to impose the stated sentence.  Mr. Linder, do you know of any

3     reasons other than those already argued why sentence should not

4     be imposed as stated?

5          MR. LINDER:  No, Your Honor.

6          THE COURT:  Do you, Mr. Ansell?

7          MR. ANSELL:  No, Your Honor.

8          THE COURT:  The Court now orders the sentence imposed

9     on the defendant, Mr. Brewer, as stated.  Mr. Brewer, you have

10    a right to appeal your conviction if you believe your guilty

11    plea was somehow unlawful or involuntary, or if there's some

12    other fundamental defect in the proceedings that was not waived

13    by your guilty plea.

14         You also have a right to appeal your sentence if you

15    believe it is contrary to law.  With few exceptions, any notice

16    of appeal must be filed within 14 days after written judgment

17    is entered in your case.  If you cannot afford the filing fee,

18    or cannot afford a lawyer to appeal for you, a lawyer would be

19    appointed to represent you in an appeal.

20         If you intend to appeal, you can tell me now, and I'll

21    have the clerk initiate your appeal, prepare your Notice of

22    Appeal for you, or you can let Mr. Ansell know within 14 days

23    because you only have 14 days from the date of your judgment.

24         Do you understand your appellate rights?

25         THE DEFENDANT:  Yes.

1          THE COURT:  And do you wish to appeal today?

2          MR. ANSELL:  We'll talk about it.

3          THE COURT:  All right.  The only other matter we have

4    to talk about is whether the defendant should be remanded or

5    allowed to self report.

6          MR. LINDER:  The Government would move to remand the

7    defendant into custody today.  The defendant has been out for

8    some time and has had plenty of time to prepare, even had a

9    continuance, several, to get to today.

10         And as Your Honor notes from the record, the

11   Government initially moved to detain the defendant at the

12   beginning, appealed that decision.  The decision was ultimately

13   to place him on home detention, but given the circumstances,

14   the fact that he's facing a substantial prison sentence of 36

15   months, and what transpired today, the Government moves to have

16   him remanded.

17         THE COURT:  You don't want him remanded?

18         MR. ANSELL:  No, Judge.  He's expecting to be

19   designated to a facility if he was sentenced to prison.  It was

20   what he was told by his supervising probation officer.  It's

21   what I've told him typically happens.

22         He's been completely compliant on pretrial

23   supervision.  I don't see any reason to remand him today.  His

24   family would obviously want a chance to spend a little bit of

25   time with him and help him prepare for the three years in

1    federal prison he's about to spend.  I don't think it's

2    necessary.

3         THE COURT:  Well, unfortunately, I don't have a

4    marshal here.  They've all gone for the day.  I can have him

5    come back tomorrow and report, but the probation officer's

6    indicated that he's always been in compliance?

7         PROBATION OFFICER:  He's been compliant, Your Honor.

8         THE COURT:  All right.  Since he's been compliant --

9    he's on home detention?

10        MR. ANSELL:  Yes, Judge.

11        THE COURT:  So we'll continue on home detention.

12   Within four to six weeks, the probation officer's going to

13   notify you that the Bureau of Prisons is ready for you.  And

14   when they give that notification, you need to go wherever the

15   prison is.

16        Do not file a motion to ask for additional time

17   because this is your opportunity to say goodbye to everyone

18   before you go off to prison.  The Court's going to keep in

19   place the no contact orders.  You're not to contact any of the

20   persons who were listed as witnesses other than your witnesses

21   who are not also the Government's witnesses.  I don't want you

22   to intimidate anyone or make anyone feel bad about anything.

23   Do you understand?

24        THE DEFENDANT:  (Nodded.)

25        MR. ANSELL:  Your Honor, what about his friend that --

1    what was the guy's name?

2              THE COURT:  The blond right there with the pony tail?

3              MR. ANSELL:  Can he spend time with him?

4              THE COURT:  I guess.  Do you have any objection?  I

5    think they have already been spending time.

6              MR. LINDER:  It sounded like that.  No, Your Honor.

7              THE COURT:  Because he's not one of the Government's

8    witnesses.  You are not to go anywhere near any synagogues,

9    Holocaust museums or anything of that nature; do you

10   understand?  Once you have completed your sentence, and you'll

11   be on supervised probation, if they want to allow you to do

12   that as a condition of probation, you can do that then.  But

13   all of the no contact orders that were previously imposed are

14   still imposed.

15             Anything further, lawyers?

16             MR. ANSELL:  Judge, we would ask that the Court allow

17   him to -- I didn't realize that Alex Hitchcock, his best friend

18   since eighth grade who testified here today, we know what he

19   has said.  We know what he would say.

20             THE COURT:  He doesn't need to be visiting with

21   anybody.  You are allowed to go to work, go home and get ready

22   for prison.  That's what the Court wants him to do.

23             MR. ANSELL:  How long does this no contact order last

24   for him?

25             THE COURT:  Until he's sentenced.

1        MR. ANSELL:  Just until he goes to --

2        THE COURT:  Prison.

3        MR. ANSELL:  -- prison, right?

4        THE COURT:  Yes, if they want to come visit him in

5   prison --

6        MR. ANSELL:  After that, it would be okay?

7        THE COURT:  Yes.

8        MR. ANSELL:  Judge, would you recommend that the

9   Bureau of Prisons designate him to a facility with the lowest

10  possible security classification as close as possible to

11  central Indiana?

12       THE COURT:  I will make that recommendation that the

13  Bureau of Prisons designate a facility with low -- as low a

14  classification as he's entitled at a facility as close to

15  central Indiana as possible.

16                      (Brief interruption)

17       Was that his monitoring unit?

18       MR. ANSELL:  The battery's low.

19       THE COURT:  All right.  Anything further, Government.

20       MR. LINDER:  No, Your Honor, thank you.

21       MR. ANSELL:  Thank you, Judge.

22       THE COURT:  All right, good luck.  You need to stay

23  and talk to the probation officer before you leave.

24                  (Court adjourned at 6:35 p.m.)

25

************************************************************

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the

foregoing is a true and correct transcript from reported

proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   August 9th, 2019

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division